# EXHIBIT "E"

City of Philadelphia

City Council
Chief Clerk's Office
402 City Hall
Philadelphia, PA  19107

Legislation Text

**File #:** 200305, **Version:** 1

Amending various sections of The Philadelphia Code to address matters related to the landlord and tenant relationship during the novel coronavirus of 2019 pandemic and otherwise, including providing for payment agreements for tenants with a certified financial hardship related to COVID-19, and making certain technical changes, all under certain terms and conditions.

*THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:*

SECTION 1.

The Council of the City of Philadelphia hereby makes the following legislative findings:

1. On March 6, 2020, in response to the 2019 novel coronavirus disease, COVID-19, the Governor of Pennsylvania issued a Proclamation of Disaster Emergency.

2. On March 11, 2020, the World Health Organization ("WHO") declared the COVID-19 outbreak a global pandemic, defined as the worldwide spread of a new virus for which most people do not have immunity.

3. On March 19, 2020, the Governor of Pennsylvania and Pennsylvania Secretary of Health ordered all non-life-sustaining businesses in Philadelphia and the surrounding counties to close their physical locations to slow the spread of COVID-19.

4. On March 22, 2020, the Mayor and the Commissioner of Public Health jointly issued their second Emergency Order Temporarily Prohibiting Operation of Non-Essential Businesses and Congregation of Persons to Prevent the Spread COVID-19, which remains in effect.

5. On March 23, 2020, the Governor of Pennsylvania issued a Stay at Home Order that applies to Philadelphia and numerous surrounding counties.

6. The local and state orders shut down or reduced the operations of many businesses in Philadelphia. 99.7% of Greater Philadelphia's economy consists of small businesses.

7. On March 16, 2020, the Supreme Court of Pennsylvania issued Orders to prevent the Judiciary from effectuating an eviction, ejectment or other displacement from a residence. The Supreme Court extended these Orders on April 28, 2020. On May 7, 2020, Governor Wolf signed an executive order staying foreclosure and eviction notice requirements for 60 days, thereby tolling the ability to commence the timelines necessary for the initiation of foreclosure and eviction proceedings until July 10, 2020. On May 21, 2020, Governor Wolf amended the May 7, 2020 executive order to apply the revised notice provisions only to matters involving the nonpayment of monies and proceedings related to removal of any tenant solely because the tenant has held over or exceeded the term of a lease.

**File #:** 200305, **Version:** 1

8. The City of Philadelphia is one of the most densely populated cities in the United States of America with an estimated population size of 1.5 million.

9. Philadelphia is also one of the poorest cities in America, where 24.5% or 377,116 Philadelphia residents, live in poverty.

10. Philadelphia has a high population of renters. The number of renters in Philadelphia has rapidly increased in recent years, growing from 40.7% in 2000 to almost half of the population today.

11. Before the pandemic, Philadelphia had the 4th highest eviction rate among large cities, with 1 out of every 14 renters facing eviction each year.

12. More than 300,000 of Philadelphia's renters struggled to afford rent before the COVID-19 pandemic. In 2017, 53.4% of Philadelphia renters were cost-burdened, meaning they paid more than 30% of their income on rent, and 31% of Philadelphia renters were severely cost-burdened, meaning they spent more than 50% of their income on rent.

13. To address the city's affordable housing crisis, Philadelphia City Council established a Tenant Legal Defense Fund in 2017, an anti-eviction task force in 2017, and right to counsel in 2019 to address evictions.

14. The number of Philadelphians struggling to pay rent has undoubtedly increased since the onset of the COVID-19 pandemic, as at least 1.9 million Pennsylvanians and over 120,000 Philadelphians have filed for unemployment since March 2020, exacerbating already-existing financial burdens.

15. When the judicial emergency is lifted, there is an estimated backlog of 5,000 eviction cases in Philadelphia Municipal Court.

16. The average annual cost for the City of Philadelphia to provide shelter to a family of four is $58,000.

17. According to current projections from the Mayor's Office, as a result of the COVID-19 pandemic, the estimated revenue losses, federal reimbursements, and expense increases indicate that the City's Fiscal Year 2021 budget must include $649 million of reductions to planned spending, reduced reserves and new revenue sources compared to the original Fiscal Year 2021 budget, proposed on March 5th, 2020, to close the budget gap.

18. The Mayor's revised Fiscal Year 2021 budget, submitted to Council on May 1, 2020, included steep cuts to many affordable housing programs and initiatives that serve the City's most vulnerable populations, including reductions in funding for the preservation and construction of affordable housing units, rental assistance programs, low-income home repair programs, the Philly First Home program and the Philadelphia Eviction Prevention Project.

