**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **HAPCO** : | |
| 2101 Chestnut Street : | |
| Suite 1615 : | |
| Philadelphia, PA 19103 : | CASE NO. 20-03300-CMR |
| : | |
| Plaintiff, : | |
| : | |
| v. : | |
| : | |
| **CITY OF PHILADELPHIA** : | |
| c/o Law Department : | |
| 1515 Arch Street : | |
| Philadelphia, PA 19102 : | |
| : | |
| and : | |
| : | |
| **THE HONORABLE JAMES KENNEY** : | |
| City Hall : | |
| Office 215 : | |
| Philadelphia, PA 19107, : | |
| : | |
| Defendants. : | |
| : | |

**FIRST AMENDED VERIFIED COMPLAINT**

Plaintiff, HAPCO ("HAPCO"), on behalf of its members (hereinafter HAPCO and its members referred to as "Plaintiffs"), by and through their undersigned counsel, allege the following causes of action challenging the Emergency Housing Protection Act, which is comprised of five (5) Bills (attached hereto as Exhibits A-E) passed by Philadelphia City Council on June 18, 2020 and signed into law by The Honorable James Kenney, Mayor of Philadelphia, on July 1, 2020 (the "Act"):

## INTRODUCTION

1.     This First Amended Verified Complaint is being filed by Plaintiffs to protect their rights and the rights of all property owners who rent their properties to tenants ("landlords") in the City of Philadelphia from the unconstitutional legislation promulgated by Defendants.

2.     Defendants passed the Act in a purported effort to address concerns from small business and residential tenants in Philadelphia arising from the COVID-19 pandemic.

3.     The Act, however, places ***all*** of the financial burden for a perceived rental crisis in Philadelphia on the City's landlords.

4.     Significantly, the Act unilaterally rewrites every residential and small business lease in Philadelphia to add terms and make void existing terms that were previously negotiated between landlord and tenant.  Landlords are forced to accept these terms, which include:

- requiring that landlords participate in an Eviction Diversion Program before seeking to reclaim possession of their properties from tenants who fail to pay rent.  Exhibit A, Bill 200294 at 2(a)(i).

- voiding lease terms for any late fees or interest due on back rent until May 31, 2021, thus allowing tenants to remain in properties without paying rent that is due and owing.  Exhibit C, Bill 200302 at *(a).

- prohibiting landlords from seeking to evict tenants for failing to pay rent for a period lasting up to May 31, 2021, unless certain limited conditions are satisfied. Exhibit B, Bill 200295 at (2); Exhibit E, Bill 200305 at *(e).

- compelling landlords to enter into "hardship repayment agreements" to allow tenants to pay – interest and penalty free – by May 31, 2021 any past due rent accumulated from March 2020 to August 31, 2020.  Exhibit E, Bill 200305 at *(a)(i)-(iii).

5.     While the Act claims to address hardships arising from the COVID-19 pandemic, its findings make clear that Philadelphia renters were experiencing financial difficulties well before then:  "More than 300,000 of Philadelphia's renters struggled to afford rent before the COVID-19 epidemic. In 2017, 53.4% of Philadelphia renters were cost-burdened, meaning they

paid more than 30% of their income on rent, and 31% of Philadelphia renters were severely cost-burdened, meaning they spent more than 50% of their income on rent." Exhibit A, Bill No. 200294 at ¶ 12; Exhibit B, Bill No. 200295 at ¶ 12; Exhibit C, Bill No. 200302 ¶ 12; Exhibit D, Bill No. 200304 ¶ 12; and Exhibit E, Bill No. 200305 ¶ 12.

6.      The Act violates the United States and Pennsylvania Constitutions in significant and profound ways, including violating the Contracts Clauses of the United States and Pennsylvania Constitutions, the Takings Clauses of the United States and Pennsylvania Constitutions, and the Due Process provisions of the United States and Pennsylvania Constitutions. In addition, the Act is preempted by the Pennsylvania Landlord and Tenant Act of 1951 (the "Landlord-Tenant Act").

7.      Accordingly, Plaintiffs bring this action pursuant to (a) 42 U.S.C. § 1983 for violations of rights guaranteed by the Fifth Amendment, Fourteenth Amendment and Article I, Section 10 of the United States Constitution, and (b) the Pennsylvania Declaratory Judgments Act for violations of rights guaranteed under Article I, Sections 1, 10 and 17 of the Pennsylvania Constitution.

8.      The Act purports to address hardships faced by Philadelphia renters as a result of the COVID-19 pandemic, of which Plaintiffs are sympathetic. Indeed, Plaintiffs rely upon small business and residential renters for their lifeblood – when they struggle, so do landlords.

9.      But, while some Philadelphia renters undoubtedly face struggles as a result of the COVID-19 pandemic, Defendants cannot violate the constitutional rights of landlords to address those issues. Defendants are not permitted to use the COVID-19 pandemic to address the historical struggles faced by renters that predate the pandemic, or to force Philadelphia's

landlords to shoulder all of the financial burden to cure Defendants' past failures to address those issues, or for current issues related to the COVID-19 pandemic.

10.     Plaintiffs seek through this action, among other relief, a declaration that the Act is: (1) unconstitutional on its face for violating the United States and Pennsylvania Constitutions; (2) unconstitutional on its face for depriving Plaintiffs of their due process rights under the United States and Pennsylvania Constitutions; and (3) pre-empted by the Landlord-Tenant Act. Plaintiffs seek injunctive relief to enjoin Defendants from enforcing the Act, attorney's fees and costs pursuant to 42 U.S.C. § 1988 for the work performed by counsel in this litigation, and for such other and further relief as the Court deems just and appropriate.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over Plaintiffs' claims asserted under federal law pursuant to 28 U.S.C. §§ 1331 and 1343.

12.     This Court has jurisdiction over Plaintiffs' claims asserted under the Constitution and laws of the Commonwealth of Pennsylvania pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants are located within this district and a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## THE PARTIES

14.     HAPCO at all relevant times, is and was a Pennsylvania non-profit company organized and authorized to do business in the Commonwealth of Pennsylvania, with an address of 2101 Chestnut Street, Suite 1615, Philadelphia, PA 19103.  HAPCO is comprised of nearly 1,900 members that own or manage more than 10,000 residential and commercial properties in Philadelphia, Pennsylvania.  Among other things, HAPCO serves as an advocate for its members

at the local, county, state and federal levels of government.  In addition, HAPCO provides education and training to its members concerning, among other subjects, laws that impact Philadelphia landlords and the eviction process in Philadelphia.

15.     HAPCO members own and/or manage residential and commercial properties throughout Philadelphia, and many of their tenants have suffered "COVID-19 Financial Hardships" as defined in the Act.  Consequently, HAPCO members are directly impacted by the Act and would have standing to challenge the Act in their own right.

16.     Significantly, now that the Act has been signed into law, HAPCO members are certain to receive "Certification[s] of Hardship" from their tenants that allow them to reside rent-free in the landlords' property for the length of the COVID-19 Emergency Period, and in some cases, through May 31, 2021 without paying penalty or interest.

