**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | |
|---|---|
| **HAPCO** | : |
| 2101 Chestnut Street | : |
| Suite 1615 | : |
| Philadelphia, PA 19103, | :      20-03300-CMR |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| **CITY OF PHILADELPHIA** | : |
| c/o Law Department | : |
| 1515 Arch Street | : |
| Philadelphia, PA 19102 | : |
| | : |
| and | : |
| | : |
| | : |
| **THE HONORABLE JAMES KENNEY** | : |
| City Hall | : |
| Office 215 | : |
| Philadelphia, PA 19107, | : |
| | : |
| Defendants. | : |

_____ :

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF HAPCO'S MOTION
FOR A PRELIMINARY INJUNCTION**

Plaintiff, HAPCO ("HAPCO"), on behalf of its members, (hereinafter, HAPCO and its

members referred to as "Plaintiffs"), by and through their undersigned counsel, hereby submit this

Memorandum of Law In Support of their Motion For A Preliminary Injunction ("the Motion").

As set forth in the accompanying First Amended Verified Complaint and the Declaration

of Victor Pinckney, Vice President of HAPCO, as well as further herein, Defendants' City of

Philadelphia and The Honorable James Kenney (collectively, "Defendants'") implementation and

enforcement of the Emergency Housing Protection Act ("the Act") violates the rights guaranteed to Plaintiffs under the United States and Pennsylvania Constitutions and is preempted by the Pennsylvania Landlord and Tenant Act of 1951 (the "Landlord-Tenant Act"). Accordingly, Plaintiffs respectfully request that this Court issue an order enjoining the implementation and enforcement of the Act.

## I.   **INTRODUCTION**

HAPCO, a 501(c)(4) corporation, is "Philadelphia's largest association of residential investment and rental property owners and managers." *See* https://hapcoassoc.com/. HAPCO is made up of nearly 1,900 members that own or manage more than 10,000 residential and commercial properties in Philadelphia, Pennsylvania, and many of their tenants have suffered "COVID-19 Financial Hardships" as defined in the Act. *See* Declaration of Victor Pinckney (the "Pinckney Declaration"), attached hereto as Exhibit 1 at ¶¶ 3-4, 19. HAPCO advocates "for fair and reasonable private property rights, through equitable tenant-landlord legislation, mediation, education, and professional management practices." *See* https://hapcoassoc.com/; *see also* Pinckney Declaration at ¶ 5. According to its Mission Statement, "HAPCO Philadelphia is dedicated to the preservation, expansion and improvement of low to moderate income rental housing, along with market rate rental and investment properties. HAPCO is also devoted to reversing the spread of blight in the City of Philadelphia." *See* https://hapcoassoc.com/about-us/; *see also* Pinckney Declaration at ¶ 6. In furtherance of its advocacy for fair and reasonable private property rights and equitable tenant-landlord legislation, HAPCO brings this action against Defendants arising out of their passage, implementation and enforcement of the Act.

On June 18, 2020, City Council passed five (5) bills that constitute the Act, and on July 1, 2020, Mayor Kenney signed them into law. *See* Pinckney Declaration at ¶¶ 7-8. Defendants passed the Act in a purported effort to address concerns from small business and residential tenants in Philadelphia arising from the COVID-19 pandemic. However, the Act places ***all*** of the financial burden for a perceived rental crisis in Philadelphia on the City's landlords. HAPCO members are certain to receive "Certification[s] of Hardship" from their tenants that allow them to reside rent-free in the landlords' property for the length of the COVID-19 Emergency Period, and in some cases, through May 31, 2021 without paying penalty or interest. The Act unquestionably will be enforced against any HAPCO member who initiates eviction proceedings against a defaulting tenant during the COVID-19 Emergency Period, and in some cases through May 31, 2021, even though many tenants have been in default since before the onset of the pandemic. As of this filing, many of Plaintiffs' tenants have defaulted under their lease agreements because they have suffered a "COVID-19 financial hardship" under the Act. *See* Pinckney Declaration at ¶ 19. Despite the default, some of which occurred immediately after the onset of COVID-19 in March 2020, Plaintiffs are barred from repossessing its property, except under certain limited conditions. The end result is legislation that violates the United States and Pennsylvania Constitutions in profound ways (as explained below) and is preempted by the Landlord-Tenant Act.

Enforcement of the Act presents a realistic danger of actual injury to HAPCO members, who will be barred from taking any steps in furtherance of repossessing their property until May 31, 2021, unless a tenant neglects to enter a hardship agreement (an unlikely scenario because landlords are required under the Act to notify tenants of this right) or enters a hardship agreement and then continues to default on rent. Accordingly, Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 (for violations of the United States Constitution) and the Pennsylvania

Declaratory Judgment Act (for violations of the Pennsylvania Constitution and for the preemption of the Act).

## II.     FACTUAL BACKGROUND

The COVID-19 pandemic has wrought serious and unprecedented health and economic damage throughout the United States. It has resulted in the loss of more than 100,000 American lives and changed, almost overnight, the way in which we live. Much work will need be done by the public and private sectors in the coming days, weeks, months and years to recover from this disaster.

In response to the outbreak, Pennsylvania Governor Tom Wolf issued a declaration of emergency on March 6, 2020. In addition, Governor Wolf issued an Executive Order on March 7, 2020 that suspended all evictions and foreclosures in the Commonwealth until July 10, 2020. The Pennsylvania Supreme Court, which has authority over the courts of the Commonwealth, previously closed court eviction proceedings until May 11, 2020. On March 22, 2020, Governor Wolf amended his Executive Order by specifying that it applied only to evictions and foreclosures due to a failure to pay rent or because a tenant has overstayed their lease. On March 22, 2020, Mayor Kenney issued a Stay-at-Home Order for the City of Philadelphia, effective beginning on March 23, 2020. On July 9, 2010, one day before Governor Wolf's March 22, 2020 Executive Order was set to expire, Governor Wolf again amended the Executive Order, which purports to prohibit evictions up to and including August 31, 2020.

Against this backdrop, and with the Executive Order allowing evictions to proceed after August 31, 2020, Defendants passed the Act in a purported effort to assist Philadelphia renters

who are facing eviction for failing to pay rent as a result of the COVID-19 pandemic.[1]  The Act's

five Bills amend Chapter 9-800 of the Philadelphia Code, which governs landlord and tenants in

the City.  *See* Pinckney Declaration at ¶ 9.  Each of the Bills contain the same legislative findings,

including the following that relate not to the COVID-19 pandemic, but to Philadelphia's *historical*

problems facing renters:

> Philadelphia is also one of the poorest cities in America, where 24.5% or 377,116 Philadelphia residents, live in poverty.

> Philadelphia has a high population of renters.  The number of renters in Philadelphia has rapidly increased in recent years, growing from 40.7% in 2000 to almost half of the population today.

> Before the pandemic, Philadelphia had the 4th highest eviction rate among large cities, with 1 out of every 14 renters facing eviction each year.

> More than 300,000 of Philadelphia's renters struggled to afford rent before the COVID-19 pandemic. In 2017, 53.4% of Philadelphia renters were cost-burdened, meaning they paid more than 30% of their income on rent, and 31% of Philadelphia renters were severely cost-burdened, meaning they spent more than 50% of their income on rent.

> To address the city's affordable housing crisis, Philadelphia City Council established a Tenant Legal Defense Fund in 2017, an anti-eviction task force in 2017, and right to counsel in 2019 to address evictions.

Exhibits A-E at ¶¶ 9-13.[2]

   The Bills go on to speculate that the "number of Philadelphians struggling to pay rent

has undoubtedly increased since the onset of the COVID-19 pandemic … and over 120,000

Philadelphians have filed for unemployment since March 2020, exacerbating already-existing

financial burdens."  *Id.* at ¶ 14.  Thus, Philadelphia City Council, in passing the Act, surmised

---

[1] On July 13, 2020, the Philadelphia Municipal Court Civil Division announced its phased reopening with President Judge Administrative Order No. 48 of 2020, which directs landlords to review the Act before initiating eviction proceedings.

[2] References to Exhibits A-E in this memorandum are the Exhibits to Plaintiffs' First Amended Verified Complaint, filed concurrently herewith.

that Philadelphia renters will struggle to pay rent in the future due to the COVID-19 pandemic.[3] *Id.* at ¶ 14.

