# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HAPCO,** | : | |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | |
| | : | **Civil Action No. 20-3300-CMR** |
| **CITY OF PHILADELPHIA, and** | : | |
| **THE HONORABLE JAMES KENNEY,** | : | |
| *Defendants.* | : | |
| | : | |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

I.    INTRODUCTION .......................................................................................................... 1

II.    FACTUAL BACKGROUND ........................................................................................ 1

    A.  The COVID-19 Pandemic in Philadelphia ................................................................ 1

    B.  Existing Housing Crisis in Philadelphia .................................................................... 4

    C.  The COVID-19 Pandemic Is Exacerbating Philadelphia's Housing Crisis .................... 5

    D.  Preventing Evictions Is Especially Important During the Pandemic .............................. 7

    E.  Recent Government Programs to Assist Landlords and Tenants in Philadelphia ........... 8

    F.  The City Passes Legislation to Ensure Residents Remain in their Homes and Small Businesses Stay in Business During the COVID-19 Crisis ............................................. 9

        1.  Temporary Eviction Relief ...................................................................................... 11

        2.  Fee and Interest Waivers ........................................................................................ 11

        3.  Mediation Requirements ......................................................................................... 12

        4.  Hardship Repayment Agreements ........................................................................... 12

        5.  Notice Requirements ............................................................................................... 13

III.    LEGAL STANDARD .................................................................................................. 13

IV.    ARGUMENT ............................................................................................................... 14

    A.  HAPCO Faces No Irreparable Harm ........................................................................ 14

    B.  HAPCO Is Not Likely to Succeed on the Merits ...................................................... 18

        1.  The Emergency Housing Bills Comply with the Contracts Clauses ........................ 18

        2.  The Bills Satisfy Rational Basis Review Under Substantive Due Process ............... 28

        3.  HAPCO Has Not Properly Pled a Facial Takings Challenge or the Necessary Property-Specific Information for an As-Applied Challenge ................................... 29

        4.  HAPCO's Preemption Claim is Foreclosed by *Warren* .......................................... 32

    C.  The Public Interest and the Balance of the Equities Do Not Support Injunctive Relief.36

V.    CONCLUSION ............................................................................................................ 37

**Cases**

*A.O. Smith Corp. v. F.T.C.,* 530 F.2d 515 (3d Cir. 1976) ............................................................ 15

*Acierno v. New Castle Cty.*, 40 F.3d 645 (3d Cir. 1994) ................................................. 14, 16, 18

*ACRA Turf Club, LLC v. Zanzuccki*, 724 F. App'x 102 (3d Cir. 2018) ...................................... 20

*ACRA Turf Club, LLC v. Zanzuccki*, No. CIV.A. 12-2775 JAP, 2012 WL 2864402 (D.N.J. July 11, 2012) ................................................................................................................................... 17

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978) ........................................... 19, 24

*Am. Exp. Travel Related Services, Inc. v. Sidamon-Eristoff*, 669 F.3d 359 (3d Cir. 2012)... 21, 23, 30, 33

*Berwick Area Landlord Ass'n v. Borough of Berwick*, 48 A.3d 524 (Pa. Cmmw. 2012) ....... 34, 36

*Dombrowski v. Pfister*, 380 U.S. 479 (1965) ............................................................................. 15

*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................................................................... 15

*Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 103 S. Ct. 697 (1983) .............. passim

*GJJM Enters., LLC v. City of Atlantic City*, 293 F. Supp. 3d 509 (D.N.J. 2017) ........................ 15

*Hawaii Hous. Auth. v. Midkiff*, 104 S. Ct. 2321 (1984) ............................................................ 33

*Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264 (1981) ............................ 32

*Hoffman Min. Co., Inc. v. Zoning Hearing Bd.*, 32 A.3d 587 (Pa. 2011) ................................... 35

*Holt's Cigar Co. v. 222 Liberty Assoc.*, 591 A.2d 743 (Pa. Super. Ct. 1991) ...................... 22, 34

*Home Bldg. & Loan Ass'n v. Blaisdell*, 54 S. Ct. 231 (1934) .................................................... 24

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) ................................................................... 25, 29

*Knick v. Twp. of Scott*, 862 F.3d 310 (3d Cir. 2017) ............................................................ 31, 32

*Knick v. Twp. of Scott, Pa.*, 139 S. Ct. 2162 (2019) ................................................................. 16

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005) ................................................................. 32

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) ................................... 33

*Lozano v. City of Hazleton*, 496 F. Supp. 2d 477 (M.D. Pa. 2007) ........................................... 36

*Marshall v. United States*, 414 U.S. 417 (1974) ...................................................................... 29

*N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374 (3d Cir. 2012) ................... 16, 21

*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) ............................................................. 15

*Nieves v. Hess Oil Virgin Islands Corp.*, 819 F.2d 1237 (3d Cir. 1987) ................................... 24

*O'Neill v. Leamer*, 239 U.S. 244 (1915) .................................................................................. 16

*Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978) ................................ 32

*Pennsylvania v. Trump*, 281 F. Supp. 3d 553 (E.D. Pa. 2017) ..................................... 39

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717 (1984) ..................................... 30

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d. Cir. 2017) ..................................... 13, 39

*S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) ..................................... 25, 29

*Sampson v. Murray,* 415 U.S. 61 (1974) ..................................... 14

*Stilp v. Contino*, 613 F.3d 405 (3d Cir. 2010) ..................................... 15

*Transp. Workers Union of Am., Local 290 v. SEPTA,* 145 F.3d 619 (3d Cir. 1998) ..................................... 20

*Troy Ltd. v. Renna*, 727 F.2d 287 (3d Cir. 1984) ..................................... passim

*United States Trust Co. v. New Jersey*, 431 U.S. 1 (1977) ..................................... 26

*United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Virgin Islands*, 842 F.3d 201 (3d Cir. 2016) ..................................... 20, 24, 26, 29

*W. Indian Co., Ltd. v. Govt. of Virgin Islands*, 844 F.2d 1007 (3d Cir. 1988) ..................................... 24

*Warren v. City of Philadelphia*, 115 A.2d 218 (Pa. 1955) ..................................... 23, 34, 36, 37

*Winter v. Nat. Res. Def. Council, Inc.,* 129 S. Ct. 365 (2008) ..................................... 39

*Yee v. City of Escondido*, 503 U.S. 519 (1992) ..................................... 22

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ..................................... 39

**Statutes**

68 P.S. § 250.301 ..................................... 35, 38

68 P.S. § 250.501 ..................................... 35

68 P.S. § 250.502 ..................................... 35

68 P.S. § 250.503 ..................................... 35

68 P.S. § 250.511 ..................................... 38

68 P.S. §§ 250.101 *et seq* ..................................... 22, 34

68 P.S. §§ 250.501-511 ..................................... 35

CARES Act, Pub. L. 116-136, § 4022 (2020) ..................................... 29

Phila Code. ch. 9-800 ..................................... 23

## I. INTRODUCTION

Now more than ever, evictions are a threat to public health. In response to a nearly unprecedented global pandemic that has taken or wreaked havoc on the lives of Philadelphia's residents and small businesses, and faced with an already dire housing crisis, the City enacted a series of emergency tenant relief measures designed to keep residents in their homes and away from a disease that spreads through physical proximity to others. Recognizing that the primary driver of evictions is nonpayment of rent and that unemployment resulting from business closures continues to this day, the measures limited nonpayment evictions for several months, temporarily waived late fees and interest that could crushingly compound, and provided for back-rent repayment and mediation programs.

HAPCO, purportedly on behalf of landlords in the City, challenges these provisions on constitutional and state statutory grounds and now seeks to enjoin the laws in the interim. But HAPCO's motion fails to meet a single one of the requirements for preliminary injunctive relief. It barely bothers to argue, let alone demonstrate, that there is irreparable harm. HAPCO's constitutional arguments about impaired contracts, due process, and takings are doomed by the fact that the City's actions were modest, temporary, and aimed at protecting tenants throughout the City from eviction and the spread of a deadly disease. And HAPCO's statutory argument was rejected over half a century ago by the Pennsylvania Supreme Court. Nor, given the dire public health and social welfare interests at stake, can HAPCO counter the equities and public interest favoring the City's provisions. For all these reasons, HAPCO's motion should be denied.

## II. FACTUAL BACKGROUND

### A. The COVID-19 Pandemic in Philadelphia

Since March, COVID-19 has had a devastating impact on Philadelphia. Tens of thousands have fallen ill, and over a thousand have died. Beyond the death toll itself, businesses

have stalled, workers have lost their jobs, and City programs have been slashed. The City had to take drastic measures to contain the disease, and even now, months since the outbreak began, it still threatens daily life in the City.

Seeking to contain the spread of disease by limiting the movement and congregation of people, Pennsylvania and Philadelphia leadership issued a host of emergency orders in response to the pandemic. *See* Ex. 1 (Gladstein Decl.) ¶¶ 17-22; Ex. 5.A (World Health Organization declared the COVID-19 outbreak a global pandemic on March 11, 2020).