19. In May 2020, the City of Philadelphia used approximately $10 million in federal funds to create PHL Rent Assist, a rental assistance program that aimed to provide rental assistance to 3,000-4,000 families. Approximately 13,000 Philadelphians--three to four times the number of families that could be funded--applied for this program.

20. The COVID-19 pandemic's negative impact on the lives and incomes of Philadelphians, and City

**File #:** 200305, **Version:** 1

revenues, has exacerbated the pre-existing housing crisis and created a housing emergency in the City of Philadelphia. The measures identified below are necessary to ensure residents are able to remain in their homes, and small businesses are able to stay in business.

SECTION 2.  Title 9 of The Philadelphia Code is hereby amended to read as follows:

TITLE 9. REGULATION OF BUSINESSES, TRADES AND PROFESSIONS

\* \* \*

CHAPTER 9-800. LANDLORD AND TENANT

§ 9-802.  Definitions.

\* \* \*

(5)   Unfair Rental Practice. Any act in violation of [§ 9-804.] *§§ 9-804 or 9-809.*

\* \* \*

*§ 9-809.  COVID-19 Emergency Housing Protections.*

*(1)        Definitions. The following definitions apply to this Section 9-809 only:*

*(a) Certification of Hardship. A signed written statement, which may be signed by use of a typed electronic signature and provided electronically or may be provided in hard copy, that is subject to the provisions of Section 1-108 of the Code (Certification), and is submitted by an individual with personal knowledge of the facts set forth therein stating, at minimum, as follows, provided that any initial statements may be further supplemented with additional explanation, facts, or support at any time:*

*(i) In the case of a residential tenant, that a residential tenant has lost income due to the pandemic and setting forth facts that provide an explanation of the COVID-19 financial hardship suffered.*

*(ii) In the case of a commercial tenant, that a small business has suffered a small business financial hardship and setting forth facts supporting such financial hardship.*

*(b)        COVID-19 emergency period.  The period beginning on the date the ordinance adding Section 9-809 to the Code becomes law and ending August 31, 2020.*

*(c)        COVID-19 financial hardship.  A tenant's or tenant's household member's loss of income due to any one or more of the following during the COVID-19 emergency period or the retroactive emergency period:*

**File #:** 200305, **Version:** 1

*(i) A diagnosis of the disease caused by the 2019 novel Coronavirus, known as COVID-19.*

*(ii) The need to quarantine or self-quarantine due to the advice of a health care provider; due to symptoms of COVID-19, such as fever, dry cough, or shortness of breath; after the return of an individual to the United States after travel to a Tier 2 or Tier 3 country as defined by the United States Center for Disease Control ("CDC") with respect to COVID-19; or as the result of having come into contact with an individual who has been diagnosed with COVID-19.*

*(iii) The need to care for a family member or a member of the tenant's household as the result of such family or household member's diagnosis of COVID-19 or self-quarantine for purposes described in subparagraph 9-809(1)(c)(ii).*

*(iv) The need to care for a family member of a member of the tenant's household as the result of the closure of a school, daycare, adult care facility, or other care facility where care would otherwise be provided for such family or household member.*

*(v) The inability to work as the result of a requirement by the Governor, the Secretary of Health of the Commonwealth of Pennsylvania, the Mayor, or the Health Commissioner that businesses, or a particular type of business, must remain closed.*

*(vi) The inability to work as the result of such tenant or such tenant's household member being at a greater risk of harm than the general population if such person or such person's household member contracts COVID-19, such as those with compromised immune systems, the elderly, or those who have self-quarantined as the result of the recommendation of a health care professional, the CDC, the Governor, the Secretary of Health of the Commonwealth of Pennsylvania, the Mayor, or the Health Commissioner.*

*(vii) The inability to work as a result of a requirement by the Governor, the Secretary of Health of the Commonwealth of Pennsylvania, the Mayor, or the Health Commissioner that residents of certain areas of the Commonwealth must not travel, and such travel would be necessary to report to work.*

*(viii) The loss of a job, the reduction of work hours offered to such tenant or such tenant's household member, or a reduction in the salary or hourly wage paid to such tenant or such tenant's household member, whether permanent or temporary.*

*(ix) The inability to commence or obtain employment.*

*(x) The need to financially support a family member due to the family member or a household member of such family member's loss of income for any one or more of the reasons set forth in this paragraph 9-809(1)(c).*
*.*