17.     Indeed, Defendants cannot contest that fact given the legislative findings set forth in the Act, which note that "Philadelphians struggling to pay rent has undoubtedly increased since the onset of the COVID-19 pandemic…."  Exhibits A-E at ¶ 14.

18.     As of this filing, many of Plaintiffs' tenants have defaulted under their lease agreements because they have suffered a "COVID-19 financial hardship" under the Act.

19.      Despite the default, some of which occurred immediately after the onset of COVID-19 in March 2020, Plaintiffs are barred from repossessing leased property, except under certain limited conditions that does not include the failure to pay rent.

20.     The Act unquestionably will be enforced against any HAPCO member who initiates eviction proceedings against a defaulting tenant during the COVID-19 Emergency Period, and in some cases through May 31, 2021, even though many tenants have been in default since before the onset of the pandemic.

21.     The interests at stake in this litigation are germane to HAPCO's purpose, and neither the claims asserted herein nor the relief requested requires the participation of individual HAPCO members in this lawsuit.  Thus, HAPCO has standing to assert the claims set forth herein.

22.     Defendant City of Philadelphia (the "City") is a First Class City of the Commonwealth of Pennsylvania with an address in care of Law Department, 1515 Arch Street, Philadelphia, PA 19107.

23.     Defendant The Honorable James Kenney is the Mayor of Philadelphia with an address of City Hall, Room 215, Philadelphia, PA 19107.  He is made a party to this action in his official capacity to enjoin the enforcement of the Act.

## FACTUAL ALLEGATIONS

24.     The COVID-19 pandemic has wrought serious and unprecedented economic damage throughout the United States.  It has resulted in the loss of more than 100,000 American lives and changed, almost overnight, the way in which we live.  Much work will need be done by the public and private sectors in the coming days, weeks, months and years to recover from this disaster.

25.     In response to the outbreak, Pennsylvania Governor Tom Wolf issued a declaration of emergency on March 6, 2020.

26.     In addition, Governor Wolf issued an Executive Order on March 7, 2020 that suspended all evictions and foreclosures in the Commonwealth until July 10, 2020.

27.     The Pennsylvania Supreme Court, which has authority over the courts of the Commonwealth, previously closed court eviction proceedings until May 11, 2020.

28.     On March 22, 2020, Governor Wolf amended his Executive Order by specifying that it only applied to evictions and foreclosures due to a failure to pay rent or because a tenant has overstayed their lease.

29.     On March 22, 2020, Mayor Kenney issued a Stay-at-Home Order, effective March 23, 2020.

30.     On July 9, 2010, one day before Governor Wolf's March 22, 2020 Executive Order was set to expire, Governor Wolf again amended the Executive Order, which purports to prohibit evictions up to and including August 31, 2020.

31.     Against this backdrop, and with the Executive Order allowing evictions to proceed after August 31, 2020, Defendants passed the Act in a purported effort to assist Philadelphia renters who are facing eviction for failing to pay rent as a result of the COVID-19 pandemic.[1]

32.     The Act's five Bills amend Chapter 9-800 of the Philadelphia Code, which governs landlords and tenants in the City.

33.     Each of the Bills contain the same legislative findings, including the following that relate not to the COVID-19 pandemic, but to Philadelphia's *historical* problems facing renters:

> Philadelphia is also one of the poorest cities in America, where 24.5% or 377,116 Philadelphia residents, live in poverty.

> Philadelphia has a high population of renters.  The number of renters in Philadelphia has rapidly increased in recent years, growing from 40.7% in 2000 to almost half of the population today.

---

[1] On July 13, 2020, the Philadelphia Municipal Court Civil Division announced its phased reopening with President Judge Administrative Order No. 48 of 2020, which directs landlords to review the Act before initiating eviction proceedings.

Before the pandemic, Philadelphia had the 4th highest eviction rate among large cities, with 1 out of every 14 renters facing eviction each year.

More than 300,000 of Philadelphia's renters struggled to afford rent before the COVID-19 pandemic. In 2017, 53.4% of Philadelphia renters were cost-burdened, meaning they paid more than 30% of their income on rent, and 31% of Philadelphia renters were severely cost-burdened, meaning they spent more than 50% of their income on rent.

To address the city's affordable housing crisis, Philadelphia City Council established a Tenant Legal Defense Fund in 2017, an anti-eviction task force in 2017, and right to counsel in 2019 to address evictions.

Exhibits A-E at ¶¶ 9-13.

34.     The Bills go on to speculate that the "number of Philadelphians struggling to pay rent has undoubtedly increased since the onset of the COVID-19 pandemic … and over 120,000 Philadelphians have filed for unemployment since March 2020, exacerbating already-existing financial burdens."  *Id.* at ¶ 14.  Thus, Philadelphia City Council, in passing the Act, surmised that Philadelphia renters will struggle to pay rent in the future due to the COVID-19 pandemic. *Id.* at ¶ 14.

35.     But the Act's findings regarding the financial impact renters will face as a result of COVID-19 is purely speculative.  For example, if any of the "over 120,000 Philadelphians" who filed for unemployment earned less than $60,000 a year (highly likely where, as the legislative findings note, nearly 25% of the City lives in poverty), they could be making *more* money now through unemployment compensation and the CARES Act supplement for unemployment.[2]   Yet those tenants could claim a COVID-19 financial hardship and decide not

---

[2] The CARES Act gives jobless workers an additional $600 per week in unemployment benefits, which is 156% larger than the current nationwide average weekly payment of $385.  Greg Iacurci, "Unemployed workers could get more than 100% of their paycheck under the coronavirus bill," CNBC, https://www.cnbs.com/2020/03/27/how-unemployed-workers-could-get-more-than-100percent-of-their-paycheck.html.  In Pennsylvania, the "breakeven point", or the point "below which a worker would make more money on unemployment" *with* the $600 supplement, is roughly $60,000. *Id.*  This means that tenants making $60,000 or less are actually making *more money* during the

to pay rent without a landlord ever knowing that the tenant was making more money than before the COVID-19 pandemic.

36.     Moreover, the Act's findings do not account for medical professionals, emergency workers and other similarly situated individuals who are making more money in overtime now due to the urgent need for their services.

37.     While the Act is silent on how City Council came up with its legislative findings on the supposed impact of COVID-19 on renters, the Act provides *absolutely no way* for landlords to challenge a tenant's claim of financial hardship.  To the contrary, a tenant can claim anything they want and the landlord is forced to accept the representation. Thus, the Act requires landlords to take City Council's findings and renters' hardship claims on good faith.

38.     The Bills further note that once the Executive Order is lifted, "there is an estimated backlog of 5,000 eviction cases in Philadelphia Municipal Court." *Id.* at ¶ 15. Significantly, those evictions may not proceed during the COVID-19 emergency period (*see* fn. 3 *infra.*) even though they were instituted *before* the COVID-19 emergency period began.  That is, the reasons for those evictions have absolutely nothing to do with anything related to COVID-19.[3]

39.     The legislative findings conclude by noting that, the "COVID-19 pandemic's negative impact on the lives and incomes of Philadelphians, and City revenues, has exacerbated

---

COVID-19 emergency period than they would with traditional unemployment compensation benefits.  These tenants will continue to receive the additional $600 payment until July 31, 2020.