The Bills further note that once the Executive Order is lifted, "there is an estimated backlog of 5,000 eviction cases in Philadelphia Municipal Court." *Id.* at ¶ 15. Significantly, those evictions may not proceed during the COVID-19 emergency period (*see* fn. 5 *infra.*) even though they were instituted *before* the COVID-19 emergency period. That is, the reasons for those evictions have absolutely nothing to do with anything related to COVID-19.[4] The legislative findings conclude by noting that, the "COVID-19 pandemic's negative impact on the lives and incomes of Philadelphians, and City revenues, has exacerbated the *pre-existing* housing crisis and created a housing emergency in the City of Philadelphia. The measures identified [in the Act] are necessary to ensure residents are able to remain in their homes, and small businesses are able to stay in business." *Id.* at ¶ 20 (emphasis added).

Plaintiffs do not dispute the significant impact the COVID-19 pandemic has had, and will continue to have, on the economy, including the ability of residential and small business tenants to pay rent. *See* Pinckney Declaration at ¶ 10. However, the manner in which Defendants have sought to address these real issues violates Plaintiffs' rights, and foists upon Philadelphia's landlords all of the financial burden related to Philadelphia renters. *Id.* Specifically, the Act

---

[3] The Act's findings regarding the financial impact renters will face as a result of COVID-19 is purely speculative. For example, if any of the "over 120,000 Philadelphians" who filed for unemployment earned less than $60,000 a year, they could be making *more* money now through unemployment compensation and the CARES Act supplement for unemployment. Yet those tenants could claim a COVID-19 financial hardship and decide not to pay rent without a landlord ever knowing that the tenant was making more money than before the COVID-19 pandemic. Moreover, the Act's findings do not account for medical professionals, emergency workers and the like who are making more money in overtime now due to the urgent need for their services.

[4] Given the improper cessation of evictions under the Act, an additional backlog of eviction cases will result that will have a disastrous impact on a landlords' ability to seek repossession of their properties. Indeed, it is not a stretch to believe landlords will have to wait more than a year just to have an eviction proceeding come before a judge.

amends Chapter 9-800 of the Philadelphia Code to provide the following "COVID-19 Emergency Housing Protections":

a.      the creation of an Eviction Diversion Program for residential tenants that requires a "conciliation conference between landlord and tenant that has experienced a COVID-19 financial hardship to mediate an agreement for asserted residential lease violations."[5] Exhibit A, Bill 200294 at 2(a)(i).  A landlord is prohibited from taking "steps in furtherance of recovering possession of a residential property occupied by a tenant who suffered a COVID-19 financial hardship other than providing a notice required under this [section] without first participating in a conciliation conference …."[6]  *Id.* at 2(b).  The requirement to participate in the Eviction Diversion Program, notwithstanding that it is not contained in any lease agreement between landlord and tenant, is an obligation that is being compelled by Defendants. The Act provides no way for landlords to challenge whether a tenant has, in fact, suffered a COVID-19 financial hardship, thus depriving landlords of any way to confirm whether a tenant has a true hardship or not.[7]  Instead, HAPCO members are simply forced to accept as true that their tenants have been financially impacted by COVID-19 without verifying the nature or extent of their hardship.

---

[5] The Act defines "COVID-19 financial hardship" as a "tenant's or tenant's household member's loss of income due to any one or more" of several criteria.  Exhibit A, Bill 200294 at (1)(c)(i)-(x).  Significantly, the "loss of income" for residential tenants is provided through a "Certification of Hardship" without the need for any supporting documentation to demonstrate an actual "loss of income."  *Id.* at (1)(a).  There is also no procedure for a landlord to contest the certificate of hardship.

[6] Two exceptions apply to this requirement:  (1) the eviction is "necessary to cease or prevent an imminent threat of harm by the person being evicted"; or (2) a date for the conciliation conference cannot be provided within thirty days of the landlord's initial request – but the landlord must still participate in a conciliation conference when it becomes available (if prior to an eviction judgment being issued).  Exhibit A, Bill 200294 at 2(b)(i)-(ii).

[7] While the Act is silent on how City Council came up with its legislative findings on the supposed impact of COVID-19 on renters, the Act provides *absolutely no way* for landlords to challenge a tenant's claim of financial hardship.  To the contrary, a tenant can claim anything they want and the landlord is forced to accept the representation. Thus, the Act requires landlords to take City Council's findings and renters' hardship claims on good faith.

b.      making it unlawful during the COVID-19 emergency period (*i.e.*, until August 31, 2020)[8] to evict a residential tenant in Philadelphia except to "prevent an imminent threat of harm by the person being evicted, including physical harm or harassment …."  Exhibit B, Bill 200295 at (2)(*Residential Eviction Relief).  Under this provision, "it shall be unlawful for a landlord to take any steps in furtherance of recovering possession of a residential premises rented by a tenant on any other basis" even based upon a preexisting lease between landlord and tenant.  *Id.* HAPCO members have been forced to allow defaulting tenants to remain in their properties rent free since March 2020.

c.      making it unlawful during the COVID-19 emergency period (i.e., until August 31, 2020) to evict a small business tenant[9] that provides a "certification of hardship"[10] except to "prevent an imminent threat of harm by the person being evicted, including physical harm or harassment …."  *Id.* at (*Commercial Eviction Relief).  Under this provision, "it shall be unlawful for a landlord to take any steps in furtherance of recovering possession of a commercial premises rented by such small business on any other basis" even based upon a preexisting lease between landlord and tenant.  *Id.*  The Act provides no way for landlords to challenge whether a small business tenant has, in fact, suffered a financial hardship, thus depriving landlords of any way to confirm whether a tenant has a true hardship or not.

---

[8] The Act defines the "COVID-19 emergency period" as beginning on the date the Act becomes law and ending on August 31, 2020.  *See, e.g.,* Exhibit B, Bill 200295 at (1)(b).  It also includes the retroactive period, *i.e.*, back to March 1, 2020, which is ten days *prior to* the World Health Organization declaring COVID-19 a pandemic and five days prior to Governor Wolf's declaration of a state of emergency related to COVID-19.

[9] The Act defines "small business" as one that employs fewer than 100 total employees whether within the City of Philadelphia or elsewhere.  Exhibit B, Bill 200295 at (1)(f).

[10] The Act defines "small business financial hardship" as a small business's "documented loss of income" due to one or more of several consequences of the COVID-19 epidemic.  Exhibit B, Bill 200295 at (1)(g).  However, the Act does not define or explain how to document a loss of income.  There is also no procedure for a landlord to contest the certificate of hardship.

d.       making it unlawful from the "retroactive emergency period" (*i.e.,* March 1, 2020)[11] until nine months after the COVID-19 emergency period (*i.e.*, until May 31, 2021) for "any landlord to charge or accept the payment of late fees, interest on back rent, or similar charges as the result of delinquent payment of rent with respect to a residential premises" where a residential tenant claims a COVID-19 financial hardship.  Exhibit C, Bill 200302 at *(a)(Temporary Waiver of Certain Fees).  This prohibition applies notwithstanding lease terms to the contrary – indeed, any such lease terms "shall be void and non-enforceable" pursuant to the Act.   *Id.*  HAPCO members have leases that contain provisions for late fees interest, but the Act prohibits them from enforcing those provisions.  *See* Pinckney Declaration, ¶ 15.  HAPCO members are thus barred from being compensated for the full value of the financial loss they incurred not only during the COVID-19 emergency period, but for nine-months afterward.

e.       forcing landlords to enter into "hardship repayment agreements" with any residential tenant that has suffered a COVID-19 financial hardship (fn. 4, *supra.*) during the "retroactive emergency period" (*i.e.,* March 1, 2020)  and has failed to pay rent at any point during the COVID-19 emergency period (*i.e.*, until August 31, 2020) upon the provision by the tenant of a certification of hardship and, at a minimum, a certification of a loss of income or increased expenses.  Exhibit E, Bill 200305 at *(a)(i)-(ii).  Notwithstanding any lease entered into prior to the Act, the "hardship repayment agreement" requires landlords to allow residential tenants until May 31, 2021 to pay – interest free and without any penalty – any past due rent.  *Id.* at (b)(i)-(iii).