Even with these measures, the disease took its toll. Philadelphia has approximately 11,340 people per square mile. *See* Ex. 5.B. This density, coupled with the contagiousness of the virus,[1] quickly overwhelmed the City's ability to trace the virus. *See* Ex. 5.D. As of August 1, 2020, there were 30,354 confirmed cases of COVID-19 in Philadelphia and 1,690 COVID-19 deaths. *See* Ex. 5.E. This is twice as many confirmed COVID-19 cases as in any other Pennsylvania county. *See* Ex. 5.F. And the CDC estimates that the number of people who have been infected may be ten times higher than the number of confirmed cases due to past testing shortages. *See* Ex. 5.G.

Still, the ability to implement social distancing was and is key to controlling the virus's spread in the City. Earlier in the pandemic, the Governor determined that "the movement and/or displacement of individuals residing in Pennsylvania from their homes or residences during the current stage of the disaster emergency constitutes a public health danger to the Commonwealth

---

[1] The novel coronavirus that causes COVID-19 is highly communicable. According to the CDC, the virus is spread when a person with COVID-19 coughs or exhales, releasing droplets from the nose or mouth. *See* Ex. 5.C. People in close proximity may breathe in these droplets or the droplets may land on objects or surfaces, which in turn are touched by people who also touch their nose, eyes, or mouth. *Id.* The virus is also spread by people who are infected but have no symptoms of the virus or those who have only mild symptoms. *Id.* Asymptomatic transmission allows people to infect each other unknowingly. *See id.*

in the form of unnecessary movement that increases the risk of community spread of COVID-19." Ex. 5.H. By implementing shut-downs, stay-at-home orders, and social distancing, Philadelphia was able to lower the infection rate, though at great cost. *See* Ex. 5.I.

Over time, these measures resulted in the temporary or permanent closure of many businesses in Philadelphia, over 99.7% of which are small businesses that may lack the financial resources of larger enterprises. *See* Ex. 5.J. Although some Pennsylvania counties began phased reopening as early as May 8, Philadelphia did not enter the "yellow phase" (which specifically advised residents they were "safer at home") until June 5, and the City's modified "green phase," which began on July 3, remains "restricted because despite the progress made, in recent weeks the daily new case count has risen at times. *See* Ex. 1 (Gladstein Decl.) ¶¶ 24-27; Ex. 1.H. Indoor dining is still not allowed and there remains a high risk of community transmission here. *See* Ex. 1 (Gladstein Decl.) ¶¶ 25-27. The City, like many areas of the country, has not been able to fully implement widespread testing and tracing, so until it can or a vaccine becomes available, Philadelphia must continue to rely on social distancing measures to limit the spread of COVID-19. *Id.* ¶ 27. This includes avoiding prolonged, close contact with other people from other households. *Id.*

Stemming the spread of COVID-19 has also been financially devastating to the City's already economically vulnerable residents, many of whom struggled to pay the rent each month even before COVID-19.[2] Business closures have contributed to record unemployment numbers in Philadelphia and exacerbated existing financial burdens. By May, the insured unemployment rate in the Commonwealth of Pennsylvania had soared to 21.21% and now remains over 11%;

---

[2] At least 1.9 million Pennsylvanians and over 100,000 Philadelphians have filed for unemployment since March 2020. *See* Ex. 5.K; Ex. 5.L at 2, 5, 8, 11; *see also* Part I.B, *infra*.

pre-COVID-19 it hovered at 2%. *See* Ex. 5.M. Importantly, this data does not include those not covered by unemployment insurance. The virus' financial toll on the City is also large. Because of reduced tax revenue, the City has to cut nearly $650 million from its 2021 fiscal year budget and will likely lay off hundreds of workers. *See* Ex. 5.N.

**B. Existing Housing Crisis in Philadelphia**

Philadelphia's eviction crisis predates the COVID-19 pandemic. Philadelphia is one of the poorest cities in America, with a poverty rate of 24.5%. *See* Ex. 5.O. Renters account for approximately 46% of all households in Philadelphia. *See* Ex. 2.C at 1. About half of all Philadelphia renters are cost-burdened, meaning they pay more than 30% of their income in rent, and 31% are severely cost-burdened, meaning they spend more than 50% of their income on rent. *See* Ex. 5.P. On any given night in 2019, 5,735 Philadelphia residents experienced homelessness. *See* Ex. 5.Q.

Pre-pandemic, roughly 1 in 14 Philadelphia renters were subject to a court-recorded eviction proceeding each year. *See* Ex. 2.B at 6 ¶ 6. In 2017 alone, over 24,000 eviction filings were recorded. *See* Ex. 2.A at 3. These figures do not include out-of-court or illegal self-help evictions, which are likely twice the number of formally filed eviction proceedings. *Id.* Evictions disproportionately impact vulnerable populations. In Philadelphia, households headed by black women with children and those with low educational attainment are most likely to face eviction. *Id.* at 8. This is especially concerning given the apparent racial disparities in health care generally and related to COVID-19 specifically. *See* Ex. 5.R.

Two years ago, the City expended significant resources to examine the eviction crisis in Philadelphia in order to understand its economic costs to the City, landlords and tenants, and to identify solutions for all stakeholders. *See* Ex. 2.A at 3. When a tenant is evicted, they often are unable to find alternative housing. In Philadelphia, "for every 100 extremely low-income renter

households, there are only 34 affordable units available." *Id.* at 10. In addition, eviction records are publicly available to landlords evaluating prospective renters and some landlords will not rent to an individual who has been evicted. *See id.* at 15. As a result, many evicted renters cannot find affordable alternative housing and become homeless. The relatively lucky evicted renters who are able to find new housing must endure the instability and expense of moving their families and possessions to their new housing, which is often more expensive and less safe. *See id.* at 8. Those who cannot find permanent affordable housing must rely on temporary housing in a shelter or the home of family or friends or must live on the streets.

Evictions carry a host of negative consequences beyond housing insecurity  Research shows that evictions can lead to "job loss, poor performance in school for children, physical and mental health issues, . . . [and] negative impacts on credit scores and the ability to re-rent. " Ex. 2.B at 7 ¶ 10; *see also id.* at 23-29. They also burden the City with "increased city shelter and other emergency housing costs, increased administrative burden for courts, . . . and the deterioration of communities when people must move away from their support systems." *Id.*

### C. The COVID-19 Pandemic Is Exacerbating Philadelphia's Housing Crisis

Early on in the pandemic, Pennsylvania's executive and judicial branches took limited steps to preserve housing.  On March 16, 2020, the Supreme Court of Pennsylvania issued Orders to prevent the Judiciary from effectuating an eviction, ejectment or other displacement from a residence. Compl. ¶ 27. The Supreme Court extended these Orders to May 11, 2020. *See id.* On May 7, 2020, Governor Wolf signed an executive order staying foreclosure and eviction notice requirements for 60 days, thereby tolling the ability to commence the timelines necessary for the initiation of foreclosure and eviction proceedings until July 10, 2020. *See* Ex. 5.H. On July 9, the Governor extended his moratorium through August 31, 2020. Compl. ¶ 30. On July 13, 2020, the President Judges of the Philadelphia Court of Common Pleas and Philadelphia

Municipal Court announced that already filed eviction cases would not be heard before September 2, 2020, and any newly filed cases would not be heard before November 16, 2020. *See* Ex. 5.S ¶¶ 2-3.

In addition, the federal CARES Act provided for forbearance for federally backed mortgages but also imposed a 120-day eviction moratorium for landlords with such mortgages or who participate in the Low-Income Housing Tax Credit (LIHTC) or other federally assisted rental housing and voucher programs. *See* Ex. 5.T. That moratorium expired on July 24, although landlords are required to provide an additional 30-days' notice before beginning eviction proceedings. According to one estimate, this provision applied to roughly a third of rental units in the country. *See id.*

The vast majority of eviction cases are filed because the renter has failed to pay rent. *See* Ex. 2.A at 10. As a result, eviction filings are likely to increase if eviction protections expire while renters are experiencing the economic consequences of the pandemic—even more so now that expanded COVID-19 unemployment benefits have expired. *See* Ex. 5.U. The Philadelphia Municipal Court dockets provide a glimpse into what the future will hold if eviction proceedings resume.  For the period of March 17 to May 29, 2020, there were 1,860 eviction cases scheduled but not heard due to the closure of Philadelphia Municipal Court. *See* Ex. 5.V at 3. This reflects a snapshot of the possible evictions over just 2 months in Philadelphia as a result of cases filed at a time when the unemployment rate in the Commonwealth was 2%. The unemployment rate in Pennsylvania reached over 20%, and many workers have yet to receive unemployment benefits. *See* Ex. 5.W. It is no leap of reason to conclude that the eviction rate will likely follow the unemployment rate as tenants struggle to pay rent in the near term.

**D. Preventing Evictions Is Especially Important During the Pandemic**

In addition to the host of social, economic, and health problems evictions normally impose, they are especially dangerous now while the City is still fighting the pandemic. At this point in time, limiting congregation of people is one of the primary ways to continue to reduce the spread of COVID-19 in Philadelphia and the Commonwealth. *See* Ex. 5.I. Allowing evictions to go forward during this crucial point in Philadelphia's fight against COVID-19 would displace vulnerable Philadelphians from the safety of their homes and increase the person-to-person contact that spreads this deadly disease.