*(d) Landlord. An owner of a rental premises and any agent, or other*

**File #:** 200305, **Version:** 1

*person, operating or managing a rental premise on behalf of an owner.*

*(e)   Retroactive emergency period.  The period beginning March 1, 2020 and continuing through the effective date of the ordinance adding this Section 9-809 to the Code.*

*(f)   Small business. A person that employs fewer than 100 total employees, wherever located, whether within the City of Philadelphia or elsewhere.*

*(g)   Small business financial hardship.  A small business's documented loss of income due to one or more of the following during the COVID-19 emergency period or the retroactive emergency period:*

*(i)   A requirement or recommendation by the Governor, the Secretary of Health of the Commonwealth of Pennsylvania, the Mayor, or the Health Commissioner that businesses in a particular area, or a particular type of business, remain fully or partially closed.*

*(ii)   The owner or operator, a key employee, or a significant number of employees of the small business being unable to work as a result of the circumstances set forth in subparagraphs 9-809(1)(c)(i), (ii), (iii), (iv), (vi), or (vii).*

*(iii)   The loss of customers or reduction of business from customers as a result of the COVID-19 pandemic, or related recommendations or requirements of the Governor, the Secretary of Health of the Commonwealth of Pennsylvania, the Mayor, or the Health Commissioner.*

(2)   Purpose.  This Section 9-809 shall apply in addition to any other provisions in this Chapter 9-800, or any provisions of a lease entered into between a tenant and landlord.  If the provisions of this Section 9-809 conflict with any other provisions of Chapter 9-800 or the provisions of any lease that otherwise governs a landlord tenant relationship, the provisions of this Section 9-809 shall control.

(*)  Mandatory Hardship Repayment Agreement for Residential Tenants with a Certified Financial Hardship as the Result of the COVID-19 Pandemic.

(a) Financial Hardship.  Except as provided in paragraph (g) below, any residential tenant that has suffered a COVID-19 financial hardship during the retroactive emergency period or the COVID-19 emergency period, and has failed to pay rent as normally due at any point prior to the end of the COVID-19 emergency period shall have the right to enter into a hardship repayment agreement as set forth in subparagraphs (b)(i) through (iii), below, without incurring any penalty.  Such tenant shall be considered in full compliance with any payment obligations under such tenant's lease, and any associated payment agreements, provided such tenant provides such tenant's landlord the following and thereafter enters into a hardship repayment agreement:

(i)   A certification of hardship; and

(ii)   Documentary evidence of the loss of income or increases in expenses the tenant has incurred during the retroactive emergency period or the COVID-19 emergency period as a result of such tenant's COVID-19 financial hardship, or if such documentation cannot be reasonably provided, a further certification explaining why such documentation is not available which may be signed by use of a typed electronic signature and provided electronically or may be provided in hard copy, that is subject to the

**File #:** 200305, **Version:** 1

provisions of Section 1-108 of the Code (Certification).

(b)  Hardship Repayment Agreement.  Any landlord whose residential tenant qualifies for a hardship repayment agreement pursuant to paragraph (a), "Financial Hardship," shall enter into a repayment agreement with such tenant to pay past due rent pursuant to the following terms:

(i) The tenant shall pay the full amount of past due rent to the landlord within nine (9) months after the last day of the COVID-19 emergency period.

(ii) Beginning the first day of the month following the COVID-19 emergency period, and every month thereafter, the tenant shall pay:

(.1) The full monthly rate of rent as normally due; plus

(.2) At a minimum, the lesser of the following: thirty percent (30%) of the full monthly rate of rent due during the COVID-19 emergency period, or the total amount of past due rent divided by nine (9).

(iii) No late fees or other charges related to past due rent may be charged during the retroactive emergency period, the COVID-19 emergency period, and the nine (9) months thereafter.

(iv) If the tenant does not renew or extend the term of the lease, at the end of the term of the lease, the landlord may apply any security deposit towards any past rent due.

(c)  Prohibition on Hardship Repayment Agreements Reduced to Judgment.  It shall be unlawful for a landlord to require or request a residential tenant who has suffered a COVID-19 financial hardship to memorialize a hardship repayment agreement entered into pursuant to subparagraph (b), "Hardship Repayment Agreement," in a judgment by agreement, consent order, a consent judgment, or similar court order.