[3] Given the improper cessation of evictions under the Act, an additional backlog of eviction cases will result that will have a disastrous impact on a landlord's ability to seek repossession of their properties.  Indeed, it is not a stretch to believe landlords will have to wait more than a year just to have an eviction proceeding come before a judge.

the *pre-existing* housing crisis and created a housing emergency in the City of Philadelphia.  The measures identified [in the Act] are necessary to ensure residents are able to remain in their homes, and small businesses are able to stay in business."  *Id.* at ¶ 20 (emphasis added).

40.     Plaintiffs do not dispute the significant impact the COVID-19 pandemic has had, and will continue to have, on the economy, including the ability of some residential and small business tenants to pay rent.  However, the manner in which Defendants have sought to address these real issues violates Plaintiffs' rights and foists upon Philadelphia's landlords all of the financial burden related to Philadelphia renters.

41.     Specifically, the Act amends Chapter 9-800 of the Philadelphia Code to provide the following "COVID-19 Emergency Housing Protections":

a.      the creation of an Eviction Diversion Program for residential tenants that requires a "conciliation conference between landlord and tenant that has experienced a COVID-19 financial hardship to mediate an agreement for asserted residential lease violations."[4] Exhibit A, Bill 200294 at 2(a)(i).  A landlord is prohibited from taking "steps in furtherance of recovering possession of a residential property occupied by a tenant who suffered a COVID-19 financial hardship other than providing a notice required under this [section] without first participating in a conciliation conference ...."[5]  *Id.* at 2(b).  The requirement to participate in the Eviction

---

[4] The Act defines "COVID-19 financial hardship" as a "tenant's or tenant's household member's loss of income due to any one or more" of several criteria.  Exhibit A, Bill 200294 at (1)(c)(i)-(x).  Significantly, the "loss of income" for residential tenants is provided through a "Certification of Hardship" without the need for any supporting documentation to demonstrate an actual "loss of income."  *Id.* at (1)(a).

[5] Two exceptions apply to this requirement:  (1) the eviction is "necessary to cease or prevent an imminent threat of harm by the person being evicted"; or (2) a date for the conciliation conference cannot be provided within thirty days of the landlord's initial request – but the landlord must still participate in a conciliation conference when it becomes available (if prior to an eviction judgment being issued).  Exhibit A, Bill 200294 at 2(b)(i)-(ii).

Diversion Program, notwithstanding that it is not contained in any lease agreement between landlord and tenant, is an obligation that is being compelled by Defendants. The Act provides no way for landlords to challenge whether a tenant has, in fact, suffered a COVID-19 financial hardship, thus depriving landlords of any way to confirm whether a tenant has a true hardship or not. HAPCO members are forced to accept as true that their tenants have been financially impacted by COVID-19 without verifying the nature or extent of their hardship.

   b. making it unlawful during the COVID-19 emergency period (*i.e.*, until August 31, 2020)[6] to evict a residential tenant in Philadelphia except to "prevent an imminent threat of harm by the person being evicted, including physical harm or harassment …." Exhibit B, Bill 200295 at (2)(*Residential Eviction Relief). Under this provision, "it shall be unlawful for a landlord to take any steps in furtherance of recovering possession of a residential premises rented by a tenant on any other basis" even based upon a preexisting lease between landlord and tenant. *Id.* HAPCO members have been forced to allow defaulting tenants who have failed to pay rent to remain in their properties rent-free since March 2020.

   c. making it unlawful during the COVID-19 emergency period (*i.e.*, until August 31, 2020) to evict a small business tenant[7] that provides a "certification of hardship"[8] except to "prevent an imminent threat of harm by the person being evicted, including physical harm or

---

[6] The Act defines the "COVID-19 emergency period" as beginning on the date the Act becomes law and ending on August 31, 2020. *See, e.g.,* Exhibit B, Bill 200295 at (1)(b).

[7] The Act defines "small business" as one that employs fewer than 100 total employees whether within the City of Philadelphia or elsewhere. Exhibit B, Bill 200295 at (1)(f).

[8] The Act defines "small business financial hardship" as a small business's "documented loss of income" due to one or more of several consequences of the COVID-19 pandemic. Exhibit B, Bill 200295 at (1)(g). However, the Act does not define or explain how to document a loss of income.

harassment ….." *Id.* at (\*Commercial Eviction Relief).  Under this provision, "it shall be unlawful for a landlord to take any steps in furtherance of recovering possession of a commercial premises rented by such small business on any other basis" even based on a preexisting lease between landlord and tenant.  *Id.*  The Act provides no way for landlords to challenge whether a small business tenant has, in fact, suffered a financial hardship, thus depriving landlords of any way to confirm whether a tenant has a true hardship or not.

        d.        making it unlawful from the "retroactive emergency period" (*i.e.,* March 1, 2020)[9] until nine months after the COVID-19 emergency period (*i.e.*, until May 31, 2021) for "any landlord to charge or accept the payment of late fees, interest on back rent, or similar charges as the result of delinquent payment of rent with respect to a residential premises" where a residential tenant claims a COVID-19 financial hardship.  Exhibit C, Bill 200302 at \*(a)(Temporary Waiver of Certain Fees).  This prohibition applies notwithstanding lease terms to the contrary – indeed, any such lease terms "shall be void and non-enforceable" pursuant to the Act.  *Id.* HAPCO members have leases that contain provisions for late fees and interest, but the Act prohibits them from enforcing those provisions.  HAPCO members are thus barred from being compensated for the full value of the financial loss they incurred not only during the COVID-19 emergency period, but for nine-months afterward.

        e.        forcing landlords to enter into "hardship repayment agreements" with any residential tenant that has suffered a COVID-19 financial hardship (fn. 1, *supra.*) during the "retroactive emergency period" (*i.e.,* March 1, 2020) and has failed to pay rent at any point

---

[9] The Act defines the "retroactive emergency period" as the "period beginning on March 1, 2020" even though Governor Wolf did not issue an emergency declaration until March 6, 2020.

during the COVID-19 emergency period (*i.e.*, until August 31, 2020) upon the provision by the tenant of a certification of hardship and, at a minimum, a certification of a loss of income or increased expenses.  Exhibit E, Bill 200305 at *(a)(i)-(ii).  Notwithstanding any lease entered into prior to the Act, the "hardship repayment agreement" requires landlords to allow residential tenants until May 31, 2021 to pay – interest free and without any penalty – any past due rent.  *Id.* at (b)(i)-(iii).

   f. making it unlawful until nine months after the COVID-19 emergency period (*i.e.*, until May 31, 2021) for a "landlord to take any steps in furtherance of recovering possession of a residential premises occupied by a tenant or a guest of a tenant, on any basis other than a legal basis for eviction."[10]  *Id.* at (e).  That is, a landlord may not seek to take possession of property until May 31, 2021 other than to prevent an imminent threat of harm by the person being evicted, including physical harm or harassment, or in certain limited circumstances where a tenant, despite additional notice from a landlord, continues to be unable to meet their rent obligations, even after the COVID-19 emergency period has ended.[11]