f.       making it unlawful until nine months after the COVID-19 emergency period (*i.e.*, until May 31, 2021) for a "landlord to take any steps in furtherance of recovering possession of a

<hr>

[11] The Act defines the "retroactive emergency period" as the "period beginning on March 1, 2020" even though Governor Wolf did not issue an emergency declaration until March 6, 2020.

residential premises occupied by a tenant or a guest of a tenant, on any basis other than a legal basis for eviction."[12] *Id.* at (e). That is, a landlord may not seek to take possession of property until May 31, 2021 other than to prevent an imminent threat of harm by the person being evicted, including physical harm or harassment, or in certain limited circumstances where a tenant, despite additional notice from a landlord, continues to be unable to meet its rent obligations, even after the COVID-19 emergency period has ended.[13]

HAPCO members are directly impacted by the Act. For example, HAPCO member Victor Pinckney manages properties for other HAPCO members where at least one tenant has failed to pay rent since before and through the COVID-19 emergency period. Pinckney Declaration ¶ 22. An eviction hearing for that tenant was scheduled for July 17, 2020, but the Act prohibits him from evicting the breaching tenant. *Id.* In addition, Mr. Pinckney owns properties where at least one tenant has failed to pay rent as required under the lease during the COVID-19 emergency period due to a COVID-19 financial hardship. *Id.* at ¶ 23. Although he has not yet received a certification of hardship from that tenant, he expects that one will be received to prevent an eviction. *Id.* Other HAPCO members are in the same position as Mr. Pinckney. *Id.*

---

[12] The conditional "legal bas[es]" for eviction place the onus on landlords to first notify tenants of their ability to enter a "hardship repayment agreement" if tenants have not already exercised that unconditional right. *See* Exhibit E, bill 200305(d)(i). If a landlord notifies a tenant of their right to enter a "hardship repayment agreement," and the tenant neglects to enter one within 30-days of receiving notice, a landlord may only evict a tenant if the tenant fails to "pay the ongoing monthly rate of rent as it is normally due after the end of the COVID-19 emergency period." *Id.* at (d)(i)-(ii). If a tenant *has* previously entered a hardship repayment agreement, a landlord may only evict a tenant if the tenant continues in their failure to pay their monthly rent, or if they are "in arrears in amount equal to *four or more* monthly payments required under clause (b)(ii)(2) of paragraph (b)." *Id.* (d)(iii) (emphasis added). In either case, the landlord *cannot* charge interest or late fees during the nine-month period following the end of the COVID-19 emergency period. *Id.* at (b)(i)-(iii).

[13] This provision appears to conflict with Bill 200295 (Exhibit A), which allows for evictions following the COVID-19 emergency period (i.e., after August 31, 2020). Bill 200305 is unclear as to whether the nine-month extension for evictions is based on a tenant entering into a hardship repayment agreement, which represents another failing of the Act.

Upon receiving a certification of hardship, tenants can remain in the property rent free. Landlords, like Mr. Pinkney and other HAPCO members, cannot obtain late fees or interest even where permitted by lease agreements, and they are compelled to enter into hardship repayment agreements with their tenants. The impact and injury on HAPCO members and other landlords cannot be disputed. Indeed, the Motion to Intervene filed by Tenant Union Representative Network and Philadelphia Unemployment Project demonstrates that the harm to HAPCO members and other landlords is not speculative – the reason they sought to intervene is to prevent Plaintiffs from obtaining the relief they seek, which would result in the admitted eviction of their members who are suffering from claimed COVID-19 financial hardships. *See, e.g.,* Memorandum in Support of Motion to Intervene at p. 2 ("TURN and PUP seeks to intervene … because of the very real risk that a victory by the Plaintiffs will result in the disruptive displacement and homelessness of countless low-income Philadelphians and people of color in the midst of a pandemic ….")

Plaintiffs, as well as other landlords throughout the City, are still required to pay their mortgages, property taxes, and other expenses related to their leased properties. Plaintiffs rely upon rental payments to satisfy these obligations. *See* Pinckney Declaration at ¶ 11. There is no similar COVID-19 financial hardship provision in the Act for landlords to obviate the requirement to pay their lenders or their City tax bills. *Id.* Nor is there any Diversion Program or hardship repayment agreements available to landlords who find themselves in financial difficulty because the Act allows their tenants not to pay rent when it is due. [14] A landlord's recourse when a tenant

---

[14] What is more, the Act is not the sole form of relief extended to Philadelphia tenants. "FAQs for Phase 2", COVID-19 Emergency Rental Assistance Program, https://phlrentassist.org/faqs-for-phase-2/ (last visited July 14, 2020). In early May 2020, the City of Philadelphia launched the Emergency Rental Assistance Program (the "ERAP"), which provides additional financial assistance to tenants. "Phase 2 of Rental Assistance for Tenants Affected by COVID-19", City of Philadelphia, https://www.phila.gov/2020-06-29-phase-2-of-rental-assistance-for-tenants-affected-by-covid-19/ (last visited July 14, 2020). The ERAP is funded by the Federal CARES Act, and is distributed to Philadelphia residents by the Pennsylvania Housing Finance Agency. *Id.* Philadelphia's share of the ERAP is $28.45 million, and allows tenants to collect $750 month as rental assistance payable directly to their landlord. *Id.* But in exchange for the $750 per month, the landlord must: 1) release the tenant from any back rent

fails to pay rent during a lease term or holds over after the expiration of that lease, is to seek possession of their property from the courts. Defendants now prohibit that – for up to almost a year.[15]  *See* Pinckney Declaration at ¶ 18.

Most residential leases entered into by HAPCO members are for a period of one year.  *Id.* The Act essentially allows those leases to be extended by prohibiting the eviction of tenants who holdover, not only during the COVID-19 emergency period, but for an additional nine-months thereafter, so long as certain conditions are met, notwithstanding that the owners of the property never agreed to such an extension.  *See* Exhibit A, Bill 200294 at 2; Exhibit B, Bill 200295 at (2); Exhibit E, Bill 200305 at *(e); *see also* Pinckney Declaration at  ¶ 18.  Plaintiffs currently have tenants who are in default under their lease agreements for, among other reasons, failure to pay rent or holding over following the term of their lease, and they desire to obtain possession of their property immediately.  Pinckney Declaration at ¶ 19. However, they would not be able to do that until at least August 31, 2020—and possibly until May 31, 2021—under the Act.  *Id.* Notwithstanding the expressed purported positive intentions of Defendants under the current circumstances, "individual rights secured by the Constitution do not disappear during a public health crisis."  *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020).  The fundamental and unalienable rights impacted by the Act are, by their very nature, essential.  Defendants' actions in passing and enforcing the Act will violate those essential rights.

Plaintiffs wish to protect their properties and their rights therein, while at the same time providing a reasonable opportunity for their tenants to maintain their tenancies.  To do so, landlords

owed; 2) waive the right to collect the tenant's rent and late fees for the months assistance is being applied; and 3) agree not to evict the tenant for 60-days following receipt of the last assistance payment.  *Id.*

[15] Landlords depend upon rental payments to meet their obligations, including those to lenders, for property taxes and for maintenance of the property.  Without rental payments – even for a short period of time – owning a property is commercially impracticable.

should not be compelled to enter into contractual agreements mandated by Defendants, give up rights they negotiated in preexisting leases, or surrender their rights to seek redress in a court of law as expressly provided by the Landlord-Tenant Act. Without immediate and permanent relief from the Act by this Court, Plaintiffs will suffer immediate and irreparable injuries when the Act is enforced against them. *See* Pinckney Declaration at ¶ 20.

## III.   LEGAL ARGUMENT

### A.    Legal Standard

A district court properly grants a preliminary injunction where the plaintiff establishes: (1) a likelihood of success on the merits; (2) it will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the non-moving party; and (4) the public interest favors such relief. *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010) (citing *Child Evangelism Fellowship of New Jersey Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 524 (3d Cir. 2004)). Because Plaintiffs satisfy each of the four factors above, the Court should grant their motion for a preliminary injunction.