If the infection rate rebounds, Philadelphia may have no choice but to ask residents to stay home. But on a basic level, Philadelphians cannot stay in their homes if they have been forced from their homes by eviction. The majority of evicted Philadelphians will likely not find permanent alternative housing immediately and will instead be forced to rely on some combination of staying with relatives or friends, or else living in temporary emergency housing, or living on the streets. *See* Ex. 4 (Levy Decl.) ¶ 6. The unnecessary movement and person-to-person contact caused by these displacements, along with the corresponding increase in household size, is likely to result in increased community spread of COVID-19 and will jeopardize the fragile progress that the City has made to date in reducing the rate of new COVID-19 infections and hospitalizations.

Dr. Michael Z. Levy, an epidemiologist at the University of Pennsylvania, has modeled the effect of resuming evictions on the spread of COVID-19 in Philadelphia. *See id.* ¶¶ 1, 10-13. According to simulations run by Dr. Levy, a resumption of evictions that results in increased household sizes will make it more difficult to prevent the spread of COVID-19 if there is another outbreak requiring another lock down. *Id.* ¶¶ 14-16. If that happens, Dr. Levy's model shows

that not limiting evictions sizes will likely result in 1.3% per one hundred thousand becoming infected.  *Id.* ¶ 15.

### E.  Recent Government Programs to Assist Landlords and Tenants in Philadelphia

Even before Philadelphia enacted the laws under challenge here, it had established a number of programs aimed at helping renters and landlords.  The City founded a Tenant Legal Defense Fund in 2017, an anti-eviction task force in 2017, and right to counsel in 2019. *See* Ex. 1 (Gladstein Decl.) ¶¶ 13-15. And this year alone, the City has started the Shallow Rent pilot program, the Rental Improvement Fund, the Landlord Working Capital Loan program, and PHLRentAssist, all designed to assist Philadelphia landlords and tenants.  These programs aim to help struggling tenants pay rent to their landlords, and to help landlords repair and maintain their properties in safe condition and keep current with expenses and mortgages.

At the beginning of this year, the City created a new rent-assistance program, Shallow Rent, for rent-burdened tenants living in affordable housing properties. Ex. 3 (Heller Decl.) ¶ 30. This program provides up to $500 per tenant per month, for 12 months. *Id.* ¶ 31.  The program is currently assisting 394 households. *Id.* ¶ 32.  Of particular relevance here, payments from the program go directly to the landlord. *Id.* ¶ 33.

Also this year, the City and the Impact Loan Fund announced a pilot program, the Rental Improvement Fund (RIF), to finance repairs and renovations for landlords to improve apartments for affordable rentals after conversations with HAPCO leadership.  *Id.* ¶¶ 15-16.  The RIF will lend to landlords who own fewer than 10 apartments in the City of Philadelphia and who need to improve their units to address health and safety-related repairs. *Id.* ¶ 17. Landlords can borrow up to $24,999 and have a 10-year term with 25-year amortization.  *Id.* ¶ 18.

After the onset of COVID-19, the City and the Impact Loan Fund partnered again, along with help from HAPCO board members, to launch the Landlord Working Capital Loan program

to assist residential landlords who have been impacted by tenant unemployment and business shutdowns due to COVID-19. *Id.* ¶¶ 7-8. This program provides working capital to landlords who own 15 or fewer residential rental units that are leased at affordable rates and who are having challenges covering their expenses. *Id.* ¶¶ 9-10. Loans can be made up to $10,000 at 4% interest with no payments for 6 months and thereafter a 36-month repayment period. *Id.* ¶¶ 12. To qualify, landlords must submit a certification that their cash flow has been affected by COVID-19 and that all their rental units qualify as affordable housing. *Id.* ¶ 11.

The City also began providing emergency rental assistance through its PHLRentAssist program to help tenants who lost income due to the pandemic. *Id.* ¶ 21. Phase 1 of the COVID-19 Emergency Rental Assistance program is providing up to $2,500 over three months to assist tenants who lost income due to the pandemic, and have a household income up to 50% of the Area Median Income. *Id.* The program only currently has funding for 4,000 households but not close to the nearly 13,000 applications received. *Id.* ¶ 23. The City is now beginning to roll out Phase 2 of the program using funds allocated by the Commonwealth of Pennsylvania. *Id.* ¶ 25. Phase 2 allows for payments of up to $4,500 over 6 months and has a higher income limit for eligible tenant households. *Id.* ¶ 26. Phase 2 has roughly funding for about 6,300 households, but has already received over nine thousand applications. *Id.* ¶ 28. As with Shallow Rent, payments are made directly to the landlord, and so far over $2.6 million has been paid to landlord for over a eleven hundred units. *Id.* ¶ 22.

### F. The City Passes Legislation to Ensure Residents Remain in their Homes and Small Businesses Stay in Business During the COVID-19 Crisis

To ensure residents can remain in their homes, and small businesses stay in business, the City considered and enacted several new pieces of legislation (collectively, the "Emergency Housing Bills"), which the Mayor signed on July 1, 2020, and which are the subject of this

litigation.  These Bills amended the City's Fair Housing Ordinance to establish several time-limited protections for tenants affected by the COVID-19 pandemic, raise the maximum penalty for violations of the Fair Housing Ordinance, and provide additional remedies for code violations involving self-help evictions.[3]  City Council also considered, but did not pass, Bill 200301, *see* Ex. 5.X, which would have temporarily prohibited rent increases for affected tenants.

Although the protections were enacted as separate bills, they share a common set of legislative findings and defined terms.  Some of the tenant protections were limited to residential tenants who suffered a "COVID-19 financial hardship" or small business (one with fewer than 100 employees) tenants that suffered a "Small business financial hardship."  *E.g.,* Am. Compl. Ex. B (Bill 200295) at 4, 6 (§ 9-809(1)(c), (g)).[4]  A "COVID-19 financial hardship" is defined as the loss of income between March 1, 2020 and August 31, 2020 due to one of ten listed COVID-19 related conditions, including a COVID-19 diagnosis, the need to quarantine, or the inability to work because of the shutdown.  *E.g., id.* at 4-5 (§ 9-809(1)(c)(i)-(x)).  A "Small business financial hardship" is defined as the "documented loss of income" due to a government business closure, the loss of customers or business as a result of the COVID-19 pandemic or related government actions, or the inability of the owner or employee to work as a result of one of the qualifying COVID-19 financial hardship conditions.  *E.g., id.* at 6 (§ 9-809(1)(g)(i)-(iii)).

The bills also created a mechanism for tenants to inform their landlord if they qualified for certain relief.  Tenants can submit a "Certification of Hardship" to their landlord that

---

[3] Although HAPCO also includes Bill 200304, *see* Ex. 5.Y, which further penalizes self-help evictions, in its collective referral to "the Act," Am. Compl. at 1, and seeks to enjoin "the Act," HAPCO makes no arguments relating to this Bill.  As a result, no injunction would be proper as to that bill regardless of the Court's decision on the Motion, and so Defendants do not address it further.

[4] Unless otherwise indicated, pincites to previously filed documents refer to the ECF pagination.

indicates that the tenant has suffered a hardship-related income loss and "setting forth facts that provide an explanation of the COVID-19 financial hardship [or small business financial hardship] suffered." *E.g.*, *id.* at 4 (§ 9-809(1)(a)). The Certification of Hardship must be (1) written, (2) signed, and is subject to the Philadelphia Code's penalties for false statements. *See, e.g.*, *id.*; *see also* Phila. Code §§ 1-108, 1-109.

### 1. Temporary Eviction Relief

Bill 200295 prohibits most evictions of small business tenants that suffer small business financial hardships, and of residential tenants (regardless of hardship) for two months, through August 31, 2020. *See* Am. Compl., Ex. B at 4, 6. The bill does so by limiting the legal bases for eviction during this time period to evictions that are necessary to prevent an imminent threat of harm by the person being evicted. *See id.* at 6. Bill 200295 also made it unlawful for a landlord to take any steps in furtherance of recovering possession of a property occupied by such tenants on any other basis during this period.

### 2. Fee and Interest Waivers

Bill 200302 made it unlawful for a landlord to charge or accept the payment of late fees, interest, or similar charges from residential tenants who have experienced a COVID-19 financial hardship and who are late in paying rent during the period between March 1, 2020 and May 31, 2021. *See* Am. Compl., Ex. C at 4, 6. It further provides that any prohibited fees that were paid by such a tenant to a landlord during the period would be credited against future rent or any other financial obligations owed to the landlord. *See id.* at 6-7. Residential tenants may establish a rebuttable presumption that they have suffered a COVID-19 financial hardship by submitting a Certification of Hardship to their landlord. *See id.* at 6.

### 3. Mediation Requirements

Bill 200294 allows Philadelphia's Fair Housing Commission to establish a residential eviction diversion program. *See* Am. Compl., Ex. A at 6 (§ *(a)). The program would provide for a conciliation conference with a designated mediator and a housing coordinator to assist the tenant in considering available resources. *See id.* at 6 (§ *(a)(i)-(iii))*; *see generally* Ex. 6 (Rizzo Witness Statement) (describing Philadelphia Court system's mortgage foreclosure diversion program during the Great Recession). If the program is implemented, landlords cannot take steps to evict residential tenants who suffered COVID-19 financial hardships until the parties' participate in the conciliation conference unless there is a threat of imminent harm. *See id.* at 6-7 (§ *(b)). This Bill also includes a safe harbor, and the landlord is compliant with this subsection if the landlord has provided the appropriate notice to the tenant and a conference cannot be scheduled within thirty days of the landlord's request. *See id.*

### 4. Hardship Repayment Agreements

Bill 200305 gives residential tenants who have suffered a COVID-19 financial hardship the right to pay back rent over a nine-month period without being evicted for nonpayment. The bill requires landlords to enter into a hardship repayment agreement at the request of a qualifying residential tenant. *See* Am. Compl., Ex. E at 6 (§ *(a)). Landlords may not evict tenants who are eligible for, and have timely requested to enter into, hardship repayment agreements and who pay ongoing monthly rent on time after August 31, 2020. *See id.* at 7 (§ *(d)(ii)).