(d)  Notice Required and Limitation on Eviction for Nonpayment of Past Due Rent.  In addition to any other limitations set forth under this Section 9-809, until nine (9) months after the last day of the COVID-19 emergency period the nonpayment of rent shall not be a legal basis to evict a tenant unless the following conditions are met:

(i) With respect to a tenant that has not entered into a hardship repayment agreement or requested to enter into a hardship repayment agreement, the landlord has provided the tenant written notice regarding the tenant's rights under this subsection, "Mandatory Hardship Repayment Agreement for Tenants with a Certified Financial Hardship as the Result of the COVID-19 Pandemic," as provided under subsection, "Notice, Forms, and Regulations" of this section 9-809 at least thirty (30) days prior to the date a landlord takes any such action and, if applicable,

(ii) With respect to a tenant who has the right to enter into a hardship repayment agreement and has requested to enter into such an agreement at any point prior to the end of the thirty (30) day notice period in subparagraph (d)(i), above, but has not yet entered such an agreement, the eviction action is based on a failure to pay the ongoing monthly rate of rent as it is normally due after the end of the COVID-19 emergency period.

(iii) With respect to a tenant who has entered into a hardship repayment agreement, the eviction

**File #:** 200305, **Version:** 1

*action is either (.1) based on a failure to pay the ongoing monthly rate of rent as it is normally due after the end of the COVID-19 emergency period; or (.2) the tenant is in arrears in an amount equal to four or more monthly payments required under clause (b)(ii)(.2) of paragraph (b), "Hardship Repayment Agreement."*

*(e)  In addition to any other limitations set forth under this Section 9-809, the Code, or any other applicable law, until nine (9) months after the last day of the COVID-19 emergency period it shall be unlawful for a landlord to take any steps in furtherance of recovering possession of a residential premises occupied by a tenant or a guest of a tenant, on any basis other than a legal basis for eviction.  For the purposes of this paragraph, sending a notice required under this Section 9-809 or participating in an eviction diversion or mediation program established by the City shall not be considered taking steps in furtherance of recovering possession of a residential premises.*

*(f)     Forms.  The Commission, or such other City department or office as the Mayor may designate, is authorized to create a form to be used by landlords and tenants entering into a hardship repayment agreement as provided for under paragraph (a) of this subsection and a form for notice under paragraph (c) of this subsection.*

*(g)     This subsection "Mandatory Hardship Repayment Agreement for Residential Tenants with a Certified Financial Hardship as the Result of the COVID-19 Pandemic," shall not apply if one or more of the following conditions are applicable to the residential tenant, or the residential premises occupied:*

*(i)     The tenant receives a federal housing subsidy pursuant to 42 U.S.C. § 1437f that is not a tenant-based subsidy; or*

*(ii)    The tenant receives a federal housing subsidy administered by the U.S. Department of Housing and Urban Development; or*

*(iii)   A loan financing the residential premises is insured or assisted under 12 U.S.C. § 1701q, § 1715l(d)(3), or § 1715z-1; or 42 U.S.C. § 1485.*

*(\*) Notice, Forms, and Regulations.*

*(a)  Required Notice.     Any notice that a landlord is required to provide a tenant under this Section 9-809 shall be provided in writing, by hand delivery or certified United States mail with proof of mailing, and must provide notice of the tenant's rights under this Section 9-809 as well as clear information on how the tenant may exercise such rights, including the following specific text or such other language that may be included in a form created by the City pursuant to paragraph (b), "Forms and Regulations," (below):*

> *YOU MAY BE ELIGIBLE FOR CERTAIN HOUSING PROTECTIONS.  IF YOU HAVE EXPERIENCED A FINANCIAL HARDSHIP DUE TO COVID-19 THIS MAY INCLUDE, BUT IS NOT LIMITED TO, A NINE (9) MONTH REPAYMENT PLAN TO PAY PAST DUE RENT.  YOU MUST PROVIDE YOUR LANDLORD A CERTIFICATION OF HARDSHIP TO QUALIFY FOR SOME OF THESE PROTECTIONS.*

*(b)  Forms and Regulations. The Commission, or such other City department or office as the Mayor may designate, is authorized to issue regulations implementing this Section 9-809, and to create*

**File #:** 200305, **Version:** 1

*forms to be used by landlords and tenants under this Section 9-809 including but not limited to, a certification of hardship form, a hardship repayment agreement form, and a form of required notice.*

*(\*) Defenses. The failure of the landlord to comply with any obligation under this Section 9-809 may be asserted as a defense by a tenant in an action before any adjudicatory body and may not be waived.*

*(\*) Severability. If any provision of this Section 9-809 or application thereof to any persons or circumstances is judged invalid by a court of competent jurisdiction, the invalidity shall not affect other provisions or applications of the Ordinance that can be given effect without the invalidated provision or application and to this end the provisions of the ordinance are declared severable.*

\*     \*     \*

SECTION 3. This ordinance shall be effective immediately, with the exception of any provisions applicable during the retroactive emergency period, as defined in Section 2 which shall be effective as of March 1, 2020.