---

[10] The conditional "legal bas[es]" for eviction place the onus on landlords to first notify tenants of their ability to enter a "hardship repayment agreement" if tenants have not already exercised that unconditional right.  *See* Exhibit E, Bill 200305(d)(i).  If a landlord notifies a tenant of their right to enter a "hardship repayment agreement," and the tenant neglects to enter one within 30-days of receiving notice, a landlord may only evict a tenant if the tenant fails to "pay the ongoing monthly rate of rent as it is normally due after the end of the COVID-19 emergency period."  *Id.* at (d)(i)-(ii). If a tenant *has* previously entered a hardship repayment agreement, a landlord may only evict a tenant if the tenant continues in their failure to pay their monthly rent, or if they are "in arrears in amount equal to *four or more* monthly payments required under clause (b)(ii)(2) of paragraph (b)."  *Id.* (d)(iii) (emphasis added).  In either case, the landlord *cannot* charge interest or late fees during the nine-month period following the end of the COVID-19 emergency period.  *Id.* at (b)(i)-(iii).

[11]  This provision appears to conflict with Bill 200295 (Exhibit A), which allows for evictions following the COVID-19 emergency period (i.e., after August 31, 2020).  Bill 200305 is unclear as to whether the nine-month extension for evictions is based on a tenant entering into a hardship repayment agreement, which represents another failing of the Act.

42.     HAPCO members are directly impacted by the Act.  For example, HAPCO member Victor Pinckney manages properties for other HAPCO members where at least one tenant has failed to pay rent since before and through the COVID-19 emergency period.  An eviction hearing for that tenant was scheduled for July 14, 2020, but the Act prohibits him from evicting the breaching tenant.  Other HAPCO members are in the same position as Mr. Pinckney.

43.     In addition, Mr. Pinckney owns properties where at least one tenant has failed to pay rent as required under the lease during the COVID-19 emergency period due to a COVID-19 financial hardship. Although he has not received a certification of hardship from that tenant, he expects that one will be received to prevent an eviction.  Other HAPCO members are in the same position as Mr. Pinckney.

44.     Upon receiving a certification of hardship, tenants can remain in the property rent free.  Landlords, like Mr. Pinckney and other HAPCO members, cannot obtain late fees or interest even where permitted by lease agreements, and they are compelled to enter into hardship repayment agreements with their tenants.

45.     The impact and injury on HAPCO members and other landlords cannot be disputed. Indeed, the Motion to Intervene filed by Tenant Union Representative Network and Philadelphia Unemployment Project demonstrates that the harm to HAPCO members and other landlords is not speculative – the reason they sought to intervene is to prevent Plaintiffs from obtaining the relief they seek, which would result in the admitted eviction of their members who are suffering from COVID-19 financial hardships.  *See, e.g.,* Memorandum in Support of Motion to Intervene at p. 2 ("TURN and PUP seeks to intervene … because of the very real risk that a victory by the Plaintiffs will result in the disruptive displacement and homelessness of countless low-income Philadelphians and people of color in the midst of a pandemic ….").

46.     Plaintiffs, as well as other landlords throughout the City, are still required to pay their mortgages, property taxes and other expenses related to their leased properties.  There is no similar COVID-19 financial hardship provision in the Act for landlords to obviate the requirement to pay their lenders or their City tax bills.  Nor is there any Diversion Program or hardship repayment agreements available to landlords who find themselves in financial difficulty because the Act allows their tenants not to pay rent when it is due.[12]

47.     Landlords depend upon rental payments to meet their obligations – including those to lenders, for property taxes and for maintenance of the property.  Without rental payments – even for a short period of time – owning a property is commercially impracticable.

48.     A landlord's recourse when a tenant fails to pay rent during a lease term or holds over after the expiration of that lease is to seek possession of their property from the courts.  Defendants now prohibit that – for up to a year.

49.     Most residential leases entered into by HAPCO members are for a period of one year.  The Act essentially allows those leases to be extended by prohibiting the eviction of tenants who holdover, notwithstanding that the owners of the property never agreed to such an extension.  *See* Exhibit A, Bill 200294 at 2; Exhibit B, Bill 200295 at (2); Exhibit E, Bill 200305 at *(e).

---

[12] What is more, the Act is not the sole form of relief extended to Philadelphia tenants.  "FAQs for Phase 2", COVID-19 Emergency Rental Assistance Program, https://phlrentassist.org/faqs-for-phase-2/ (last visited July 14, 2020).  In early May 2020, the City of Philadelphia launched the Emergency Rental Assistance Program (the "ERAP"), which provides additional financial assistance to tenants.  "Phase 2 of Rental Assistance for Tenants Affected by COVID-19", City of Philadelphia, https://www.phila.gov/2020-06-29-phase-2-of-rental-assistance-for-tenants-affected-by-covid-19/ (last visited July 14, 2020).  The ERAP is funded by the Federal CARES Act, and is distributed to Philadelphia residents by the Pennsylvania Housing Finance Agency.  *Id.*  Philadelphia's share of the ERAP is $28.45 million, and allows tenants to collect $750 month as rental assistance payable directly to their landlord.  *Id.*  But in exchange for the $750 per month, the landlord must: 1) release the tenant from any back rent owed; 2) waive the right to collect the tenant's rent and late fees for the months assistance is being applied; and 3) agree not to evict the tenant for 60-days following receipt of the last assistance payment.  *Id.*

50.     Notwithstanding the expressed good intention of Defendants under the current circumstances, "individual rights secured by the Constitution do not disappear during a public health crisis." *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020).  The fundamental and unalienable rights impacted by the Act are, by their very nature, essential.  Defendants' actions in passing and enforcing the Act will violate those essential rights.

51.     Plaintiffs desire to protect their properties and their rights therein, while at the same time providing reasonable opportunity for their tenants to maintain their tenancies.  To do so, landlords should not be compelled to enter into contractual agreements mandated by Defendants, give up rights they negotiated in preexisting leases, or surrender their rights to seek redress in a court of law.

52.     Without immediate and permanent relief from the Act by this Court, Plaintiffs will suffer immediate and irreparable injuries when the Act is enforced against them.

### COUNT I
### (against all Defendants)
### 42 U.S.C. § 1983 – Violation of the Contracts Clause of United States Constitution
### (U.S. Const. Art. I, § 10)

53.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

54.     Article I, Section 10 of the United States Constitution provides:  "No State shall … pass any … Law impairing the Obligation of Contracts" (the "Federal Contracts Clause").

55.     The Federal Contracts Clause applies to cities and it prohibits them from enacting legislation that substantially impairs existing, lawful contracts.