### B.    Plaintiffs Are Likely To Succeed On The Merits.

For the court to issue an injunction, a movant need not prove its entire case. Rather, the movant on a preliminary injunction "need only prove a *prima facie case, not a certainty* that he or she will win." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001) (citation omitted) (emphasis added). The Third Circuit requires only a "reasonable likelihood" of success on the merits. *Saudi Basic Indus. Corp. v. Exxon Corp.*, 364 F.3d 106, 112 (3d Cir. 2004) (citing *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.2d 153, 158 (3d Cir. 1999)).

The First Amended Complaint asserts seven causes of action: **Count I** – 42 U.S.C. § 1983 for violation of Article I, Section 10 of the United States Constitution (the "Federal Contracts Clause"); **Count II** – declaratory judgment for violation of Article I, Section 17 of the

Pennsylvania Constitution (the "PA Contracts Clause"); **Count III** – 42 U.S.C. § 1983 for violation of the Fifth Amendment, made applicable to Defendants through the Fourteenth Amendment (the "Federal Takings Clause"); **Count IV** – declaratory judgment for violation of Article I, Section 10 of the Pennsylvania Constitution (the "PA Takings Clause"); **Count V** – declaratory judgment that the Act is preempted by the Landlord-Tenant Act; **Count VI** – 42 U.S.C. § 1983 for violation of Plaintiffs' due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution; and **Count VII** – declaratory judgment for violation of Plaintiffs' due process rights as guaranteed by Article I, Section 1 of the Pennsylvania Constitution.

Here, Plaintiffs can make out a *prima facie* case for all seven claims, even though they only have to show that they are reasonably likely to succeed on **any one** of their claims to obtain injunctive relief. *Air Products and Chem., Inc. v. Inter-Chemical LTD*, 2003 WL 22917491, *9 (E.D. Pa. Dec. 2, 2003).

### 1.    The Act Constitutes a Violation of the Federal and PA Contracts Clauses.

Plaintiffs have a reasonable likelihood of success in proving that the Act constitutes a violation of the Federal and Pennsylvania Contracts Clauses because it is an "*ex post facto* law…impairing the obligation of contracts." *Assoc. of Settlement Companies v. Dept. of Banking*, 977 A.2d 1257 (Pa. Cmwlth. 2009) (citing Pa. Const. art. I., § 17).

"The contracts clauses of the United States and Pennsylvania Constitutions protect contracts freely arrived at by the parties to them from subsequent legislative impairment or abridgement." *First Nat. Bank of Pa. v. Flanagan*, 528 A.2d 134, 137 (Pa. 1987). "Any law which enlarges, abridges, or in any manner changes the intention of the parties as evidenced by their contract, imposing conditions not expressed therein or dispensing with the performance of those which are a part of it, impairs its obligation, whether the law affects the validity, construction,

duration, or enforcement of the contract…the amount of impairment of the substantive obligation of a contract is immaterial. Any deviation from its terms, however slight, falls within the meaning of the Constitution." *Id.* (citing *Beaver Cty. Building and Loan Ass'n. v. Winnowich*, 187 A.2d 481, 485-86 (Pa. 1936)). "A later law cannot abridge rights under a prior contract. The only substantive laws in effect when the parties enter into a contract are implicitly incorporated into it." *Id.* (citing *DePaul v. Kauffman*, 272 A.2d 500, 506 (Pa. 1971); *Beaver*, 187 A.2d at 484).

In determining whether a statute unconstitutionally impairs the obligation of contracts, courts examine three elements: "(1) whether there is a contractual relationship; (2) whether a change in law impairs that contractual relationship; and (3) whether the impairment is substantial." *Transport Workers Union of Amer., Local 290 v. SEPTA*, 145 F.3d 619, 621 (3d Cir. 1998) (quoting *General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992)); *Assoc. of Settlement Companies v. Dept. of Banking*, 977 A.2d 1257 (Pa. Cmwlth. 2009) (quoting *General Motors, supra*); *see also Com v. Ritz*, 153 A.3d 336, 346 (Pa. Super. 2016) (explaining that the test for unconstitutional impairment of contract is the same under both Constitutions).

Where a government regulation substantially impairs a contract, the state, in justification, must have a significant and legitimate public purpose behind the regulation, "such as the remedying of a broad and general social or economic problem." *Id.* Once a legitimate public purpose has been identified, the court must evaluate if the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption. *Id.*

As to the first element, "substantial impairment," courts consider whether "legitimate expectations [of the parties] have been thwarted," and if the law "prevents the party from safeguarding or reinstating his rights." *Allied Structural Steel v. Spannaus*, 438 U.S. 234 (1978);

*Sveen v. Melin*, 138 S.Ct. 1815, 1821-22 (2018); *United Steel Paper and Forestry Rubber Manufacturing Allied Industrial and Service Workers Int'l. Union AFL-CIO-CLC v. Gov't. of the Virgin Islands*, 842 F.3d 201, 210 (3d Cir. 2016). While "minimal alteration of contractual obligations may end the inquiry at its first stage, [s]evere impairment…will push the inquiry to a careful examination of the nature and purpose of the state legislation." *Spannaus*, 438 U.S. at 245. The "high value" placed upon the protection of private negotiation is evidenced in both the Federal and PA Contracts Clauses, which not only "enables individuals to order their personal and business affairs according to their particular needs," but also allows the parties to rely upon their contractual arrangements. *Id*.

After demonstrating substantial impairment, the court must evaluate if the government "had a significant and legitimate public purpose" in enacting the statute implicating private contracts. *United Steel Paper*, 842 F.3d at 211; *Assoc. of Settlement Companies*, 977 A.2d at 1278-79 (quoting *Energy Reserves Group v. Kansas Power & Light Co.*, 459 U.S. 400, 410 (1983)). "A legitimate public purpose is one aimed at remedying a broad and general social or economic problem; it need not be addressed to an emergency or temporary situation." *Id*. (citing *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411-13 (1983)).

Finally, even if a legitimate public purpose exists, the impairment must be *both* reasonable and necessary "to meet the purpose advanced by the Government in justification." *Id.* For the impairment to be "reasonable," it must be appropriately tailored to the emergency or societal concern at hand, and limited to the duration of the emergency. *Spannaus*, 438 U.S. at 250 (citing *Home Building Loan Ass'n. v. Blaisdell*, 290 U.S. 398 (1934)); *see United States Trust Co. v. New Jersey*, 431 U.S. 1, 31 (1977).

The Third Circuit analyzed a claim brought pursuant to the Federal Contracts Clause in *United Steel Paper, supra*. In that case, several unions and other collective bargaining groups sued the Virgin Islands alleging that the Virgin Islands Economic Stability Act ("VIESA"), which reduced the salaries of government workers by 8%, constituted an impermissible impairment of collective bargaining agreements in violation of the Federal Contracts Clause. *United Steel Paper*, 842 F.3d at 205. The District Court found that although VIESA substantially impaired the collective bargaining agreements, the impairment was justified given the state's ongoing fiscal crisis, and therefore did not violate the Federal Contracts Clause. *Id.* at 207.

On appeal, the Third Circuit reversed. Though it agreed that VIESA substantially impaired plaintiffs' collective bargaining agreements, and that the impairment was the product of a "significant and legitimate public purpose" – namely, that the Virgin Islands "faced an immediate fiscal problem that needed to be addressed" – it determined the ends did *not* justify the means. *See United Steel Paper*, 842 F.3d at 211-12. Critically, the court concluded that VIESA was unreasonable, "which is alone sufficient to render it improper under the [Federal] Contract Clause." *Id.* at 213 ("[W]e need not decide today whether…VIESA was necessary because…we conclude it was unreasonable."). The court found VIESA unreasonable because the government of the Virgin Islands knew of the economic crisis when it was negotiating the collective bargaining agreements, and moved forward with them anyway. *Id.* at 214. That the financial condition became increasingly worse did not change the "kind of problem that VIESA sought to solve." *Id.* The Third Circuit, finding "an impairment is not a reasonable one if the problem sought to be resolved by an impairment of the contract existed at the time the contractual obligation was incurred," declared the statute unconstitutional and in violation of plaintiffs' contract rights. *Id.* at

213-14 (citing *United States Trust*, 431 U.S. at 32 ("[T]his change in degree is not enough to render the impairment 'reasonable in light of changed circumstances.")).