Under a hardship repayment agreement, a tenant who did not timely pay their rent between March 1 and August 31, 2020 can pay, in addition to their usual monthly rent, an additional percentage of the back rent due, with all back due rent to be paid in full by May 31, 2021. *See id.* at 6-7 (§ *(a), (b)). A tenant who complies with their hardship repayment agreement is considered current on their rent, *see id.* at 6 (§ *(a)), and landlords can only evict

such a tenant for failing to pay ongoing monthly rent on time after August 31, 2020 or for failing to pay back rent as agreed if the tenant is in arrears in an amount equal to four or more monthly payments.  *See id.* at 7-8 (§ *(d)(iii)(.1)-(.2)).  In order to qualify for a hardship repayment agreement, a residential tenant must submit a Certification of Hardship, as well as "documentary evidence" of the loss of income or a certified explanation for why documentation is not available.  *See id.* at 6 (§ *(a)(i)-(ii)).

### 5.  Notice Requirements

Bill 200305 also requires landlords to provide advance notice to tenants of their rights before seeking to evict them.  If the landlord and tenant have not already entered into a hardship repayment agreement, the landlord must provide a specified notice by hand delivery or certified mail at least 30 days prior to taking steps to evict the tenant.  *See id.* at 7 (§ *(d)(i)).  The notice must inform the tenant of the potential protections available, including hardship repayment agreements.  *See id.* at 8 (§ *(a)).  If the notice is not provided, the landlord may not take steps to evict the tenant for nonpayment of rent until May 31, 2021.  *See id.* at 7-8 (§ *(d)-(e)).

## III. LEGAL STANDARD

The preliminary injunction test is well-established:

> [T]he moving party must generally show as a prerequisite[:] "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted . . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."

*Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d. Cir. 2017) (citation omitted). "[A] movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors," and if those are met "a court then considers the remaining two factors."  *Id.* at 179.

## IV. ARGUMENT

HAPCO cannot satisfy any of the injunction factors. HAPCO cannot show irreparable harm so injunctive relief is unavailable. HAPCO is also not likely to succeed on the merits as precedent establishes that governments, like Philadelphia, can enact reasonable economic legislation, such as the ordinances at issue here, to protect tenants and public health. Finally, despite HAPCO's arguments otherwise, the balance of the equities and the public interest in the face of this pandemic fall decisively in the City's favor. For all these reasons, HAPCO's motion should be denied.

### A. HAPCO Faces No Irreparable Harm

As an initial matter, HAPCO cannot show irreparable harm so this Court need not consider the other injunction factors. HAPCO makes two arguments. First, it claims the violation of constitutional rights constitutes irreparable harm *per se*. But that theory does not apply to the constitutional provisions on which HAPCO bases its claims. And second, HAPCO has not made—and cannot make—a factual showing of irreparable harm because the types of harm it alleges all can be remedied by money damages.

"In general, to show irreparable harm a plaintiff must 'demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'" *Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994) (citation omitted). Economic losses, such as a temporary loss of income, "however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Id.* (quoting *Sampson v. Murray,* 415 U.S. 61, 90 (1974)). "Thus, in order to warrant a preliminary injunction, the injury created by a failure to issue the requested injunction must '"be of a peculiar nature, so that compensation in money cannot atone for it . . . ."'" *Id.* (quoting *A.O. Smith Corp. v. F.T.C.,* 530 F.2d 515, 525 (3d Cir. 1976)).

HAPCO relies almost entirely on claimed constitutional violations in an effort to satisfy irreparable harm. *See* Pl.'s Mem. at 13-14. HAPCO is correct that a "'continuing constitutional violation **can** constitute irreparable harm.'" Pl.'s Mem. at 34 (citations omitted) (emphasis added). But as HAPCO's brief and citations make clear, this doctrine generally only applies in the First Amendment context. *See id.* at 34 (citing *Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010) (noting that *First Amendment violation* satisfies irreparable injury requirement)); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (citing *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971)); *GJJM Enters., LLC v. City of Atlantic City*, 293 F. Supp. 3d 509, 520 (D.N.J. 2017) (holding, in challenge to advertising ban, plaintiffs must show "'a chilling effect on free expression.'" (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965))). These cases do not control here as HAPCO has not brought a First Amendment claim.

HAPCO's claims are predicated on alleged violations of the federal and Pennsylvania Takings Clauses, federal Contracts Clause, and HAPCO's substantive due process rights under the federal and Pennsylvania constitutions.[5] None of these qualify as irreparable harm *per se*. First, it is black letter law that "injunctive relief [is] foreclosed" for takings claims. *Knick v. Twp. of Scott, Pa. (Knick II)*, 139 S. Ct. 2162, 2179 (2019); *see also Troy Ltd. v. Renna*, 727 F.2d 287, 300 (3d Cir. 1984) (noting "there is no federal constitutional prohibition against takings, as such. . . . If adequate compensation is afforded, and if the challenged legislation has a sufficient public purpose to satisfy the demands of equal protection and substantive due process, then it is valid"

---

[5] HAPCO also brings a preemption claim, but only asserts irreparable harm from the constitutional violations. *See* Pl.'s Mem. at 34-35 ("Plaintiffs have alleged several significant constitutional violations in the First Amended Complaint and shown a likelihood of success on the merits of those claims. These violations of fundamental rights guaranteed by the United States and Pennsylvania Constitutions satisfy the requirement of showing irreparable harm.").

(citing *O'Neill v. Leamer*, 239 U.S. 244, 248 (1915)). Second, for Substantive Due Process and

Contracts Clause claims the Third Circuit has required plaintiffs such as HAPCO to make a

factual showing of irreparable harm and held that such a showing is not satisfied when the harm

can be remedied by an award of money damages. *See Acierno,* 40 F.3d at 654 (reversing the

grant of a preliminary injunction involving alleged violations of substantive and procedural due

process and equal protection because "any actionable harm [plaintiff] may suffer, if it is

ultimately determined that the County violated his constitutional rights, can be remedied by an

award of money damages"). The same is also true for Contracts Clause violations. *See N.J.*

*Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 388 (3d Cir. 2012) (holding that while

the plaintiffs had shown a likelihood of success on the merits for their Contracts Clause claim,

irreparable harm was only satisfied because monetary relief would not be available due to state

sovereign immunity); *see also ACRA Turf Club, LLC v. Zanzuccki (ACRA I)*, No. CIV.A. 12-

2775 JAP, 2012 WL 2864402, at *10, *13-1*4 (D.N.J. July 11, 2012) (denying preliminary

injunction for lack of irreparable harm even though plaintiff had shown a likelihood of success

on the merits of Contracts Clause claim because "sufficient relief will be available in the later

stages of litigation").

HAPCO therefore must demonstrate irreparable harm as a factual matter, but the purely

speculative harms it briefly mentions fail to meet this burden. HAPCO's claim that "providing

complete relief from a tenant's obligation to pay rent if they claim a COVID-19 financial

hardship while simultaneously maintaining all financial obligations for the landlords will also

result in additional irreparable harm if properties are foreclosed upon and landlords are saddled

with the resulting effects on their livelihood and creditworthiness," Pl.'s Mem. at 35, is based on

a flawed premise, no evidence, and is legally insufficient in any event.

First, HAPCO's theory misinterprets the legal and practical effect of the Bills. While here HAPCO incorrectly equates the temporary limits on evictions and late fees with a prohibition on collection of rent itself, HAPCO elsewhere concedes that the Bills "allow[] landlords to theoretically recover unpaid rent." Pl.'s Mem. at 25. Nor is there is any factual support for the proposition that the Bills are preventing the collection of rent. Now that the Governor has extended the statewide eviction moratorium until at least August 31, 2020, *see* Ex. 5.H, and the Philadelphia Municipal Court has announced it will not hear new filings until November 16, 2020, *see* Ex. 5.V ¶ 3, Plaintiff's members would be unable to evict tenants during the COVID-19 emergency period and beyond for non-payment of rent even without the laws at issue. In an interview given earlier this month, HAPCO's Vice President and declarant, Victor Pinckney, admitted that even without the ordinances under challenge here, "the case backlog and court rules limiting the number of hearings per day would have meant there was 'a good chance' he wouldn't have reclaimed his units until November or December and wouldn't have been able to collect rent until he could lease units again in January or February." *See* Ex. 5.Z.