56.     Violations of the Federal Contracts Clause are actionable under 42 U.S.C. § 1983. *Southern Calif. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003) ("The right of a party not to have a State, or a political subdivision thereof, impair its obligations to contract is a

right secured by the first article of the United States Constitution.  A deprivation of that right therefore give rise to a cause of action under section 1983."); *Watters v. Bd. of School Directors of City of Scranton*, 400 F.Supp.3d 117, 126 (M.D.Pa. 2019) (adopting decision in *Southern Calif. Gas Co.* that a violation of the Federal Contracts Clause gives rise to a cause of action under 42 U.S.C. § 1983).

57.     In determining whether legislation violates the Federal Contracts Clause, courts consider whether:  (a) there has been a substantial impairment of contractual rights; (b) the legislation impairing the contract serves a significant and legitimate public purpose; and (c) the adjustment of a contract was reasonable and necessary to serve the legislation's public purpose. *See, e.g., United Steel Paper and Forestry Rubber Manufacturing Allied Industrial and Service Workers Int'l. Union AFL-CIO-CLC v. Gov't. of the Virgin Islands*, 842 F.3d 201, 210 (3d Cir. 2016).

58.     The Act substantially impairs Plaintiffs' contractual rights by, among other things: (a) eliminating the ability to seek eviction of tenants who fail to pay rent, breach conditions of the lease, or holdover until August 31, 2020 (at the earliest) or May 31, 2021 (at the latest); (b) preventing the imposition of late fees and interest on past due rent; (c) requiring participation in an Eviction Diversion Program that is not contained in any preexisting lease; and (d) compelling the acceptance of hardship repayment agreements on terms that are mandated by the Act.  *See* Exhibits A-E.

59.     The Act further requires landlords to provide notice to tenants of their right to enter into a hardship repayment agreement as well as notice of the Eviction Diversion Program, both of which delay a landlord's ability to begin eviction proceedings.

60.     Unless a tenant neglects to enter a hardship agreement (an unlikely scenario because landlords are required under the Act to notify tenants of this right) or enters a hardship agreement and then continues to default on rent, the Act bars Plaintiffs from taking *any* steps in furtherance of repossessing their property until May 31, 2021.

61.     Indeed, the Act impacts the very purpose of the bargain landlords and tenants strike:  landlords agree to rent property to tenants and no one else in exchange for tenants agreeing to pay rent, including consequences such as late fees and interest if tenants fail to do so. The Act prevents landlords from exercising their contractual rights when that bargain is breached by a tenant.

62.     The purported purpose of the Act is to address the suspected temporary and emergency financial conditions brought about by the COVID-19 pandemic.  That purpose is not sufficient to support the substantial impairment of Plaintiffs' contractual rights.[13]

63.     Further, the Act is not reasonable and necessary to serve its purported purpose. Whether the purpose of the Act was to address COVID-19 specific or historical rental issues in Philadelphia, requiring landlords to bear all of the financial burden is not reasonable or necessary.  Indeed, there are myriad ways in which to address the issues sought to be remedied by the Act, including through the CARES Act, stipends or property tax relief from the City, or grants from the Commonwealth.

64.     The Act unilaterally rewrites all leases existing in the City before its implementation to make void and unenforceable certain terms landlords and tenants negotiated,

---

[13] As set forth above, the legislative findings concerning the financial impact of the COVID-19 pandemic on renters are purely speculative and, at least on the face of the Act, are not supported by any data.  In fact, the purpose of the Act appears to be to remedy *historical* financial issues facing renters that City Council *speculates* will be exacerbated by COVID-19.

prevents landlords from exercising rights negotiated (such as the imposition of late fees and interest), and forces landlords to accept new terms (*i.e.,* Eviction Diversion Program and hardship repayment agreements).  *See* Exhibit A, Bill 200294 at 2(a)(i); Exhibit C, Bill 200302 at *(a); Exhibit E, Bill 200305 at *(a)(i)-(ii).

65.     Indeed, landlords are expressly prohibited from taking any steps to recover possession of their properties for nearly a year even if the tenant fails to pay rent, unless certain limited conditions are met, including threat of imminent harm.  *See* Exhibit A, Bill 200294 at 2; Exhibit B, Bill 200295 at (2); Exhibit E, Bill 200305 at *(e).

66.     Even if there was a legitimate purpose for the Act, it significantly impairs the rights of landlords by obliterating the benefit of the bargain for the leases they entered into prior to the Act.

67.     For these reasons, the Act violates the Federal Contracts Clause.

68.     In promulgating the Act and applying it to Plaintiffs, as well as all landlords in Philadelphia, Defendants have acted under color of statute, ordinance, regulation and/or policy of the municipality.  Defendants' conduct has deprived Plaintiffs of the rights, privileges and immunities secured by the United States Constitution and/or the laws of the United States to which they are and were legitimately entitled.

69.     Plaintiffs have no adequate remedy at law to prevent or redress the irreparable injuries alleged herein.  The Act will be enforced against any landlord who attempts to recover their property from a defaulting tenant until August 31, 2020 at the earliest, but in most cases, until May 31, 2021.  Because HAPCO members have tenants who have defaulted before and after the COVID-19 emergency period, they are directly impacted by the prohibition in the Act from taking any steps in furtherance of repossessing their properties.

70.     Unless Defendants are enjoined and restrained from enforcing or threatening to enforce the Act, Plaintiffs will be irreparably injured, as they will be deprived of their rights under the United States Constitution, and will continue to suffer substantial loss of rents, profits, possession of their property, and good will, the nature and extent of which will be extremely difficult or impossible to ascertain.

71.     As Defendants' constitutional violations are ongoing, Plaintiffs are entitled to immediate injunctive relief.

72.     Because Defendants' actions required Plaintiffs to retain counsel and incur attorney's fees and costs to bring this action, Plaintiffs are entitled to the recovery of those fees and costs pursuant to, *inter alia*, 42 U.S.C. § 1983 *et seq.* and 42 U.S.C. § 1988(b).

**COUNT II**
**(against all Defendants)**
**Declaratory Judgment – Violation of Contracts Clause of Pennsylvania Constitution**
**(Pa. Const. Art. I, § 17)**

73.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

74.     Article I, Section 17 of the Pennsylvania Constitution provides that, "No *ex post facto* law, nor any law impairing the obligation of contracts, or making irrevocable any grant of special privileges or immunities, shall be passed" (the "PA Contracts Clause").

75.     Like the Federal Contracts Clause, the PA Contracts Clause "protects contracts freely arrived at by the parties to them from subsequent legislative impairment or abridgement." *First Nat.'l Bank of Pa. v. Flanagan*, 528 A.2d 134, 137 (Pa. 1987).

76.     "Any law which enlarges, abridges, or in any manner changes the intention of the parties as evidenced by their contract, imposing conditions not expressed therein or dispensing with the performance of those which are a part of it, impairs its obligation, whether the law

20

affects the validity, construction, duration or enforcement of the contract … the amount of impairment of the substantive obligation of a contract is immaterial.  Any deviation from its terms, however slight, falls within the meaning of the Constitution." *Id.* (citations omitted).