Applying the test articulated in *United Steel Paper*, Plaintiffs have a reasonable likelihood of success of prevailing on their claim that the Act violated the Federal and PA Contract Clauses. **First,** the Act substantially impairs the lease agreements negotiated and entered into by Plaintiffs, who own and/or manage residential and small business commercial properties throughout Philadelphia. Plaintiffs entered lease agreements with their tenants for one underlying purpose: to ensure prompt payment of rent for their property, and in the case of default, to ensure their ability to repossess. The Act, however, substantially impairs both the payment terms of these lease agreements and a landlord's ability to evict defaulting tenants. For example:

- Bill 200302 prohibits a landlord from "charg[ing] or accept[ing] the payment of late fees, interest on back rent, or similar charges as the result of delinquent payment of rent…during the retroactive emergency period through nine months after the last day of the COVID-19 emergency period" notwithstanding leases that allow for such charges. Exhibit C, Bill 200302 (*Late Fee Waiver).

- Bill 200295 makes it unlawful to evict a residential tenant in Philadelphia during the COVOD-19 emergency period, *except* to "prevent an imminent threat of harm by the person being evicted, including physical harm or harassment…" Exhibit B, Bill 200295 (*Residential Eviction Relief). Under this provision, "it shall be unlawful for a landlord to take any steps in furtherance of recovering possession of a residential premises rented by a tenant on any other basis", even based upon a preexisting lease between landlord and tenant. *Id.*

- Bill 200305 forces landlords to enter "hardship repayment agreements" with any residential tenant that has suffered a COVID-19 financial hardship. Exhibit E, 200305 (*Hardship Repayment Agreement). Despite any lease entered into before the Act, the "hardship repayment agreement" gives residential tenants an additional *nine months* – until May 31, 2021 – to pay past due rent, interest free and without penalty. *Id.* at (b)(i)-(iii). Existing leases do not contain such a provision; indeed, such a provision did not exist until mandated by the Act. Bill 200305 further prohibits landlords from repossessing property until May 31, 2021, other than to prevent an imminent threat of harm by the person being evicted, including physical harm or harassment, or in certain limited circumstances where a tenant, despite additional notice from a landlord, continues to be unable to meet their rent obligations, even after the COVID-19 emergency period has ended. *Id.* at (b)(i)-(iii).

- Bill 200294 requires landlords to participate in an "Eviction Diversion Program" before seeking to reclaim possession of their properties from tenants who fail to pay rent. Exhibit A, 200294 at 2(a)(i). Existing leases do not contain this requirement; indeed, the Act created the Eviction Diversion Program and forced landlords to participate in it.

Together, these provisions fundamentally upend the contractual bargains struck between Plaintiffs, as landlords, and their tenants, by effectively relieving the tenants of their obligation to pay rent through at least August 31, 2020, and leaving landlords without any immediately available recourse. Under the Act, landlords must allow tenants to remain on the properties rent-free for the duration of the COVID-19 emergency period, and can only evict tenants in certain limited circumstances for nine-months thereafter. Moreover, during the emergency period, landlords are barred from collecting *any* rent from their current tenants, and for the following nine-months cannot collect late fees or interest on past-due rent, which precludes their ability to recoup their total losses and to reinstate their rights. The Act further adds a term to every private lease agreement requiring that the parties engage in mandatory mediation before a landlord can exercise its rights to recover the real property. The Act is the quintessential "substantial" impairment, because it thwarts any reasonable expectation Plaintiffs had in the enforcement of their lease agreements.

**Second**, the Act does not address a "general social problem" that satisfies the "significant and legitimate interest" element of the impairment inquiry. *See Spannaus*, 438 U.S. at 250. While the Act is purportedly designed to relieve financial distress suffered by small commercial and residential tenants in Philadelphia, the "problem" at the heart of the Act is limited to a distinct and temporary situation, COVID-19, and the resolution relates to a single group of people, renters. Accordingly, "this law can hardly be characterized…as one enacted to protect a broad societal interest rather than a narrow class." *Id*. at 249. Even if the Act was designed to address the City's

19

broader, ongoing poverty and purported renter distress, "a [contractual] impairment is not a reasonable one if the problem sought to be resolved by an impairment of the contract existed at the time the contractual obligation was incurred." *United Steel Paper*, 842 F.3d at 213-14. As demonstrated by the City's legislative findings, Philadelphia historically has faced an affordable housing crisis, which the City speculates will be *exacerbated* by COVID-19. *Id.* (holding a change in the *degree* of a problem, rather than a change in the *kind* of problem before the state, was insufficient to justify contractual impairment when the legislature was aware of the problem to begin with).

**Third**, even if the Act could be said to address a "broad societal interest," it is neither reasonable nor necessary to alleviate the City's concerns. Where a law substantially impairs a contract, the public entity bears the burden of showing that the impairment is both reasonable and necessary. The government must use the least intrusive means to achieve its goals; it is not free to impose a "drastic impairment when an evident and more moderate course would serve its purposes equally well." *United Steel Paper*, 842 F.3d at 212 (quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 31 (1977)).

Here, the Act arbitrarily bars Plaintiffs from recovering possession of their property for not only the term of the COVID-19 emergency period, but also in certain circumstances after the emergency ends, unless landlords comply with stringent notice requirements. City Council defined the "COVID-19 emergency period" as "[t]he period beginning on the date of the ordinance adding Section 9-809 to the Code becomes law and *ending August 31, 2020*," and yet extended certain relief to small business and residential tenants through at least *May 31, 2021*. Exhibit B, ¶ 1(b) (emphasis added). What is more, the relief extended to tenants includes living interest and penalty-free up to and including May 31, 2021 without fear of eviction. Indeed, landlords are

precluded under the Late Fee Waiver from collecting any "late fees or interest on unpaid rent during the retroactive emergency period through nine months after the last day of the COVID-19 emergency period." Exhibit C, Bill 200302 (*Late Fee Waiver).

Further still, there is no indication that City Council considered any more "moderate course" to alleviate the financial hardship at hand. The City effectively seeks to condemn lease agreements and contract rights entered into by Plaintiffs and shift the entire cost of the condemnation onto them, rather than considering other available avenues for relief. For instance, the City could have reduced the eviction moratorium, allowed for the gradual payment of late fees and interest, or made direct payments to renters consistent with the federal government's mandate under the Coronavirus Aid, Relief, and Economic Recovery Act. The Act further fails to recognize that by abating tenants' rent obligations and staying evictions during the emergency period, and in some cases, for nearly a year thereafter, *Plaintiffs'* ability to comply with their financial obligations will be at risk. The fact remains that landlords must continue to pay their mortgages and property taxes, but the Act provides them with no "hardship repayment agreements" with their lenders, or a parallel COVID-19 financial hardship period in which to delay meeting their financial obligations without any interest or penalties. Defendants certainly could have provided landlords with property tax relief for the same period that tenants received rent relief under the Act, but instead they shouldered the entire financial burden on the City's landlords.

Even if there were a legitimate purpose behind the Act, which there is not, the complete obliteration of landlords' right to possession and tenants' obligations to pay rent under existing leases is not a reasonable way of achieving that purpose. The Act will be enforced against any landlord who attempts to recover their property from a defaulting tenant until August 31, 2020 at the earliest, but in most cases, until May 31, 2021. Because HAPCO members have tenants who

have defaulted before and after the COVID-19 emergency period, they are directly impacted by the prohibition in the Act from taking any steps in furtherance of repossessing their properties. *See generally* the Pinckney Declaration. Accordingly, the Act unreasonably and substantially interferes with the existing lease agreements for Plaintiffs, infringing upon their rights under the Contracts Clauses of the United States and Pennsylvania Constitutions. U.S. Const. art. I, § 10; Pa. Const. art. I, § 17.

### 2. The Act Constitutes a Taking in Violation of the Federal and PA Takings Clauses.

Plaintiffs are able to show a reasonable likelihood of success on the merits for their claim that the Act constitutes a taking in violation of the Fifth and Fourteenth Amendments of the United States Constitution and Article 10, § 1 of the Pennsylvania Constitution.