Second, HAPCO's claim is entirely speculative. HAPCO's brief does not cite any evidence that foreclosures are looming, and Mr. Pinckney's declaration is similarly conclusory. *Id.* at 34 (citing Pinckney Decl. ¶ 21 ("In the event that the Act is enforced and implemented, HAPCO members will suffer immediate and irreparable injuries as set forth above.") Although Mr. Pinckney also posits that "HAPCO members rely on rental payments to pay mortgages, property taxes and other expenses for their properties," he does not provide any support for this claim and makes no mention of foreclosure or creditworthiness. Pinckney Decl. ¶ 11. This is tantamount to no showing at all. And third, even if HAPCO's speculation came to pass, the injuries alleged are purely monetary. As Plaintiff's General Counsel elsewhere conceded,

HAPCO's complaint is that the Ordinances are "basically taking away money from the landlord." Ex. 5.AA; *see also Acierno*, 40 F.3d at 654-55 (holding alleged loss of property and business advantage not irreparable harm). Because HAPCO has not articulated, let alone shown, an injury of such "'a peculiar nature[] so that compensation in money cannot atone for it,'" *Acierno*, 40 F.3d at 653, HAPCO cannot satisfy the irreparable harm requirement necessary to justify an injunction.

## B. HAPCO Is Not Likely to Succeed on the Merits

Nor is HAPCO likely to succeed on the merits of any of its claims. First, the Emergency Housing Bills operate only temporarily and do not relieve tenants of their obligation to pay rent, and therefore do not substantially impair contracts. And even if they did, they would survive Contracts Clause scrutiny because they are temporary, reasonable, and necessary measures aimed at preventing evictions and limiting the spread of COVID-19. Second, the Bills easily survive the even more deferential rational basis review applicable to economic and social welfare legislation under the Due Process Clause analysis for the same reasons. Third, HAPCO's facial challenge under the takings clauses fails to controvert the City's public purpose in enacting the Bills.[6] And fourth, HAPCO's preemption argument is foreclosed by binding Pennsylvania Supreme Court precedent.

### 1. The Emergency Housing Bills Comply with the Contracts Clauses

Despite HAPCO's arguments to the contrary, the Bills do not violate the Contracts Clauses because they do not "substantially" impair existing leases, as the Bills operate only temporarily or on ancillary terms. Even if the Bills did substantially impair existing leases, they

---

[6] Defendants agree with Plaintiff that the analysis for each type of constitutional claim is the same under both the federal and Pennsylvania constitutions. *See* Pl.'s Mem. at 15, 22, 31.

would still be constitutional because they are reasonable and necessary means of furthering the goal of preventing evictions and limiting the spread of disease during the COVID-19 pandemic.

While the Contract Clause under Article I, Section 10, Clause 1 of the U.S. Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts," "[t]he Clause is not . . . the Draconian provision that its words might seem to imply." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978). To determine whether a law violates the Contract Clause, courts in the Third Circuit apply a three-part test: "[1] whether the law has operated as a substantial impairment of a contractual relationship; [2] whether the government entity, in justification, had a significant and legitimate public purpose behind the regulation; and [3] whether the impairment is reasonable and necessary to serve this important public purpose.'" *ACRA Turf Club, LLC v. Zanzuccki (ACRA II)*, 724 F. App'x 102, 108 (3d Cir. 2018) (quoting *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Virgin Islands*, 842 F.3d 201, 210 (3d Cir. 2016)).

Although the various provisions of the Emergency Housing Bills need only satisfy either part one or parts two and three of the Contracts Clause analysis, each provision satisfies all three. None of the Bills *substantially* impair existing leases as they are limited and temporary, the City had an obvious public purpose—to prevent evictions and the spread of disease—and the measures are reasonable and necessary to achieve those goals, particularly given the deference to which the City is entitled when legislating with respect to economic issues and public health.

### a. The Bills Do Not Substantially Impair Leases

Under the first prong, courts "determine whether there has been a substantial impairment of a contractual relationship by inquiring whether legitimate expectations of the plaintiffs have been substantially thwarted." *Transp. Workers Union of Am., Local 290 v. SEPTA,* 145 F.3d 619,

622 (3d Cir. 1998)). If the law does not operate as a "substantial impairment," the Contracts

Clause is not implicated. *Troy Ltd.*, 727 F.2d at 297.

In determining what expectations were legitimate and whether any impairment is

substantial, the court "consider[s] whether the industry the complaining party has entered has

been regulated in the past." *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 103 S. Ct.

697, 706 (1983)). "When a party enters an industry that is regulated in a particular manner, it is

entering subject to further legislation in the area, and changes in the regulation that may affect its

contractual relationships are foreseeable." *Am. Exp. Travel Related Services, Inc. v. Sidamon-

Eristoff*, 669 F.3d 359, 369 (3d Cir. 2012) (citing *Energy Reserves*, 103 S. Ct. at 704); *see also

Energy Reserves*, 103 S. Ct. at 706 (holding no legitimate expectation of free market pricing

where the industry was already subject to "extensive and intrusive" supervision). For example,

the Third Circuit considered the same law in two companion cases, enjoining it under the

Contracts Clause in *New Jersey Retail* but upholding it in *American Express Travel* because

American Express's product had been previously regulated by the state. *Compare N.J. Retail*,

669 F.3d at 387 ("New Jersey law never before provided for the escheat of SVCs"), *with Am.

Exp. Travel*, 669 F.3d at 369 ("New Jersey has consistently regulated travelers checks").

HAPCO contends that landlords leased their properties with the "one underlying

purpose" of "ensur[ing] *prompt* payment of rent." Pl.'s Mem. at 18 (emphasis added). HAPCO

argues that the Emergency Housing Bills collectively constitute a substantial impairment because

"together" they "fundamentally upend the contractual bargains" in four ways: (1) "landlords are

barred from collecting *any* rent from their current tenants," "effectively reliev[ing] the tenants of

their obligation to pay rent through at least August 31, 2020"; (2) Bill 200302 eliminates late

fees for certain tenants through May 2021; (3) the Bills limit the bases for eviction for certain

tenants until May 2021; and (4) the Bill 200294 "adds a term to every private lease" requiring mediation. *Id.* at 19. But these claims misconstrue the Bills and, in the context of the highly regulated landlord-tenant arena, fail to identity a legitimate expectation that is thwarted.

First, as HAPCO concedes, the Bills do not "bar" landlords from collecting rent due at any time. *See* Pl.'s Mem. at 25 (noting "the Act allows landlords to theoretically recover unpaid rent"). While some provisions temporarily stop evictions for nonpayment, *see e.g.,* Am. Compl., Ex. B (Bill 200295) at 6, none prohibit the collection of rent or forgive rent that is owed. Any impact from the temporary limitation on evictions is severely, if not entirely, obviated by Governor Wolf's Executive Order extending the statewide eviction moratorium until August 31, 2020 as well. And rather than "add[ing] a term" to leases, Bills 200294 and 200305 build on the existing regulatory framework for eviction by establishing mediation and repayment programs intended to help tenants become current and pay their landlords in full within nine months. *See* Am. Compl., Ex. A (Bill 200294) at 6 (§ *(a)) (mediation); Am. Compl., Ex. E at 7-8 (§ *(b), (d)) (hardship repayment agreements); *see also* Ex. 6 (Rizzo Witness Statement) ¶¶ 9-14.

Underlying all of this is the fact that the landlord-tenant relationship has long been highly regulated. *C.f. Yee v. City of Escondido*, 503 U.S. 519, 528–29 (1992) (listing existing landlord-tenant regulations that did not constitute compensable takings). Pennsylvania's Landlord and Tenant Act of 1951 imposes certain notice and procedural requirements on evictions as well as limitations on security deposits that can be maintained and interest that may be charged for past due rent. *See* 68 P.S. §§ 250.101 *et seq*. Late-performance penalty provisions in contracts are also disfavored under Pennsylvania law. *Cf. Holt's Cigar Co. v. 222 Liberty Assoc.*, 591 A.2d 743, 749 (Pa. Super. Ct. 1991). Federal, state, and City fair housing laws regulate discrimination in housing and the safety of the premises provided. And in addition to the Bills at issue, the City

regulates landlords specifically in several ways, including penalizing self-help evictions, requiring landlord registration, and requiring "good cause" for evictions of month-to-month tenants. *See* Phila Code. ch. 9-800.

None of this is new. The City's Fair Housing Ordinance, Chapter 9-800, dates back to the 1950s. Similarly, longstanding Pennsylvania case law acknowledges that the City previously has and may in the future limit the legal bases for eviction. *See Warren v. City of Philadelphia*, 115 A.2d 218 (Pa. 1955). Landlords enter the industry "subject to further legislation in the area, and changes in the regulation that may affect its contractual relationships are foreseeable." *Am. Exp. Travel*, 669 F.3d at 369.

While HAPCO may contend that landlords often enter leases in exchange for the payment of rent, in light of the many provisions that regulate the landlord-tenant relationship, the promptness of the payment cannot reasonably be considered exempt from regulation or the "one underlying purpose." Nor has HAPCO provided any evidence that this is the case. That a party to a contract prefers quick performance and full payment does not mean that landlords in this highly regulated industry have any legitimate expectation that the government would never affect the ancillary terms surrounding the payment of rent. *See, e.g., id.* at 370. To the contrary, landlords have long been on notice that their leases are subject to regulation in a wide variety of ways. As a result, laws like the Emergency Housing Bills that interpose new regulatory limitations on the landlord tenant relationship but do not dispense with the rent obligation itself do not constitute "substantial" impairments.