77.     Similar to the test applied under the Federal Contracts Clause, the test applied for violations of the PA Contracts Clause requires a court to examine three elements:  (1) whether there is a contractual relationship; (2) whether a change in law impairs that contractual relationship; and (3) whether the impairment is substantial.  *See, e.g., Assoc. of Settlement Companies v. Dept. of Banking*, 977 A.2d 1257, 1277 (Pa. Cmwlth. 2009) (citing *General Motors Corp. v. Romein*, 53 U.S. 181, 186 (1992)).

78.     As set forth above, and incorporated herein, the Act substantially impairs Plaintiffs' contractual rights without the requisite significant and public purpose that is closely tied to the legislation.

79.     Plaintiffs seek a declaration from this Court that the Act violates the PA Contracts Clause, injunctive relief to prevent enforcement of the Act, and other and further relief as the Court deems just and appropriate.

80.     Without a declaration that the Act is unconstitutional, Plaintiffs are forced to allow defaulting tenants remain in their property rent, interest, and penalty-free until as late as May 31, 2021, which will significantly and directly impact their ability to meet their own monthly financial obligations.

### COUNT III
### (against all Defendants)
### 42 U.S.C. § 1983 – Violation of the Fifth Amendment to the United States Constitution

81.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

82.     The Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation." U.S. Const., Amend. V (the "Federal Takings Clause").

83.     The purpose of the Federal Takings Clause is to "bar[ ] Government from forcing some people alone to bear the public burdens which, in all fairness and justice, should be borne by the public as a whole." *Lingle v. Chevron Corp.*, 544 U.S. 528, 537 (2005) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).

84.     To establish a claim under the Federal Takings Clause, a plaintiff must prove two things: (1) that they had a property interest for purposes of the Fifth Amendment; and (2) that the government's actions amounted to a compensable taking of that property interest.

85.     The Act violates the Federal Takings Clause by forcing landlords, like Plaintiffs, to accept the occupation of their properties by tenants who have not paid rent during the occupancy. *See* Exhibit A, Bill 200294 at 2; Exhibit B, Bill 200295 at (2); Exhibit E, Bill 200305 at *(e).  Landlords are expressly prohibited from seeking to obtain possession of their properties for the failure to pay rent through August 31, 2020 (at the earliest) and May 30, 2021 (at the latest), thus allowing tenants to remain without the contractually agreed upon requirement that they pay rent.

86.     While the Act purports to allow owners to recover rent at some later date, the Act does nothing to protect landlords from their obligations to pay mortgages, property taxes and other expenses.

87.     The Act has thus eliminated Plaintiffs' fundamental property rights to exclude nonpaying tenants from their properties.

88.     The economic impact of the Act is severe and ruinous to Plaintiffs, as well as other landlords in the City, who are entitled by valid and binding lease agreements to receive rent from their tenants in exchange for allowing them to reside at the properties.  Plaintiffs, as well as other landlords in the City, cannot sustain their properties by providing them to tenants rent-free.

89.     The Act further undermines the "reasonable investment-backed expectations" of landlords who purchased and/or financed properties with the reasonable expectation that they would collect rent or else have recourse to recover the property.  *See Lingle*, 544 U.S. at 537 (citations omitted).

90.     And while the Act allows landlords to theoretically recover unpaid rent, it does so without any interest or late fees notwithstanding leases that provided for the same.  It further forces landlords to enter into "hardship repayment agreements" that amount to interest free loans to unpaying tenants.  Exhibit E, Bill 200305 at *(a)(i)-(ii).  While the tenant lives rent-free, the landlord still is obligated to pay mortgages, property taxes and other expenses related to the property.

91.     The practical effect of the Act amounts to a taking of property by effectively allowing tenants to occupy properties free of charge and requires landlords – like Plaintiffs – to allow this for upwards to almost a year.  Exhibit E, Bill 200305 at (e); Exhibit A, Bill 200294 at 2(b); Exhibit B, Bill 200295 at (2).

92.     Consequently, the Act has resulted in a complete and total regulatory taking of property from Plaintiffs and other landlords in Philadelphia without just compensation in violation of the Federal Takings Clause.

93.     Plaintiffs have no adequate remedy at law for the harm caused by the Act.  Unless Defendants are enjoined and restrained from enforcing or threatening to enforce the Act,

Plaintiffs will be irreparably injured, as they will be deprived of their rights under the United States Constitution, and will continue to suffer substantial loss of rents, profits, and good will, the nature and extent of which will be extremely difficult or impossible to ascertain.

94.     As Defendants' constitutional violations are ongoing, Plaintiffs are entitled to immediate injunctive relief.

95.     Because Defendants' actions required Plaintiffs to retain counsel and incur attorney's fees and costs to bring this action, Plaintiffs are entitled to the recovery of those fees and costs pursuant to, *inter alia*, 42 U.S.C. § 1983 *et seq.* and 42 U.S.C. § 1988(b).

**COUNT IV**
**(against all Defendants)**
**Declaratory Judgment – Violation of Article I, Section 10 of Pennsylvania Constitution**

96.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

97.     The Pennsylvania Constitution provides, in relevant part, that "[n]o person shall, for the same offense, be twice put in jeopardy of life or limb*; nor shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured.*" Pa. Const. Art. I, Section 10 (emphasis added) (the "PA Takings Clause").

98.     The PA Takings Clause provides the same protections offered by the Federal Takings Clause and, consequently, Pennsylvania courts have analyzed claims asserted under the PA Takings Clause under Federal Takings Clause case law. *See Machipongo Land & Coal Co. v. Dept. of Envt'l. Prot.*, 799 A.2d 751, 763 n. 7 (Pa. 2002).

99.     Therefore, for the reasons set forth above concerning Count III, the Act constitutes a taking under the PA Takings Clause in violation of the Pennsylvania Constitution.

100.    Accordingly, Plaintiffs seek a declaration from this Court that the Act violates the

PA Takings Clause, injunctive relief to prevent enforcement of the Act, and other and further

relief as the Court deems just and appropriate.

## COUNT V
### (against all Defendants)
### Declaratory Judgment – The Act is Preempted by the Landlord-Tenant Act

101.    Plaintiffs incorporate herein by reference each and every allegation contained in

the preceding paragraphs of this Complaint as though fully set forth herein.

102.    Under Pennsylvania law, a local ordinance, like the Act, that "contradicts,

contravenes, or is inconsistent with a state statute is invalid." *Holt's Cigar Co., Inc. v. City of

Phila.*, 10 A.3d 902, 907 (Pa. 2011) (citations omitted).

103.    Here, the Act irreconcilably "contradicts, contravenes, or is inconsistent" with the

Landlord-Tenant Act.

104.    The Landlord-Tenant Act expressly provides that the Pennsylvania legislature

shall be the sole source of rights, remedies, and procedures governing the landlord/tenant

relationship:  "All other acts and parts of acts, general, local and special, inconsistent with or

supplied by this act, are hereby repealed.  ***It is intended that this act shall furnish a complete***

***and exclusive system in itself***."  68 P.S. § 250.602 (emphasis added); *see also Com. v. Tobin*,

828 A.2d 414, 422 n.7 (Pa. Cmwlth. 2003) ("[T]he focus of [the Landlord-Tenant Act] is on the

right of landlords to recover possession and rental fees owed.").