The Federal Takings Clause provides, in part, that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. The PA Takings Clause likewise provides that private property shall not "be taken or applied to public use, without authority of law and without just compensation being first made or secured." Pa. Const. art. I, § 10. The PA Takings Clause is interpreted using the same standards and framework as applied to the Federal Takings Clause. *See Smith v. Cortes*, 879 A.2d 382 (Pa. Cmwlth. 2005), *aff'd*, 587 Pa. 506 (2006) (recognizing that the Pennsylvania Supreme Court has consistently relied upon decisions from the United States Supreme Court when resolving claims under the Pennsylvania takings clause).

The Fifth Amendment prohibition against unlawful taking of private property "is designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. U.S.*, 364 U.S. 40, 49 (1960). A Fifth Amendment takings claim is particularly appropriate here, where Defendants are forcing

landlords alone to "bear the public burden" of the COVID-19 pandemic when, in all fairness and justice, that burden should be borne by the public as a whole.

Fifth Amendment takings can be either physical or regulatory; categorical (in which it deprives the owner of all economically viable uses of their property) or non-categorical (in which it deprives the owner of some amount of economic use of their land); and permanent or temporary. *Caquelin v. U.S.*, 140 Fed. Cl. 564 (2018). To establish a viable takings claim, a plaintiff must prove two things: (1) that they had "a property interest for purposes of the Fifth Amendment" and (2) that the government's actions "amounted to a compensable taking of that property interest." *Id.* Partial and temporary takings are compensable just as total and permanent takings are compensable. *Palazzolo v. Rhode Island,* 533 U.S. 606, 617 (2001) (in considering whether the denial of landowner's application to fill 18 acres of coastal wetlands and build a beach club constituted a taking, the Court remanded for further proceedings after finding a small tract of land exempt from regulation still had value but also stated that there could still be a taking even without complete economic loss); *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003 (1992) (finding that property owner who applied for a special beachfront development permit that was not initially available when statute was enacted could potentially still have takings claim under the Fifth Amendment for the period from when the statute was enacted to when the permit provision became available because "temporary takings are as protected by the Constitution as are permanent ones," *citing First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304 (1987)).

Here, the Act amounts to a temporary, non-categorical regulatory taking. When analyzing a regulatory taking, a court must determine "the extent to which the government action interferes with the economic use of the property." *Stearns Co. v. U.S.* 396 F.3d 1354, 1357 (Fed. Cir. 2005).

In *Pennsylvania Coal v. Mahon*, 260 U.S. 383 (1922), the United States Supreme Court held that "[t]he general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." 260 U.S. at 415. Here the Act goes too far.

In *Pennsylvania Coal*, the claimant sold the surface rights to property but specifically reserved the right to mine the coal thereunder. *Id.* at 404. Thereafter, Pennsylvania passed a statute that prohibited the mining of coal if it could cause a house to sink or cave in unless certain conditions were met. *Id.* The Court held that the Pennsylvania statute was invalid as effecting a taking without just compensation because it made mining the coal commercially impracticable, thereby having nearly the same effect as destroying the rights the claimants had reserved from the owners of the surface of the land. *Id.* at 414.

Courts have described the process for determining whether a regulation constitutes an impermissible taking as essentially a case specific "ad-hoc factual inquiry." *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978). In *Penn Central Transp. Co.* the Supreme Court again reviewed a challenge under the takings clause of the Fifth Amendment. While ultimately concluding that application of New York City's Landmark Law to reject the proposed construction of an office tower above Grand Central Terminal did not constitute a taking under the Fifth Amendment, the Court articulated certain factors to guide the "ad-hoc factual inquiry" and help balance several pragmatic considerations in making a regulatory taking determination. These considerations are: (1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation interferes with investment-backed expectations, and (3) the character of the Government action. 438 U.S. at 124.

Applying the considerations articulated in *Penn Central Transp.* and many cases thereafter, to this case, it is clear that Plaintiffs have a reasonable likelihood of prevailing on their Federal

and PA Takings Clause claims. **First**, the economic impact of the Act on landlords in the City of Philadelphia is significant – in some cases, devastating. For some landlords, rent from residential properties is their sole source of income. Even in cases where it is not their sole source of income, all of the landlord's financial obligations remain due and owing even though they have no recourse if tenants refuse to make rental payments and have no choice but to allow non-paying tenants to remain: mortgage payments are still due, property taxes and insurance payments are still due, and maintenance expenses will still be incurred. Landlords will be forced to pay these obligations with their own savings or, if that is not possible, risk losing insurance or having their property foreclosed upon.

The fact that the Act permits eviction of non-paying tenants as early as August 31, 2020, and as late as May 31, 2021 is of no import to landlords who lose their property to foreclosure in the interim. Moreover, while the Act allows landlords to theoretically recover unpaid rent, it does so without any interest or late fees notwithstanding leases that provided for the same – thus forcing landlords to provide interest free loans to tenants. It further forces landlords to enter into "hardship repayment agreements" that also amount to interest free loans to unpaying tenants. Exhibit E, Bill 200305 at *(a)(i)-(ii); *see also* Pinckney Declaration at ¶ 14. Plaintiffs are sympathetic to the financial impact the COVID-19 pandemic has had on many tenants, but the Act is a perfect example of legislation that forces some people (landlords) to bear a public burden which, in fairness and justice, should be borne by all. The Fifth Amendment is designed to remedy precisely this type of injustice.

**Second**, the Act undoubtedly interferes with investment-backed expectations of landlords in Philadelphia. When evaluating this factor, courts will look at whether the regulatory scheme at issue was "in place at the time of purchase [of the property]." *Broadwater Farms Joint Venture v.*

*U.S.*, 45 Fed.Cl. 154, 156 (1999). "Where a regulatory scheme is in place at the time of purchase … the reasonableness of the buyer's expectations must be discounted." *Id.* The Act was passed on June 18, 2020 and signed into law on July 1, 2020. Because the Act only came into existence days before Plaintiffs sought relief in this Court, there is no argument that they had actual or constructive knowledge of its effect. The Act will wreak havoc on landlords' completely reasonable investment backed expectations (whether those investments were made by an individual, a small business, or a corporation) and the reasonableness of those expectations weighs heavily in favor of a finding that the Act constitutes an impermissible taking. *Broadwater Farms Joint Venture*, 45 Fed.Cl. at 156

**Third**, the character of the government action likewise supports a finding that the Act constitutes a regulatory taking. Although takings *may* be more readily found when the interference with property can be "characterized as a physical invasion by the government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good," *Penn Central Transp. Co.,* 438 U.S. at 124, the character of the government action here does not promote the common good – to the contrary, it shifts the "burdens" of economic hardship resulting from the COVID-19 pandemic *entirely* to the landlords.

Plaintiffs, as much as anyone else, understand the desire to help those suffering financially as a result of the COVID-19 pandemic.[16] But that same worthwhile objective could have been achieved by other means that did not go so far as to interfere with the landlords' economic interest in their properties. The City, like the federal government did, could have made stimulus payments to renters. It could have limited the time for which tenants with a hardship are allowed to remain

---

[16] The Act seemingly disregards the possibility that landlords may also be within the group of individuals adversely affected by the COVID-19 pandemic.

in the property.  It could have required tenants to pay late fees and interest to landlords over a period of time.  It could have provided property tax relief to landlords for the time in which they were not receiving rent.  It did *none* of these things.  It could have taken steps to "balance the benefits and burdens" of the current economic crisis but instead it shifted the entire burden of the COVID-19 crisis onto landlords.  Accordingly, the character of the government action here also weighs in favor of finding that the Act constitutes an impermissible taking.

Plaintiffs have demonstrated all three elements of the ad hoc test articulated in *Penn Central Transp. Co.* and, therefore, have shown a likelihood of success on their claims based on the Federal and PA Takings Clauses.

### 3.      The Act Is Preempted By the Landlord-Tenant Act.

Plaintiffs are likely to succeed on the merits of their claim that the Act is preempted by the Landlord-Tenant Act, because the Act is irreconcilable with Pennsylvania's regulation of landlord-tenant relationships.  A local enactment that irreconcilably conflicts with or stands as an obstacle to the execution of the full purposes of the state is unenforceable.  *Hoffman Min. Co., Inc. v. ZHB of Adams Tp.*, 32 A.2d 587 (Pa. 2011) (citing *Council 13, Am. Fed'n of State, County & Mn. Employees v. Rendell*, 986 A.2d 63, 81-82 (Pa. 2009)); *Berwick Area Landlord Ass'n v. Borough of Berwick*, 48 A.3d 524 (Pa. Cmwlth. 2012) ("[P]ursuant to the doctrine of conflict preemption, a local ordinance…contradicts, contravenes, or is inconsistent with a state statute.").