### b. Preventing Evictions and Protecting Public Health Are Public Purposes

Even if any impairment could be deemed "substantial," the City has acted in furtherance of a legitimate public purpose. "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests."

*Energy Reserves*, 103 S. Ct. at 705. "A legitimate public purpose is one aimed at remedying a broad and general social or economic problem; it need not be addressed to an emergency or temporary situation." *United Steel Paper*, 842 F.3d at 211 (citation omitted).

Courts that have found public purpose lacking have done so because the legislation has been targeted at a very small group or even a single entity. *See, e.g., Allied Structural Steel*, 438 U.S. at 248 (suggesting "the legislation was aimed largely at a single employer); *W. Indian Co., Ltd. v. Govt. of Virgin Islands*, 844 F.2d 1007, 1022 (3d Cir. 1988) ("The Repeal Act is by its own terms directed at a single company and a single 15–acre area."); *Nieves v. Hess Oil Virgin Islands Corp.*, 819 F.2d 1237, 1250 (3d Cir. 1987) ("[T]he legislative history indicates that the legislature was aware that the major impact of the retroactive application provision would be on Hess.").

That is not the case here. Providing eviction or foreclosure relief to a broad group such as renters or homeowners during times of economic distress is a classic public purpose not for the advantage of particular individuals. *See, e.g.*, *Home Bldg. & Loan Ass'n v. Blaisdell*, 54 S. Ct. 231, 242 (1934) (holding mortgage moratorium extending time period for redemption "was not for the mere advantage of particular individuals but for the protection of a basic interest of society"); *Troy Ltd.*, 727 F.2d at 298 ("[T]here is no question but that the state has justified [anti eviction law] by showing a broad remedial purpose in protecting the mental and physical health of citizens who could suffer greatly by evictions."). So is protecting public health by preventing the spread of deadly, communicable diseases. *Cf., e.g.*, *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring); *Jacobson v. Massachusetts*, 197 U.S. 11 (1905).

In this case, the City acted to protect City residents in general and tenants in particular from COVID-19 and its economic consequences by "ensur[ing] residents are able to remain in their homes, and small businesses are able to stay in business." Am. Compl., Ex. B at ¶¶ 1-5, 20. HAPCO does not dispute that the Bills seek to provide relief to residential and small business tenants. *See* Pl.'s Mem. at 19. Instead, HAPCO characterizes these renters as "a single group of people." *Id.* But HAPCO's attempt to analogize all residential and small business tenants to the types of "single group[s] of people" discussed in applicable cases such as the individual employers targeted in *Allied Structural Steel*, *West Indian*, and *Nieve* is nonsensical. Unsurprisingly, HAPCO's characterization is squarely foreclosed by cases like *Blaisdell* and *Troy Ltd.*[7] As a result, the Bills' public health and safety goals satisfy the requirement of a significant and legitimate public purpose.

### c. The Bills Are Reasonable and Necessary to Prevent Evictions and Protect Public Health

At the third step of the Contracts Clause analysis, if a law imposes a substantial impairment but serves a public purpose, it is constitutional if the means chosen are reasonable and necessary. When, as here, the government is not a contracting party, "'courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure,'" as "'is customary in reviewing economic and social regulation.'" *Energy Reserves,* 103 S.Ct. at 705–06.

---

[7] HAPCO briefly argues that eviction prevention is not a public purpose because Philadelphia faced an affordable housing crisis even before COVID-19. Pl.'s Mem. at 19-20. This is similarly mistaken. HAPCO quotes *United Paper Steel* for this proposition, but as the quoted excerpt itself states, whether a problem predated the legislation goes to the legislation's "reasonable[ness]" under the third stage (reasonable-and-necessary) of the Contracts Clause analysis, not the second stage consideration of public purpose. In addition, and as discussed further *infra*, a preexisting problem is only a factor bearing on reasonableness "when the State itself is a contracting party," which is not the case here. *United Paper Steel*, 842 F.3d at 212-13.

As an initial matter, we note that HAPCO's argument does not follow this approach. HAPCO would have the Court "[a]pply[] the test articulated in *United Steel Paper*" and argues that the City "must use the least intrusive means to achieve its goals." Pl.'s Mem. at 17-18, 20-21 (citing *United Steel Paper*, 842 F.3d at 212 (quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 31 (1977))). HAPCO's application of the *United Steel Paper* standard to this case is mistaken because here the government is not a party to the contract. In *United Steel Paper* the law at issue "reduced the salaries of *government* workers" that were the subject of a collective bargaining agreement between the workers *and the government*. Pl.'s Mem. at 17 (emphasis added) (citing *United Steel Paper*, 842 F.3d at 205). Here, the City is not a party to the types of contracts at issue, and so "[t]he higher standard of *United States Trust* is not relevant to the disposition of this case, which poses the very different problem of legislation allegedly impairing the obligation of contracts between private parties." *Troy Ltd.*, 727 F.2d at 296. As a result, if the Court reaches the third stage of the analysis, the City's determinations as to reasonableness and necessity are entitled to substantial deference.

*Troy Limited* illustrates the reasonableness-and-necessity analysis and deference courts afford legislation when the government is not a party. There, New Jersey passed a law providing certain low-income elderly tenants "the right to remain as a tenant in a converted [condominium[] unit for up to forty years beyond any period already authorized." *Id.* at 291. The Third Circuit found that this measure was reasonable and necessary to protect "certain senior citizens and disabled persons against evictions resulting from condominium conversions," particularly given that the protections were limited by a "reasonable personal income test." *Id.* at 290, 298 ("[W]e are admonished not to substitute our views for those of the legislature.").

Elsewhere, the Supreme Court has said that making measures "temporary" is also a signal of reasonableness. *Energy Reserves*, 459 U.S. at 418.

Here, the provisions of the Emergency Housing Bills were and are reasonable and necessary to keep tenants in their homes and small businesses afloat because they provide flexibility for tenants who have lost income due to the pandemic while leaving in place tenants' core financial obligations to their landlords. There is extensive evidence about the negative economic and health consequences to tenants of eviction. *See supra* Part I.B. In addition, City Council could reasonably infer a connection between evictions—in which people cannot stay home, must move around in close contact, and often end up living with other people or in shelters—and COVID-19, which spreads through close contact and among household members; indeed, we now have quantitative analyses showing exactly that. *See supra* Part I.D; *see also* Ex. 4 (Levy Decl.) ¶ 11.

HAPCO does not dispute that these measures will help prevent evictions and keep people in their homes, and that preventing evictions is necessary to avoid these harmful consequences. Further, these measures were eminently reasonable: each challenged provision is temporary, evictions where harm is imminent remain available, and most measures are limited to tenants who have lost income due to the COVID-19 pandemic. *See, e.g.*, Am. Compl., Ex. C (Bill 200302) (prohibiting late fees for residential tenants who experience a COVID-19 financial hardship only).

Although HAPCO at times characterizes the Bills collectively as an unreasonable "obliteration" of landlord's rights, Pl.'s Mem at 21, the Bills do no such thing and HAPCO's actual complaints are much narrower. HAPCO quibbles with the length of the eviction moratorium and contends that other relief is unreasonable because it extends beyond August 31,

2020, *see* Pl.'s Mem at 18, 21. But given the continuing rise in COVID-19 cases and associated limitations on economic activity in the City, it is reasonable for the City to determine that renters' financial difficulties will extend further into the future, and so the corresponding relief necessary to prevent eviction will need to as well. *See, e.g.*, *Troy Ltd.*, 727 F.2d at 296 (noting that in *East New York Savings Bank v. Hahn*, 326 U.S. 230 (1945), the Supreme Court "approv[ed] [a] tenth extension of [a] mortgage moratorium"). This crisis has already lasted six months, and it may take multiple months for those renters who were out of work or whose businesses were closed to accumulate sufficient funds to repay back rent that the Bills do not forgive.

HAPCO's argument that the provisions were unconstitutional because the City did not consider a more moderate course or provide relief to landlords in these bills is also legally wrong and factually disingenuous. *See* Pl.'s Mem. at 21. Even under the level of scrutiny HAPCO erroneously applies, this would be wrong. *See United Steel Paper*, 842 F.3d at 213 ("[T]the Contracts Clause also 'does not require the courts . . . to sit as superlegislatures,' choosing among various options proposed by plaintiffs, as 'we [are] ill-equipped even to consider the evidence that would be relevant to such conflicting policy alternatives.'" (citation omitted)). And it is egregiously inappropriate here where the City is not a contracting party, *see Troy Ltd.*, 727 F.2d at 296, and is responding to protect its citizens from the physical and economic effects of a deadly communicable disease. As the Chief Justice of the Supreme Court recently explained in denying an application for an injunction by a church in a free exercise case subject to strict scrutiny:

> Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." When those officials "undertake[] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad."

*S. Bay United Pentecostal Church*, 140 S. Ct. at 1613 (quoting *Jacobson*, 197 U.S. at 38;

*Marshall v. United States*, 414 U.S. 417, 427 (1974)) (alteration original)).