105.    To that end, the Landlord-Tenant Act provides landlords with an absolute right to

seek repossession of their property when a tenant defaults under a lease agreement.  68 P.S.

§ 250.501.  So long as a landlord complies with its notice requirements, a landlord can recover

property from a defaulting tenant and restore their ability to re-let the property and collect rent. *See id.*

106.     But rather than supplementing a landlord's right to evict a defaulting tenant, the Act strips landlords of this right entirely.  The Act makes it unlawful, during the COVID-19 emergency period (*i.e.*, until at least August 31, 2020 at the earliest), for Plaintiffs to evict a residential or small business tenant in Philadelphia, except to "prevent an imminent threat of harm by the person being evicted, including physical harm or harassment."  Exhibit B, Bill 200295 (\*Residential Eviction Relief, \*Commercial Eviction Relief).  In essence, the Act forecloses landlords from filing complaints for repossession of their property for the failure to pay rent, breach of a lease, or at the end of the lease term.  Plaintiffs are now mandated to allow defaulting tenants to reside in their property until at least August 31, 2020, and in many cases up to and including May 31, 2021.

107.     The Landlord-Tenant Act, however, expressly provides that a landlord may file a complaint and the "the justice of the peace *shall* issue a summons" to a defaulting tenant, who must answer the complaint within ten days.  68 P.S. § 250.502(b) (emphasis added).  The Act is irreconcilably contrary to that by shutting the court doors to landlords until – at the earliest – August 31, 2020.

108.     In addition, the Act requires landlords to submit to an Eviction Diversion Program, including a "conciliation conference … to mediate an agreement for asserted residential lease violations."  Exhibit A, Bill 200294 at 2(a)(i).  Under the Act, a landlord is prohibited from taking "steps in furtherance of recovering possession of residential property … without first participating in a conciliation conference …."  *Id.* at 2(b).

109.    The Landlord-Tenant Act, however, allows a landlord "desirous of repossessing real property from a tenant [to] notify, in writing, the tenant to remove from the same" when the lease has expired, tenant has breached the terms of the lease, or tenant failed to pay rent due and owing.  68 P.S. § 250.501(a).  There is no requirement to participate in an Eviction Diversion Program.

110.    The Landlord-Tenant Act further provides that, "[n]othing contained in this article shall be construed as abolishing the right of any landlord to recover possession of any real property from a tenant by action of ejectment, or from instituting any amicable action of ejectment to recover possession of any real property by confession of judgment in accordance with the terms of any written contract or agreement."  68 P.S. §250.511.

111.    The Act, however, effectively voids any confession of judgment provisions entered into by landlords and commercial (small business) tenants.

112.    Landlords are further prohibited under the Act from collecting rent and late fees during the COVID-19 emergency period, and must also enter a "hardship repayment agreement" with any defaulting tenant under which a tenant "shall be considered in full compliance with any payment obligations under such tenant's lease."  Exhibit C, Bill 200302 (*Temporary Waiver of Certain Fees); Exhibit E, Bill 200305 (*Mandatory Hardship Repayment Agreement for Residential Tenants).

113.    For any tenant who enters into a hardship repayment agreement, "until nine (9) months after the last day of the COVID-19 emergency period the nonpayment of rent shall not be a legal basis to evict a tenant," *except* in the face of imminent harm, *or*, despite additional, repeated notice from the landlord of a tenant's rights under the Act, continued failure to pay rent. *Id*. Further still, apart from any lease entered into before the Act, the "hardship repayment

agreement" requires landlords to allow residential tenants until May 31, 2021 to pay, both interest and penalty free, any past due rent. *Id.*

114.    The Landlord-Tenant Act, however, expressly provides that a "landlord may recover from a tenant rent in arrears in an action of assumpsit …. In any such action, interest at the legal rate on the amount of rent may be allowed if deemed equitable under the circumstances of the particular case." 68 P.S. § 250.301. The Act prohibits the imposition of interest for rent in arrears and is thus irreconcilably inconsistent with the Landlord-Tenant Act.

115.    The Act wholly frustrates the purpose of the Landlord-Tenant Act. It stifles the remedies available to landlords under the Landlord-Tenant Act to recover possession of their property, and allows tenants to shirk their contractual obligations without consequence. The eviction moratoria, late fee waiver, and hardship repayment agreements are in direct conflict with the Landlord-Tenant Act, and thus are invalid and unenforceable.

116.    The only way to remedy the conflict between the Landlord-Tenant Act and the Act is to strike down the Act. *Hoffman Min. Co., Inc. v. v. ZHB of Adams Twp.*, 32 A.3d 587, 594-95 (Pa. 2011) (citations omitted).

## COUNT VI
### (against all Defendants)
### 42 U.S.C. § 1983 – Violation of the Fourteenth Amendment
### to the United States Constitution (Due Process)

117.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

118.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution "provides heightened protection against government interference with certain fundamental rights and liberty interests," including those "specific freedoms protected by the Bill of Rights" and "those fundamental rights and liberties which are, objectively, deeply rooted in

this Nation's history and tradition …." *Washington v. Glucksberg*, 521 US 702, 720-21 (1997).

Such rights include most of those enumerated in the Bill of Rights, including property rights.

*Duncan v. Louisiana*, 391 U.S. 145, 147-49 (1968).

119.    While Defendants have certain police powers, those powers do not afford

"unrestricted authority to accomplish whatever the public may presently desire." *Panhandle E.*

*Pipe Line Co. v. St. Highway Comm'n of Kansas*, 294 U.S. 613, 622 (1935).

120.    The Act and enforcement thereof violates the substantive due process rights of

Plaintiffs guaranteed by the Fourteenth Amendment to the United States Constitution, which

expressly states that the government shall not "deprive any person of life, liberty, or property,

without due process of law."

121.    Under the Due Process Clause, a law must not be unreasonable, unduly

oppressive or patently beyond the necessities of the case, and the means which it employs must

have a real and substantial relation to the objects sought to be attained.  "The rational

relationship standard of substantive due process by which legislation is judicially measured is

that the statute or regulation at issue must have had a real and substantial relationship to the

object sought to be obtained." *Khan v. State Bd. of Auctioneer Examiners*, 842 A.2d 936, 946

(Pa. 2004) (citing *Nixon v. Com.*, 839 A.2d 277, 287-88 (Pa. 2003)); *see also Heffner v. Murphy*,

745 F.3d 56, 79 (3d Cir. 2014).

122.    As recounted previously, the Act is "patently beyond the necessities of the case"

and therefore violates Plaintiffs' due process rights.[14]

---

[14] In fact, the legislative findings in the Act address *historical* financial issues that renters face and the shut-down of the Commonwealth and City as a result of COVID-19.  The findings about the financial impact of the COVID-19 pandemic on renters are purely speculative and, at least on the face of the Act, are not supported by any data.  In fact, the purpose of the Act appears to be to remedy *historical* financial issues facing renters that City Council *speculates* will be exacerbated by COVID-19.