While municipalities may, in the exercise of their police power, enact regulations that advance the "purpose of the general law as may seem appropriate to the necessities of the particular locality and which are not in themselves unreasonable," an ordinance will be stricken if "there is such actual, material conflict between the state and local powers that only by striking down the local power can the power of the wider constituency be protected." *Hoffman Min. Co., Inc.*, 32

A.3d at 594-95 (citing *United Tavern Owners of Phila. v. School Dist. of Phila.*, 272 A.2d 868, 871 (Pa. 1971); *Mars Emergency Medical Services Inc., v. Tp. of Adams*, 740 A.2d 193, 196 (Pa. 1999)). Any local ordinance must also be "considered in light of the objectives of the General Assembly and the purposes of the relevant statute." *Holt's Cigar Co., Inc. v. City of Phila.*, 10 A.3d 902, 907 (Pa. 2011). Accordingly, while municipalities can *supplement* state law, they can only do so in a way that does not interfere with its purpose. But the Act does more than supplement the Landlord-Tenant Act – it rewrites it.

Compliance with both the Act and the Landlord-Tenant Act is impossible. The Act materially minimizes landlords' remedies in the event of tenant default, even though the Pennsylvania Legislature unequivocally expressed in the text of the Landlord Tenant Act that it be the sole source of rights, remedies, and procedures governing the landlord/tenant relationship:

> All other acts and parts of acts, general, local and special, inconsistent with or supplied by this act, are hereby repealed. *It is intended that this act shall furnish a complete and exclusive system in itself.*

68 P.S. § 250.602 (emphasis added); *see also Com. v. Tobin*, 828 A.2d 414, 422 n.7 (Pa. Cmwlth. 2003) ("[T]he focus of [the Landlord Tenant Act] is on the right of landlords to recover possession and rental fees owed.").

To that end, the Landlord-Tenant Act provides landlords with several remedies to maintain their property and collect rent. Critically, landlords have an absolute right to seek repossession of their property when a tenant defaults under a lease agreement. 68 P.S. § 250.501 ("Notice to quit" – (a) A landlord desirous of repossessing real property from a tenant…may notify, in writing, the tenant to remove the same...upon the failure of the tenant, upon demand, to satisfy any rent reserved and due.").

So long as a landlord complies with the notice requirements, a landlord can recover property from a defaulting tenant and restore their ability to re-let the property and collect rent. *See id.* After providing requisite notice under the Landlord-Tenant Act, a landlord may file a complaint, after which "the justice of the peace *shall* issue a summons" to a defaulting tenant, who must answer the complaint within ten days. 68 P.S. § 250.502(b) (emphasis added).

In addition to guaranteeing landlords the ability to recover their property, the Landlord Tenant-Act also permits landlords to "recover from a tenant rent in arrears in an action of assumpsit." 68 P.S. § 250.301. If a landlord sues a tenant for unpaid rent, "interest at the legal rate on the amount of rent may be allowed if deemed equitable under the circumstances of the particular case." *Id.*

Finally, the Landlord Tenant Act provides,

Nothing contained in this article shall be construed as abolishing the right of any landlord to recover possession of any real property from a tenant by action of ejectment, or from instituting any amicable action of ejectment to recover possession of any real property by confession of judgment in accordance with the terms of any written contract or agreement.

*Id.* 68 P.S. § 250.511.

Rather than supplementing a property owners' rights under the Landlord-Tenant Act, the Act abolishes their remedies altogether. Landlords, like Plaintiffs, are now prohibited from evicting defaulting tenants through at least August 31, 2020 (and in some cases through May 30, 2021), suing for past-due rent, interest, or other penalties guaranteed under their private lease agreements, and must engage in mandatory conciliatory conferences before pursuing relief in the courts once the emergency is lifted.

In contrast to landlords' ability to recover possession from a defaulting tenant under the Landlord-Tenant Act, the Act now makes it unlawful to evict a residential or commercial tenant

during the COVID-19 emergency period, *except* to "prevent an imminent threat of harm by the person being evicted, including physical harm or harassment." Exhibit B, Bill 200295 (*Residential Eviction Relief, Commercial Eviction Relief). Not only that, but landlords must first submit to an "Eviction Diversion Program", including a "conciliation conference…to mediate an agreement for asserted residential lease violations," before attempting to evict a tenant when the emergency period ends. Exhibit A, Bill 200294 at 2(a)(i).

In addition to limiting landlords' eviction rights, the Act also prohibits landlords from suing to collect past-due rent, late fees, and interest during the COVID-19 emergency period. Exhibit C, Bill 200302 (*Temporary Waiver of Certain Fees). Landlords must also enter a "hardship repayment agreement" with any defaulting tenant under which a tenant "*shall be considered in full compliance* with any payment obligations under such tenant's lease" – regardless of the scope and extent of their arrears. Bill 200305 (*Mandatory Hardship Repayment Agreement for Residential Tenants). Finally, for any tenant who enters a hardship repayment agreement, "until nine (9) months after the last day of the COVID-19 emergency period the nonpayment of rent *shall not be a legal basis to evict a tenant*," *unless* a landlord faces imminent harm, or complies with stringent notice requirements before repossessing its property. *Id.* (emphasis added).

The Act wholly frustrates the purpose of the Landlord-Tenant Act. The remedies originally afforded to landlords under the Landlord-Tenant Act are no longer available. Landlords are barred from evicting defaulting tenants, cannot demand rent during the COVID-19 emergency period, and once the emergency ends, are prohibited from collecting interest and late fees contracted for in their lease agreements, which predated the Act. Many HAPCO members have provisions in their commercial leases that allow for a confession of judgment upon a default by tenants and for interest for late rental payments. *See* Pinckney Declaration at ¶¶ 15-16. Those leases predated the

Act. *See id.* The Act, however, effectively voids any confession of judgment provisions entered into by landlords and commercial (small business) tenants.

The terms of the Act are irreconcilable with the Landlord Tenant Act, and allow tenants to shirk their contractual obligations without consequence. The eviction moratoria, late fee waiver, and hardship repayment agreements are in direct conflict with the Landlord-Tenant Act, and thus are invalid and unenforceable. The only way to remedy the conflict between the Landlord-Tenant Act and the Act is to strike down the Act. *See Hoffman Min. Co., Inc.*, 32 A.3d at 594-95 (citations omitted).

> **4.     The Act Violates Plaintiffs' Rights to Due Process Under the United States and Pennsylvania Constitutions.**

The substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 1 of the Pennsylvania Constitution stand as an additional constitutional hurdle to the Act. These two foundational documents have been described as "'substantially equivalent' in their protective scope." *Hospital & Healthsystem Ass'n. of Pa. v. Com.*, 77 A.3d 587, 600 n.15 (Pa. 2013).

While the Due Process Clause of the Fourteenth Amendment "speaks to the adequacy of state procedures," the clause "also has a substantive component." *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 139 (3d Cir. 2000). In accordance with the substantive due process rubric, certain governmental actions are prohibited "regardless of the fairness of the procedures to implement them." *Alexander v. Whitman*, 114 F.3d 1392, 1402 (3d Cir. 1997) (quoiting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). Indeed, the federal Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests," including the "specific freedoms protected by the Bill of Rights" and "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and

tradition,'" such as property rights. *Washington v. Glucksberg*, 521 U.S. 702, 720-721 (1997) (quoting *Moore V.E. Cleveland*, 431 U.S. 494, 502 (1977)). Article I, Section 1 of the Pennsylvania Constitution likewise guarantees persons in the Commonwealth certain inalienable rights. *Nixon v. Com.*, 839 A.2d 277, 286 (Pa. 2003).