Factually, City Council did consider other alternatives, such as rent control, *see* Bill 200304, which it did not ultimately enact, and it tailored the enacted relief to those financially impacted. HAPCO's counsel acknowledged that City Council even limited the eviction moratorium period at HAPCO's suggestion. *See* Ex. 5.BB at 159:21-160:2 (noting moratorium "was originally going to be a very extended period, and we [HAPCO] thank the Councilmembers for putting it into just the specific time period; namely, August the 31st"). And, in addition to the foreclosure moratorium provided by the CARES Act, the City is providing financial relief directly to landlords. *Compare* Pl.'s Mem. at 21 (suggesting landlord must still pay mortgages and property taxes), *with* CARES Act, Pub. L. 116-136, § 4022 (2020) (providing for forbearance on mortgage payments, without late fees, penalties, or interest, in the event of a COVID-19 financial hardship); *supra* Part I.E (discussing City rent-assistance programs that pay landlords directly, and programs that provide loans to landlords to meet financial obligations). Thus, the City's temporary measures represent reasonable judgments about what was and is necessary to limit evictions during this tumultuous time. Particularly given the deference to which the City's reasonableness and necessity judgments are entitled, each provision of the Bills satisfies the limited demands of the Contracts Clauses.

### 2. The Bills Satisfy Rational Basis Review Under Substantive Due Process

HAPCO also contends that the provisions of the Emergency Housing Bills violate landlords' substantive due process rights under the federal and Pennsylvania constitutions. *See*

Pl.'s Mem. at 32-34. Defendants agree with HAPCO that substantive due process claims for property interests under both constitutions are subject to a rational basis test. *See Am. Exp. Travel*, 669 F.3d at 366 (noting under rational basis, "[a] court's inquiry is limited to whether the law 'rationally furthers *any* legitimate state objective.'" (citation omitted)); Pl.'s Mem. at 31.

Because, as discussed above, the Emergency Housing Bills pass muster under the Contracts Clause, and because scrutiny under the Contracts Clause, deferential as it is, is still more exacting than rational basis scrutiny, the Bills also necessarily satisfy rational basis review. *See Am. Exp. Travel*, 669 F.3d at 369 (noting Contracts Clause "review of legislative judgment is more exacting than the rational basis standard applied in the due process analysis" (citing *Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 733 (1984)).

To the extent a separate analysis is necessary, the challenged provisions easily satisfy this standard. Limiting evictions and the pecuniary costs that contribute to them during a pandemic furthers the legitimate goals of protecting public health and economic welfare by preventing evictions. HAPCO concedes as much. *See* Pl.'s Mem. at 33 ("It is true that abating rent obligations and staying evictions may allow tenants to fend off the financial impact of COVID-19; but the City fails to account for the ongoing financial obligations landlords face, like enduring mortgage payments, property taxes, and utilities."). HAPCO's complaint that the Bills do not, to its mind, satisfactorily address the hardships faced by landlords is precisely the kind of narrow tailoring not required in a rational basis review.

### 3. HAPCO Has Not Properly Pled a Facial Takings Challenge or the Necessary Property-Specific Information for an As-Applied Challenge

HAPCO also brings a facial challenge to the mediation program (Bill 200294), eviction moratorium (Bill 200295), and mandatory hardship repayment (Bill 200305) provisions of the Emergency Housing Bills under the Takings Clauses of the Fifth and Fourteenth Amendments

and the Pennsylvania Constitution. *See* Pl.'s Mem. at 22; Am. Cmpl. ¶ 85; *see also* Am Compl. ¶ 10. But the Bills easily survive a facial challenge to their public purpose, particularly since HAPCO raises only as-applied arguments bearing on whether compensation is due, not whether the Bills are invalid. And in any event, because the Bills are classic landlord-tenant regulations under the government's police power, they would not constitute compensable takings under the as-applied, ad hoc *Penn Central* analysis that would otherwise apply to the "temporary, non-categorical regulatory taking" HAPCO alleges. Pl.'s Mem. at 23.

A facial challenge under the Takings Clause "attacks the 'underlying validity' of a law or regulation" on the theory that "'[n]o amount of compensation can authorize a taking rooted in a facially invalid law.'" *Knick v. Twp. of Scott (Knick I)*, 862 F.3d 310, 324–25 (3d Cir. 2017) (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005)), *vacated and remanded on other grounds, Knick II*, 139 S. Ct. 2162. The only issue on a facial challenge under the Takings Clause—as opposed to the Due Process Clause, *see supra* Part IV.B.2—is "for lacking a public purpose." *Knick I*, 862 F.3d at 326.

By contrast, an as-applied challenge seeks monetary compensation for government interference with property rights that rises above a certain threshold. *See Lingle*, 544 U.S. at 536. Non-facial "regulatory takings challenges are governed by the standards set forth in *Penn Central Transportation Co. v. New York City,* 438 U.S. 104 (1978)." *Id.* at 538. The *Penn Central* factors include "'[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations[,]" and *"the 'character of the governmental action'—for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.'" *Id.*

at 538-39 (quoting *Penn Central*, 438 U.S. at 124). Because of the need to examine "the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances" *Penn Central*'s "'ad hoc, factual inquir[y]' must be conducted with respect to specific property," and cannot be applied to a facial challenge. *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 295 (1981).

Rather than seeking "just compensation," HAPCO seeks a declaration that the Bills are "unconstitutional on [their] face," Am. Compl. ¶ 10. Because HAPCO brings a facial challenge, the only issue is whether the various provisions in the Emergency Housing Bills have a public purpose. But because HAPCO's argument focuses on the *Penn Central* factors, it has not argued or shown an invalid purpose. The closest HAPCO comes is a misguided argument under the character-of-the-governmental-action factor that the Bills "do[] not promote the common good." Pl.'s Mem. at 26. But as discussed above in Sections IV.B.1.b and 2, the Bills easily satisfy rational basis and the purpose requirement of the Contracts Clause analysis. *See Hawaii Hous. Auth. v. Midkiff*, 104 S. Ct. 2321, 2329 (1984) ("The 'public use' requirement [of the Takings Clause] is thus coterminous with the scope of a sovereign's police powers.").

Even if analyzed generously under the *Penn Central* factors, HAPCO's generalized regulatory claim would not constitute a compensable taking. With respect to the character-of-the-state-action factor, "a public program adjusting the benefits and burdens of economic life to promote the common good . . . ordinarily will not be compensable.'" *Am. Exp. Travel*, 669 F.3d at 371. As the Supreme Court has noted, "states have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982) (collecting cases). Here, the Emergency Housing Bills make up a

public program, not a physical invasion. Because there is no specific property, HAPCO cannot point to a significant economic impact on any *distinct* investment-backed expectation, such as an assignment of rent payments to a third party. As a result, HAPCO is not likely to succeed on the merits of any type of challenge under the takings clauses.

### 4. HAPCO's Preemption Claim is Foreclosed by *Warren*

The Pennsylvania Supreme Court has expressly held that the City of Philadelphia has the legal authority to limit the basis for eviction, require landlords to provide additional notice prior to eviction, and impose limits on the rent a landlord can charge. *See Warren v. City of Philadelphia*, 115 A.2d 218 (Pa. 1955). Approximately 65 years ago, in a strikingly similar case, the Pennsylvania Supreme Court rejected the argument HAPCO makes today—that the City's imposition of eviction and rent controls is preempted by the Pennsylvania Landlord and Tenant Act of 1951 (the "Landlord-Tenant Act"), 68 P.S. §§ 250.101 *et seq*. Because the Court in *Warren* held that the Landlord-Tenant Act did not preempt Philadelphia's regulation of landlord-tenant relations and evictions, HAPCO's preemption argument fails.

HAPCO argues that the Bills are preempted under the doctrine of conflict preemption because "[c]ompliance with both the [Bills] and the Landlord-Tenant Act is impossible." Pl.'s Mem. at 28. The City is vested with the legal authority to legislate regarding matters that affect the health and welfare of the City and its residents "as fully as could the General Assembly" unless limited by constitutional restrictions or specifically preempted by state law. *Warren*, 115 A.2d at 221. But "[f]or conflict preemption to be applicable, the conflict between the statute and the ordinance must be irreconcilable." *Berwick Area Landlord Ass'n v. Borough of Berwick*, 48 A.3d 524, 534 (Pa. Cmmw. 2012) (quoting *Holt's Cigar*, 10 A.3d at 907–08). Moreover, mere inconsistency does not constitute an "irreconcilable conflict"; rather the Pennsylvania Supreme Court has been clear that "[a] conflict is irreconcilable if simultaneous compliance with both the

local ordinance and the state statute is impossible." *Hoffman Min. Co., Inc. v. Zoning Hearing Bd.*, 32 A.3d 587, 602 (Pa. 2011).

HAPCO's argument implicates two articles of the 1951 Landlord-Tenant Act. Article III provides that "[a]ny landlord may recover from a tenant rent in arrears in an action of assumpsit as debts of similar amount are by law recoverable. In any such action, interest at the legal rate on the amount of rent due may be allowed if deemed equitable under the circumstances of the particular case." 68 P.S. § 250.301. And Article V lays out the process for a summary eviction proceeding, in contrast to the ejectment action. *See generally id.* §§ 250.501-511.