123.     The Act expressly deprives Plaintiffs of their rights and interest in their property, as they are prevented from using their properties in the manner they please or to mitigate harm when a tenant fails to pay rent or other obligations.  HAPCO members have been forced to allow defaulting tenants to remain in their rental properties rather than recovering possession to re-let to a paying tenant.  Not only that, but they are now barred from collecting interest or penalties as called for under its privately negotiated lease agreements, and will therefore never be made whole under the Act.

124.     Defendants failed to provide Plaintiffs with the procedural and substantive due process required by the United States Constitution as they relate to the significant property rights at stake.

125.     Even if there was a legitimate reason for these restrictions, the Act is by no means "rationally related" to the City's objective.  While the Act purports to address the economic strain resulting from COVID-19, it remedies only the struggle faced by tenants without considering what financial impact the pandemic has and will continue to have on landlords.  It is true that abating rent obligations and staying evictions may allow tenants to fend off the financial impact of COVID-19; but the City fails to account for the ongoing financial obligations landlords face, like enduring mortgage payments, property taxes, and utilities.

126.     In fact, the Act "robs Peter to pay Paul – it plunders [Plaintiffs'] due process rights in its efforts to enhance public safety." *See Com v. Ritz*, 153 A.2d 336, 348 (Pa. Super. 2016).

127.     Plaintiffs have no adequate remedy at law for the harm caused by the Act.  Unless Defendants are enjoined and restrained from enforcing or threatening to enforce the Act, Plaintiffs will be irreparably injured, as they will be deprived of their rights under the United

States Constitution, and will continue to suffer substantial loss of rents, profits, and good will, the nature and extent of which will be extremely difficult or impossible to ascertain.

128.    As Defendants' constitutional violations are ongoing, Plaintiffs are entitled to immediate injunctive relief.

129.    Because Defendants' actions required Plaintiffs to retain counsel and incur attorney's fees and costs to bring this action, Plaintiffs are entitled to the recovery of those fees and costs pursuant to, *inter alia*, 42 U.S.C. § 1983 *et seq.* and 42 U.S.C. § 1988(b).

**COUNT VII**
**(against all Defendants)**
**42 U.S.C. § 1983 – Violation of Article I, Section 1 of the**
**Pennsylvania Constitution (Due Process)**

130.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

131.    Article I, Section 1 of the Pennsylvania Constitution – the Commonwealth's Due Process guarantee – provides: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness."

132.    The Due Process clauses in the United States and Pennsylvania Constitutions are "'substantially equivalent' in their protective scope." *Hospital & Healthsystem Ass'n of Pa. v. Com.*, 77 A.3d 587, 600 n.15 (Pa. 2013).

133.    Accordingly, for the reasons set forth above concerning the Due Process clause in the United States Constitution, the Act violates Plaintiffs' due process as guaranteed by the Pennsylvania Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, individually, jointly and/or severally as follows:

(a)     declare that the Act is null and void because it is unconstitutional under Article I, Section 10 of the United States Constitution;

(b)     declare that the Act is null and void because it is unconstitutional under Article I, Section 17 of the Pennsylvania Constitution;

(c)     declare that the Act is null and void because it is unconstitutional under the Fifth and Fourteenth Amendments to the United States Constitution;

(d)     declare that the Act is null and void because it is unconstitutional under Article I, Section 10 of the Pennsylvania Constitution;

(e)     declare that the Act is null and void because it is preempted by the Pennsylvania Landlord-Tenant Act;

(f)     declare that the Act is null and void because it violates Plaintiffs' rights under the Due Process clause of the Fourteenth Amendment to the United States Constitution;

(g)     declare that the Act is null and void because it violates Plaintiffs' rights under Article I, Section 1 of the Pennsylvania Constitution;

(h)     permanently enjoin Defendants, or anyone acting in concert with Defendants, from implementing and/or enforcing the Act;

(i)     issue a preliminary injunction prohibiting Defendants, or anyone acting in concert with Defendants, from implementing and/or enforcing the Act;

(j)     award Plaintiffs damages arising out of the claims asserted under 42 U.S.C. § 1983, including at least nominal damages;

(k)      award Plaintiffs their costs and reasonable attorneys' fees incurred in this action

pursuant to 42 U.S.C. § 1988 and other applicable laws; and

(l)      all such other further relief as the Court deems proper and just.

                                     Respectfully submitted,

Dated:  July 16, 2020                /s/  *Colin D. Dougherty*
                                     Colin D. Dougherty, Esq. (Pa. I.D. No. 88363)
                                     Michael K. Twersky, Esq. (Pa. I.D. No. 80568)
                                     Beth L. Weisser, Esq. (Pa. I.D. No. 93591)
                                     Emma M. Kline, Esq. (Pa. I.D. No. 314027)
                                     **FOX ROTHSCHILD LLP**
                                     10 Sentry Parkway, Suite 200
                                     P.O. Box 3001
                                     Blue Bell, PA 19422-3001
                                     (215) 299-2000 (tel)/(215) 299-2150 (fax)
                                     Email:  cdougherty@foxrothschild.com
                                     Email:  mtwersky@foxrothschild.com

                                     Paul Jay Cohen, Esq. (Pa. I.D. No. 38441)
                                     **COHEN MARRACCINI, LLC**
                                     660 Second Street Pike
                                     Southampton, PA 18966
                                     (215) 887-8100 (tel)/(215) 887-8732 (fax)
                                     Email: paul@cohenmarraccini.com

                                     Todd L. Baritz, Esq. (Pa. I.D. No. 89157)
                                     **Kenneth L. Baritz & Associates, P.C.**
                                     100 S. Broad Street
                                     Suite 1205
                                     Philadelphia, PA 19102
                                     215-557-8608 (tel)
                                     Email: tbaritz@baritzlaw.com
                                     **Attorneys for Plaintiff**

## **VERIFICATION FOR FIRST AMENDED VERIFIED COMPLAINT**

I, Victor Pinckney, hereby state that I am Vice President of HAPCO, the Plaintiff in this matter, and I am authorized to take this Verification on its behalf.  I verify under penalty of perjury under the laws of the United States of America that the statements and factual averments in the foregoing document are true and correct to the best of my knowledge, information and belief.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

VICTOR PINCKNEY

Date: July 16, 2020

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

HAPCO,

          Plaintiff,

     v.

CITY OF PHILADELPHIA and THE
HONORABLE JAMES KENNEY,

          Defendants.

Case No.: No. 2:20-cv-03300

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, a copy of the foregoing was filed electronically and served by mail on any party unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties and/or counsel of record via the Court's electronic filing (ECF) system and the parties may access this filing through the Court's system.

Dated:  July 16, 2020          By:___*/s/ Colin D. Dougherty*_____
                           Colin D. Dougherty, Esq. (Pa. I.D. No. 88363)
                           **FOX ROTHSCHILD LLP**