As discussed previously, "[w]hile the General Assembly may, under its police power, limit those rights by enacting laws to protect the health, safety, and welfare," those police powers do not afford "unrestricted authority to accomplish whatever the public may presently desire." *Nixon*, 839 A.2d at 286 (citing *Gambone v. Com.*, 101 A.2d 634, 636-37 (Pa. 1954)); *Panhandle E. Pipe Line Co. v. St. Highway Comm'n. of Kansas*, 294 U.S. 613, 622 (1935). "Courts must weigh the rights infringed upon by the law against the interest sought to be achieved by it, and also scrutinize the relationship between the law (the means) and that interest (the end)." *Id.*

To be enforceable, a law "must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained." *Id.* (citing *Gambone*, 101 A.2d at 637). "The rational relationship standard of substantive due process by which legislation is judicially measured is that the statute or regulation at issue must have had a real and substantial relationship to the object sought to be obtained." *Khan v. State Bd. of Auctioneer Examiners*, 842 A.2d 936, 946 (Pa. 2004) (citing *Nixon*, 839 A.2d at 277); *see also Heffner v. Murphy*, 745 F.3d 56, 79 (3d Cir. 2014). As recounted previously, the Act is "patently beyond the necessities of the case" and therefore violates Plaintiffs' due process rights.

Under the Act, Plaintiffs are barred from repossessing their property for the entirety of the COVID-19 emergency period, which runs through (at a minimum) August 31, 2020. Exhibit E, Bill 200305 at ¶ 1(b). Moreover, despite the emergency period ending on August 31, 2020, the

relief extended to tenants permits them to remain in the property living interest and penalty free up to and including May 31, 2021, without fear of eviction or other financial penalty. Exhibit C, Bill 200302 (*Late Fee Waiver). The Act also unilaterally incorporates additional terms into Plaintiffs' privately negotiated lease agreements that further restrict their ability to evict delinquent tenants. Namely, landlords have been forced into both "hardship agreements", which are the vehicle that allows tenants to reside late fee and interest fee free through May 31, 2021, and Eviction Diversion Programs, which mandate landlords engage in a conciliation conference *before* enforcing their rights to repossess their property.

Again, even if there was a legitimate reason for these restrictions, the Act is by no means "rationally related" to the City's objective. While the Act purports to address the economic strain resulting from COVID-19, it remedies only the struggle faced by tenants without considering what financial impact the pandemic has and will continue to have on landlords. It is true that abating rent obligations and staying evictions may allow tenants to fend off the financial impact of COVID-19; but the City fails to account for the ongoing financial obligations landlords face, like enduring mortgage payments, property taxes, and utilities. The act "robs Peter to pay Paul – it plunders [Plaintiffs'] due process rights in its efforts to enhance public safety." *See Com v. Ritz*, 153 A.2d 336, 348 (Pa. Super. 2016). Because the Act violates Plaintiffs' due process rights, it is unconstitutional and must be found invalid and unenforceable.

### 5. Plaintiffs Will Prevail In Their Request for Declaratory Relief.

Under Section 7533 of the Declaratory Judgments Act, 42 Pa.C.S. § 7533, any person whose rights or other legal relations, including contracts, are affected by a statute or municipal ordinance, may have determined any question of construction or validity, and obtain a declaration of rights or legal relations with respect to same. "The purpose of the Declaratory Judgment Act is

to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and is to be liberally construed and administered." *Robinson Twp., Washington Cty. v. Com.*, 83 A.3d 901, 990 (Pa. 2013). "In order to sustain an action under the Declaratory Judgments Act, a plaintiff must demonstrate an 'actual controversy' indicating imminent and inevitable litigation, and a direct, substantial and present interest." *Unified Sportsmen of Pennsylvania v. Pennsylvania Game Comm'n. (PGC)*, 950 A.2d 1120, 1132 (Pa. Cmwlth. 2008). "Courts are empowered to exercise their discretion in determining whether to consider requests for declaratory judgment." *Mazin v. Bureau of Prof'l & Occupational Affairs*, 950 A.2d 382, 391 (Pa. Cmwlth. 2008).

Plaintiffs have a high likelihood of success on their request for declaratory relief. There exists an actual controversy regarding their constitutional rights and the impairment of their legal relations as a result of the Act's directives. The Court's intervention is required to assess and determine the validity of the regulation.

### C.    Plaintiffs Will Suffer Irreparable Harm In The Absence Of Injunctive Relief.

Plaintiffs will suffer irreparable harm if the Act is allowed to go into effect and be enforced. *See* Pinckney Declaration at ¶ 21. To prove irreparable harm, a moving party "must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994) (quotation omitted). "Where probable success on the merits of a constitutional claim is shown, and such violation will continue unless enjoined, the continuing constitutional violation can constitute irreparable harm." *GJJM Enterprises, LLC v. City of Atlantic City*, 293 F. Supp. 3d 509, 520 (D. N.J. 2017) (*citing Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010) (noting that First Amendment violation satisfies irreparable injury requirement)). Plaintiffs have alleged several significant constitutional

violations in the First Amended Complaint and shown a likelihood of success on the merits of those claims. These violations of fundamental rights guaranteed by the United States and Pennsylvania Constitutions satisfy the requirement of showing irreparable harm.

Finally, providing complete relief from a tenant's obligation to pay rent if they claim a COVID-19 financial hardship while simultaneously maintaining all financial obligations for the landlords will also result in additional irreparable harm if properties are foreclosed upon and landlords are saddled with the resulting effects on their livelihood and creditworthiness. Once it goes into effect, the consequences of the Act simply cannot be undone. Accordingly, Plaintiffs will be irreparably harmed without injunctive relief.

### D. Greater Injury Will Result From Denial of Injunctive Relief Than From the Grant of Injunctive Relief.

Greater injury will be inflicted by the denial of injunctive relief than by granting it. Denying injunctive relief will result in the violation of fundamental rights guaranteed to Plaintiffs by the United States and Pennsylvania Constitutions and immediate harm. Granting injunctive relief will only restore the status quo as it existed prior to the passage of the Act until these important issues are fully vetted by the Court.

### E. The Public Interest Favors The Granting of Injunctive Relief.

The public interest favors granting the injunctive relief Plaintiffs seek here. Landlords, as much as tenants, are members of the public whose rights must be accounted for when determining what constitutes the "public interest." The public also has an interest in preventing societal burdens from being unfairly allocated to one particular group of persons. The public's confidence is undermined when elected officials enact legislation shifting all risk – financial or otherwise – to one particular group when less extreme alternatives exist.

Moreover, public policy weighs strongly in favor of granting a preliminary injunction because it provides an opportunity for the intentions of both the landlords and tenants to be recognized. There is also a strong public policy in enforcing contracts so that when individuals enter into one, they do so knowing that it is a binding agreement. Enforcing clear and unambiguous contractual agreements is consistent with public policy. *See, e.g., Borough of Ambridge Water Auth. v. J.Z. Columbia*, 328 A.2d 498, 500 (Pa. 1974) (stating, "[f]undamental in our law of contracts is the axiom that parties may write their own contracts, and that it is the function of the courts to interpret those contracts and to enforce them as made").

## IV. <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiffs respectfully request that the Court issue a preliminary injunction precluding the enforcement of any provision of the Act.

Respectfully submitted,

/s/  *Colin D. Dougherty*

Colin D. Dougherty, Esq. (Pa. I.D. No. 88363)
Michael K. Twersky, Esq. (Pa. I.D. No. 80568)
Beth L. Weisser, Esq. (Pa. I.D. No. 93591)
Emma M. Kline, Esq. (Pa. I.D. No. 314027)
**FOX ROTHSCHILD LLP**
10 Sentry Parkway, Suite 200
P.O. Box 3001
Blue Bell, PA 19422-3001
(215) 299-2000 (tel)
(215) 299-2150 (fax)
Email:  cdougherty@foxrothschild.com
Email:  mtwersky@foxrothschild.com

Paul Jay Cohen, Esq. (Pa. I.D. No. 38441)
**COHEN MARRACCINI, LLC**
660 Second Street Pike
Southampton, PA 18966
(215) 887-8100 (tel)/(215) 887-8732 (fax)
Email: paul@cohenmarraccini.com

Todd L. Baritz, Esq. (Pa. I.D. No. 89157)
**Kenneth L. Baritz & Associates, P.C.**
100 S. Broad Street
Suite 1205
Philadelphia, PA 19102
215-557-8608 (tel)
Email: tbaritz@baritzlaw.com


Attorneys for Plaintiff

July 16, 2020