Under the summary procedure, a landlord seeking to evict a tenant must issue the tenant a written "notice to quit" at least ten days before filing for eviction. *Id.* § 250.501(a)-(b). The Act identifies examples of when the notice to quit may generally be issued: "(1) [u]pon the termination of a term of the tenant, (2) or upon forfeiture of the lease for breach of its conditions, (3) or upon the failure of the tenant, upon demand, to satisfy any rent reserved and due." *Id.* After the expiration of the notice period, the landlord can file a complaint, with a hearing to be scheduled within ten days. *Id.* § 250.502(a). At the hearing, the court may enter judgment for the premises to be delivered to the landlord and for any rent due. *See id.* § 250.503(a)(1), (3).

Despite the circumstances listed as *possible* grounds for a notice to quit, the Pennsylvania Supreme Court has held that the Landlord-Tenant Act does not regulate the substantive legal bases for eviction, making clear that the examples provided are merely illustrative not regulatory. In 1955, the City of Philadelphia passed an ordinance in response to a housing emergency that provided for rent control, required notice before eviction, and limited the legal bases for eviction. *See Warren*, 115 A.2d at 219 n.1. In particular, the ordinance expressly prohibited eviction on the ground that the lease had ended and required several additional types of notice prior to

33

eviction.  *See id*. (providing "evictions shall not be had unless '(1) The tenant has violated a substantial obligation of his tenancy o*ther than the obligation to surrender possession*" (emphasis added)). Landlords challenged the ordinance, in part, on the ground that it was preempted by the Landlord-Tenant Act.  *See id*. at 221.  The Court held that the Landlord-Tenant Act "sets up the procedure whereby a landlord may repossess premises if he has a *right* to evict the tenant. The substantive law as to *when* he has a right to evict is not touched upon. The Landlord and Tenant Act is not an exercise of police powers by the state, and hence is not in derogation of the police power of the city."  *Id*. (emphasis in original).[8]

Contrary to HAPCO's claims, there are no conflicts here.  HAPCO claims without support that it is "impossible" for its members to comply with both the City law and the Act, because City law "minimize[s] landlords' remedies." Pl.'s Mem at 28-29.  But HAPCO's argument misunderstands the mechanism by which the Bills operate and ignores *Warren*.  The Bills do not change the applicable procedure under the Act, but temporarily limit what circumstances may legally constitute default in Philadelphia during the relevant period.  *See, e.g.,* Am. Compl., Ex. B (Bill 200295) at 6 ("During the COVID-19 emergency period the only legal basis for evicting a residential tenant in Philadelphia shall be to cease or prevent an imminent

---

[8] *Warren* is still good law, and this core holding was recent reaffirmed by the Commonwealth Court.  *See Berwick*, 48 A.3d at 536 ("[T]he Landlord Tenant Act sets forth procedures for eviction, but does not address all of the factual or substantive legal scenarios that may trigger a landlord's right to evict." (citing 68 P.S. § 250.501; *Warren,* 115 A.2d at 221)); *see also Lozano v. City of Hazleton*, 496 F. Supp. 2d 477, 553 (M.D. Pa. 2007) ("The Pennsylvania Supreme Court, however, has held that the L/T Act sets forth the procedures for eviction and does not address the substantive issue of when a landlord has a right to evict." (citing *Warren*)), *aff'd in part, vacated in part on other grounds,* 620 F.3d 170, 181 n.12 (3d Cir. 2010) ("The district court dismissed the Equal Protection, Fair Housing Act, privacy, and Pennsylvania Landlord and Tenant Act claims, and those portions of its order have also not been appealed.").

threat of harm . . . .").[9] HAPCO's members may not want to comply with both the Act and City law but that does not make compliance impossible.

Under *Warren*, the City is free to limit the circumstances "*when* [a landlord] has a right to evict." 115 A.2d at 221 (emphasis added). Just as the City in 1955 could impose limitations on rent, require additional notice prior to eviction, and prohibit eviction at the end of a lease term, the City can now, subject to the constitutional constraints discussed *supra*, temporarily limit evictions to cases of imminent harm. Without a legal basis for eviction, a landlord has no cause to issue a notice to quit or file an eviction complaint in the first place.

Next, HAPCO claims that landlords "cannot demand rent during the COVID-19 emergency period," and that Bills 200302 and 200305 "prohibit[] landlords from suing to collect past-due rent, late fees, and interest." Pl.'s Mem. at 30 (citing Am. Compl., Exs. C, E). But neither Bill imposes any limit on landlords' ability to seek and collect monthly rent if due, as HAPCO elsewhere acknowledges. *See* Pl.'s Mem. at 25 (noting "the Act allows landlords to theoretically recover unpaid rent"). Bill 200302 only prohibits landlords from seeking late fees, interest, or similar charges. *See* Am. Compl., Ex. C at 6 (§ *(a), (c)). And as HAPCO points out, Bill 200305 provides that a tenant who enters into a hardship repayment agreement "shall be considered in full compliance with any payment obligations under such tenant's lease." Pl.'s Mem. at 30 (quoting Am. Compl., Ex. E at 6). If a tenant is in "full compliance," then there is no

_____

[9] The conciliation (also referred to as diversion or mediation) program authorized by Bill 200294 is even more benign. As an initial matter, the provision has no effect until the program is established—it has not yet been— and it expires at the end of the year. *See* Am. Compl., Ex. A at 6 (§ *(a)(b). And in any event, while the Bill makes it unlawful, absent imminent harm, to begin eviction proceedings within thirty days without participating in a conciliation conference if scheduled, 200294 does not itself change the eviction procedure. Instead, it builds on the thirty-day notice provision of Bill 200305, which does limit the legal basis for eviction. As discussed above, that is permissible under *Warren*.

rent due to be demanded. HAPCO is free to raise, as it does elsewhere, due process or other constitutional complaints against such a provision contravening existing lease terms, but these provisions do not present a preemption issue.[10]

Finally, the late fee and interest waiver provision is also consistent with the Act. The Act provides that "interest . . . may be allowed if deemed equitable, " 68 P.S. § 250.301, but the Act does not require that interest be awarded or mention late fees at all. Moreover, the waiver provision is limited to those tenants who have lost income due to COVID-19, consistent with the Act's implicit provision that interest is not available where it would be not be "equitable."

Because the Bills do not conflict with the Landlord-Tenant Act as interpreted by *Warren*, the Act does not preempt them.

## C. The Public Interest and the Balance of the Equities Do Not Support Injunctive Relief.

Because HAPCO cannot show irreparable harm or a likelihood of success on the merits, the Court need not reach the balance-of-the-equities or the public-interest factors. But given the harm evictions cause and the continuing pandemic, those factors also favor the City.

"'Balancing the equities' is jurisprudential 'jargon for choosing between conflicting public interests.'" *Pennsylvania v. Trump*, 281 F. Supp. 3d 553, 584 (E.D. Pa. 2017) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609 (1952) (Frankfurter, J.,

---

[10] Similarly, HAPCO's passing reference to confession-of-judgment provisions in leases being voided by the Bills also does not raise a preemption issue. *See* Pl.'s Mem. at 30-31. The Landlord-Tenant Act does not provide for confession of judgment; it merely clarifies that the Act does not abolish that procedure if elsewhere authorized. *See* 68 P.S. § 250.511 ("Nothing contained in this article shall be construed as abolishing the right of any landlord to recover possession of any real property from a tenant by action of ejectment, or from instituting any amicable action of ejectment to recover possession of any real property by confessing judgment in accordance with the terms of any written contract or agreement.") As a result, there is no state provision to conflict with in the first place.

concurring)). "'[C]ourts must *balance* the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Reilly*, 858 F.3d at 177–78 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 129 S. Ct. 365, 376 (2008)).

Here, HAPCO has not alleged any substantive irreparable harm and only alludes to generalized financial harm landlords might suffer from delayed rent payments. Compare this to the permanent black mark attached to tenants from an eviction filing, their physical loss of housing, and the increased risk of contracting COVID-19 and spreading it to others. *See* Ex. 2.A at 15; Ex. 4 (Levy Decl.) ¶¶ 6-7, 11; *see also supra* Parts I.B, I.D. Any one of these public interests would be sufficient to outweigh the generalized financial harm alleged by HAPCO, and together they leave no doubt that the equities favor the City. As a result, HAPCO cannot satisfy the requirements for injunctive relief.

## V. CONCLUSION

For all the reasons set forth above, Defendants respectfully request that this Court deny the Plaintiff's Motion for a Preliminary Injunction.

Respectfully submitted,

CITY OF PHILADELPHIA LAW DEPARTMENT
Marcel Pratt, City Solicitor

Date: August 7, 2020

By: /s/ Eleanor N. Ewing
ELEANOR N. EWING (PA ID No. 28226)
Chief Deputy City Solicitor
BENJAMIN H. FIELD (PA ID No. 204569)
Divisional Deputy City Solicitor
LYDIA FURST (PA ID No. 307450)
Deputy City Solicitor
MICHAEL PFAUTZ (PA ID No. 325323)
Assistant City Solicitor
Affirmative & Special Litigation
CITY OF PHILADELPHIA LAW DEPARTMENT
1515 Arch Street, 16th Floor
Philadelphia, PA 19102
Phone:  (215) 683-5014
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I, Michael Pfautz, hereby certify that on August 7, 2020, I caused a true and correct copy of the foregoing Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction, to be served via CM/ECF filing upon counsel for all parties.


/s/ Michael Pfautz
Michael Pfautz, Assistant City Solicitor