# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HAPCO

*Plaintiff*,

v.

City of Philadelphia and
The Honorable James Kenney

*Defendants*,

and

Tenant Union Representative Network and
Philadelphia Unemployment Project

*Defendant-
Intervenors*.

Civil Action No. 2:20-cv-3300

## **ORDER**

AND NOW, this _____ day  of _____, 2020, upon consideration of Plaintiff's

Motion for a Preliminary Injunction, and in consideration of all responses thereto, it is hereby

ORDERED that the Motion is DENIED.

BY THE COURT:

_____

RUFE, J.

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HAPCO

        *Plaintiff,*

   v.

City of Philadelphia and
The Honorable James Kenney

        *Defendants*,

   and

Tenant Union Representative Network and
Philadelphia Unemployment Project

        *Defendant-*
        *Intervenors.*

Civil Action No. 2:20-cv-3300

## **DEFENDANT-INTERVENORS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS……………………………………………………….......................i

TABLE OF AUTHORITIES…………………………………………………………........ii

INTRODUCTION…………………………………………………………………........1

BACKGROUND……………………………………………………………………......2

ARGUMENT…………………………………………………………………....………9

    A. Plaintiff Has Failed to Make the Required "Gateway" Showing that Its Members Will *Likely* Suffer *Nonmonetary* Harm in the Absence of Injunctive Relief..........................................................................................................................10

        1. The Pinkney Affidavit Fails to Establish a Nonspeculative, Nonmonetary Harm..........................................................................................................................11

        2. Plaintiff Cannot Avoid Its Burden of Proving Irreparable Harm by Alleging "Continuing Constitutional Violations"……………………..………………..........…15

    B.  Plaintiff is Unlikely to Succeed on the Merits …………………………….........……15

        1.  Plaintiff's Contract Clause Challenge Fails Since the Impairment of Lease Contracts Caused by the EHPA Is Neither Substantial Nor Unreasonable ………..15

        2.  The Plaintiff has not demonstrated a reasonable likelihood of success that the EHPA constitutes a taking which violates the U.S. Constitution, nor the Pennsylvania Constitution……………………………………………………………18

        3. The Plaintiff is unlikely to succeed on the merits in its contention that the EHPA is preempted by the Landlord-Tenant Act of 1951…………………..……22

        4. Plaintiffs' Due Process Claim Is Without Merit……………………………...25

    C. The Potential Harm Caused by Granting an Injunction Far Outweighs Any Harm Threatening Plaintiff and Its Members…………………………………………………..28

CONCLUSION……………………………………………………………………..29

**CASES**

*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008)……..……………....………..2, *Passim*

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017)…    …………….………..2, *Passim*

*Elmsford Apartment Associates v. Cuomo*, No. 20-cv-4062 (CM), 2020 WL 3498456 (S.D.N.Y. Jun. 29, 2020)…………………………………………………………..………..2, *Passim*

*Del. River Port Auth. v. Transamerican Trailer Transport, Inc.,* 501 F.2d 917, 919–20 (3d Cir. 1974)……………………………………………………………………………………………….9

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187 (3d Cir. 1990)………………...10

*Morton v. Beyer,* 822 F.2d 364 (3d Cir.1987)……………………………………………………10

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.,* 847 F.2d 100 (3d Cir. 1988)…………...….10

*Grand Cent. Sanitation, Inc. v. City of Bethlehem,* No. 94-5928, 1994 WL 613674 (E.D. Pa. Nov. 2,1994)……………………………………………………………………………………………10

*GJJM Enterprises, LLC v. City of Atlantic City*, 293 F. Supp. 3d 509 (D. N.J. 2017)……………15

*Stilp v. Contino*, 613 F.3d 405 (3d Cir. 2010)…………………………………………..…………..15

*Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965)……………………..15

*Hohe v. Casey*, 868 F.2d 69 (3d Cir. 1989)………..…………………………………….......15

*Sveen v. Melin*, 138 S. Ct. 1815 (2018)…………………………………………………15, *Passim*

*El Paso v. Simmons,* 379 U.S. 497 (1965)……………………………………………….....16

*Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234 (1978)…………………………………16

*Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934)…………………………...16, *Passim*

*Edgar A Levy Leasing Co. v. Siegel*, 258 U.S. 242 (1922)………………………………16, *Passim*

*Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400 (1983)………...………16

*United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Gov't of Virgin Islands*, 842 F.3d 201 (3d Cir. 2016)………………………………...…..18

*U.S. Trust*, 431 U.S. at 26, 97 S.Ct. 1505 (1977)……………………………………………..…18

*DePaul v. Kauffman,* 272 A.2d 500, 507 (Pa. 1971)…………………………………………..……18

*Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470 (1987)....................18, *Passim*

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002)…....19,20

*Cty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159 (3d Cir. 2006)………..…..…………..19

*Eide v. Sarasota County,* 908 F.2d 716 (11th Cir. 1990)………………………………………19

*Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978)…………..…………19, *Passim*

*Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264 (1981)……………...19

*Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211 (1986)……………………………20, *Passim*

*Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359 (3d Cir. 2012)…………20

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005)…………………………………......20, 22

*Nat'l Amusements Inc. v. Borough of Palmyra,* 716 F.3d 57 (3d Cir. 2013)………………..20, 22

*Brace v. United States*, 72 Fed. Cl. 337 (2006)……………………………….……………….20
250 F. App'x 359 (Fed. Cir. 2007)……………………………………………......……………20

*B & G Const. Co. v. Dir., Office of Workers' Comp. Programs*,
662 F.3d 233 (3d Cir. 2011)………………………………………………………………………21

*Block v. Hirsh,* 256 U.S. 135 (1921)……………………………………......……………………22

*United States v. Cent. Eureka Mining Co.*, 357 U.S. 155 (1958)…………………………...……22

*Holt's Cigar Co., Inc. v. City of Philadelphia*, 10 A.3d 902, 907 (Pa. 2011)…………...……...22,23

*Berwick Area Landlord Ass'n v. Borough of Berwick,*
48 A.3d 524 (Pa.Cmwlth. 2012)……………………………………………………………………22

*City Council of the City of Bethlehem v. Marcincin,* 515 A.2d 1320 (Pa. 1986)………………..23

*Warren v. City of Philadelphia,* 382 Pa. 380 (Pa.1955)…………………………………23, 24

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.,*
560 U.S. 702 (2010)……………………………………………………………………......25

*Ferguson v. Skrupa,* 372 U.S. 726 (1963)……………………………………………...25, 27

*Lincoln Federal Labor Union, etc. v. Northwestern Iron & Metal Co.*, 335 U.S. 525
(1949)………………………………………………………………………………………..25

*Washington v. Glucksberg*, 521 U.S. 702 (1997)…….………………………………..………26

*Rogin v. Bensalem Twp.,* 616 F.2d 680 (3d Cir. 1980)………………………………………26, 27

*Driscoll v. Corbett*, 69 A.3d 197 (Pa. 2013)……………………………………...……26, 27

*Williamson v. Lee Optical Co.,* 348 U.S. 483 (1955)…………………………….………...…..27

*E. Enterprises v. Apfel,* 524 U.S. 498 (1998)…………...……………………………..…...…..27

*Myrie v. Comm'r, N.J. Dep't of Corr.*, 267 F.3d 251 (3d Cir. 2001)……...……………………27

*Heffner v. Murphy,* 745 F.3d 56 (3d Cir. 2014)……………………….……………….27

*Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt*, 793 F.3d 313 (2015)…………………...28

**STATUTES**

Emergency Housing Protection Act, Bill No. 200295……………………….…….…...…….8

Emergency Housing Protection Act, Bill No. 200302……………………………………...8, 12

Emergency Housing Protection Act, Bill No. 200294…………………….…….…...…..9, 12

Emergency Housing Protection Act, Bill No. 200305……………………….…………......9, 12

Coronavirus Aid, Relief, and Economic Security Act (CARES Act)………………………...13, 14

Philadelphia Property Maintenance Code § 9-3902…………………………………...…21, *Passim*

Philadelphia Code § 6-800……………………………………………………………21, *Passim*

Philadelphia Code § 9-800…………………….……………………………...21, *Passim*

Pa. R. Philadelphia Mun. Ct. R.C.P. 123……………………….…………………………...23

Landlord-Tenant Act of 1951  P.L. 69, 68 P.S. § 250.101……………………………….....24,25

**OTHER AUTHORITIES**

Governor's Executive Order (July 9, 2020)…………………………………………………12

Fannie Mae Landlord Letter 2020-02 (Jun. 24, 2020)…………………………………….13

Freddie Mac Bulletin 2020-16 (May 14, 2020)……………………………………………...13

H.U.D. Mortgagee Letter 2020-19 (June 17, 2020)…………………………………………13

First Judicial District Order No 48 of 2020 (July 13, 2020)……………………………………29

# I. INTRODUCTION

In the midst of a global public health and economic crisis of unprecedented magnitude, the municipal government of the City of Philadelphia enacted legislation imposing a *temporary* stay of residential eviction proceedings and establishing some modest procedural protections applicable to such proceedings once they resume, including a City-supported, pre-court diversion program designed to encourage out-of-court payment agreements. Contained in several ordinances that are collectively referred to as the Emergency Housing Protection Act ("EHPA"), this legislation was passed unanimously by the City Council and signed into law by Mayor Jim Kenney on July 1, 2020.

Plaintiff HAPCO opposed this legislation, claiming that its members would suffer greater harms than those that City Council was trying to prevent. Having lost those arguments during the legislative process, HAPCO filed this action to try to overturn the EHPA based on an assortment of Constitutional and state law theories.[1] Presently before the Court is HAPCO's motion for a preliminary injunction in which the association asserts that the City acted unreasonably and without factual basis in taking these steps to minimize the number of Philadelphians who are evicted amidst this pandemic; that it will suffer irreparable harm unless the EHPA, in its entirety, is enjoined; and that it has a strong likelihood of success on its legal theories. These assertions lack merit.

The two Defendant-Intervenors, Tenants Union Representative Network ("TURN") and Philadelphia Unemployment Project ("PUP"), are not-for-profit service and advocacy organizations that know first-hand the financial hardships currently being faced by low-income Philadelphians affected by the COVID-19-related economic collapse and the devastating consequences of evictions, which has been further exacerbated by the effects of COVID-19. Knowing the importance of the

---

[1] Plaintiff is only contesting four out of the five bills that make up the EHPA. Throughout the legislative process Plaintiff was in support of the fifth bill which amends Phila Code 9-1600 to increase penalties for landlords who illegally evict tenants outside of the court process, and does not include any language in their brief contesting this bill.

EHPA to the well-being of their members and clients, TURN and PUP have intervened to support the City in defending this legislation.

A preliminary injunction is an "extraordinary remedy," that can only be granted if the moving party meets a threshold test of proving that it will likely succeed on the merits of its case and that it will likely suffer "irreparable harm." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008); *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). After meeting those threshold requirements, they also have to show that these likely harms outweigh any harms that would result from the requested injunction and would be in the public interest. *City of Harrisburg.* Plaintiffs here have not met their threshold burden, let alone shown that their interests take precedence over the overwhelming public health and welfare concerns underlying the EHPA. The Southern District of New York recently rejected the same arguments asserted by New York landlords against similar pandemic-responsive state action. *Elmsford Apartment Associates v. Cuomo*, No. 20-cv-4062 (CM), 2020 WL 3498456, at *10 (S.D.N.Y. Jun. 29, 2020). For much the same reasons, this Court should also deny this Motion.

## II.    BACKGROUND

The facts surrounding the current public health and economic crises facing the nation as a whole are well known to this Court. The facts listed in the legislative findings appearing in each of the bills making up the EHPA make clear the unusual, emergency context that existed at the time the legislation was enacted:

> 1. On March 6, 2020, in response to the 2019 novel coronavirus disease, COVID-19, the Governor of Pennsylvania issued a Proclamation of Disaster Emergency.

> 2. On March 11, 2020, the World Health Organization ("WHO") declared the COVID-19 outbreak a global pandemic, defined as the worldwide spread of a new virus for which most people do not have immunity.

3. On March 19, 2020, the Governor of Pennsylvania and Pennsylvania Secretary of Health ordered all non-life-sustaining businesses in Philadelphia and the surrounding counties to close their physical locations to slow the spread of COVID-19.

4. On March 22, 2020, the Mayor and the Commissioner of Public Health jointly issued their second Emergency Order Temporarily Prohibiting Operation of Non-Essential Businesses and Congregation of Persons to Prevent the Spread of COVID-19, which remains in effect.

5. On March 23, 2020, the Governor of Pennsylvania issued a Stay at Home Order that applies to Philadelphia and numerous surrounding counties.

6. The local and state orders shut down or reduced the operations of many businesses in Philadelphia. 99.7% of Greater Philadelphia's economy consists of small businesses.

7. On March 16, 2020, the Supreme Court of Pennsylvania issued Orders to prevent the Judiciary from effectuating an eviction, ejectment or other displacement from a residence. The Supreme Court extended these Orders on April 28, 2020. On May 7, 2020, Governor Wolf signed an executive order staying foreclosure and eviction notice requirements for 60 days, thereby tolling the ability to commence the timelines necessary for the initiation of foreclosure and eviction proceedings until July 10, 2020. On May 21, 2020, Governor Wolf amended the May 7, 2020 executive order to apply the revised notice provisions only to matters involving the nonpayment of monies and proceedings related to removal of any tenant solely because the tenant has held over or exceeded the term of a lease.

Even in ordinary times, the eviction system in Philadelphia pushes out numerous tenants from their rental housing. Philadelphia's Municipal Landlord Tenant Court processes approximately 20,000 eviction filings annually. Affidavit of Ira Goldstein (hereafter "Goldstein Aff.") ¶ 9. Philadelphia has the fourth highest eviction rate among large cities, with one out of every fourteen renters facing eviction each year. Goldstein Aff. ¶ 9.[2] Even before the pandemic, Philadelphia homeless shelters were overwhelmed and forced to turn away many who sought services. Affidavit of Erin Blair (hereafter "Blair Aff.") ¶ 19.

_____

[2] *See also* The Reinvestment Fund, *Policy Brief: Evictions in Philadelphia: A Data & Policy Update* (October 2019) *available at* https://www.reinvestment.com/wp-content/uploads/2019/10/ReinvestmentFund__PHL-Evictions-Brief-Oct-2019.pdf, page 7, figure 9.

This eviction machinery targets low-income and Black Philadelphians at a heightened rate. In 2019, the eviction rate in areas with at least 80% Black residents was more than three times higher than in areas where the population was less than 10% Black residents. Goldstein Aff. ¶ 9. In fact, as the population of Black residents increased in a Philadelphia neighborhood, so did the eviction rate. *Id*. at ¶ 10. Philadelphia rates among the top ten cities in the country for income inequality, and low-income renters disproportionately struggle with housing instability. Lord Aff. ¶ 6. In 2019, 14,480 evictions were filed against Philadelphians whose household income was $45,000 or less, compared to 4,804 eviction filings against people with household incomes of more than $45,000.[3]

Low-income and Black Philadelphians who experience eviction are also saddled with the negative health effects of displacement, both physically and psychologically. Blair Aff. ¶ 23 Families who are evicted, or have an eviction on their rental record, are more likely to accept substandard living conditions containing indoor health hazards, such as dust (lead, particulate matter, mold, pet and pest allergens, insects), gas (cigarette smoke, radon, carbon monoxide), water (moisture and polluted sources), and structural deficiencies. Blair Aff. ¶ 14.[4] These hazards contribute to health conditions like asthma, lead poisoning, eczema, childhood injuries, elevated blood pressure, physical and emotional dysregulation leading to developmental delays, heart disease, and exposure to communicable diseases. Blair Aff. ¶ 15. Additionally, families that lack residential stability have more difficulty accessing psychological stability, which allows people to place an emotional investment in their homes, social relationships, and community. Lord Aff. ¶ 15.[5] Lack of residential stability decreases school stability for children, and decreases the likelihood that students will excel

---

[3] *Id*. at page 8, figure 10.
[4] *See also* Allyson E. Gold, *No Home for Justice: How Eviction Perpetuates Health Inequity Among Low-Income and Minority Tenants,* 24 Georgetown J. Poverty L. & Pol'y 1 (2016).
[5] *See also* Matthew Desmond, Rachel Tolbert Kimbro, *Eviction's Fallout: Housing, Hardship, and Health,* Social Forces (2015).

in their studies and graduate. Lord Aff. ¶ 15.[6] Women who are forced to leave their homes are at

significantly greater risk of depression, and the toxic stress associated with housing insecurity

contributes to premature delivery in pregnant women. Blair Aff. ¶ 12.[7] Additionally, housing

instability increases the likelihood of child welfare involvement up to and including child removal.

Blair Aff. ¶ 14; Affidavit of Marcella Joe (hereafter "Joe Aff.") ¶ 18.  Finally, being evicted in

housing court has been shown to increase the probability of being hospitalized for a mental health

diagnosis in the two years after filing by 9 percentage points.[8]

      The nexus of public health, racial inequality, and housing insecurity has been amplified

during the COVID-19 pandemic. Low-wage workers, especially Black and Latinx people and

undocumented people, have been shown to be at a higher risk of contracting COVID-19 and

experiencing serious complications with the virus than their middle-class and white peers. Goldstein

Aff. ¶ 16; Blair Aff. ¶ 23. In Pennsylvania, although Black residents account for 11.3% of the state's

population, Black residents represent almost one-third of the COVID-19 cases where the race of the

patient was recorded. Black Philadelphia residents test positively for COVID-19 at a rate of more

than double that of White Philadelphia residents, and Latinx residents test positively at a rate of more

than 50% higher than that of White residents. Goldstein Aff. ¶ 16.  The pandemic is also affecting

Black Philadelphian neighborhoods at a heightened rate. The neighborhoods that report the highest

positivity rates for COVID-19, Elmwood and Oak Lane, have 85% Black and 83% Black resident

populations, respectively. Goldstein Aff. ¶ 18. In Philadelphia, Black patients are dying from

COVID-19 at a rate of 12.7 for every 10,000 people – more than thirty percent higher than the death

---

[6] *Id.*

[7] *See also* Theresa Osypuk et al., *The Consequences of Foreclosure for Depressive Symptamatology*, 22 Annals of Epidemiology 379-87 (2012).

[8] Collinson, Robert and Davin Reed. The Effects of Evictions on Low-Income Households (December 2018).

rate among white patients. Goldstein Aff. ¶ 17. These disparities have been linked both to more limited access to health care in Black communities, and to racial segregation pushing Black people into crowded and substandard housing. Goldstein Dec. ¶ 19-20.[9]

In addition to the increased health impact, the economic impact of COVID-19 has fallen more heavily on low-income Black and Brown Philadelphians. Blair Aff. ¶ 23; Joe Aff. ¶ 18. Even prior to the pandemic, Philadelphia was among the top ten cities in the country for income inequality. Lord Aff. ¶ 6. Unemployment in Pennsylvania is currently thirteen percent higher than at any time since the Great Depression. Affidavit of John Dodds (hereafter "Dodds Aff.") ¶ 11. Low-wage service and hospitality workers are more likely to be renters, and to have marginal savings, making it even more difficult to keep stable housing during the pandemic. Dodds Aff. ¶ 11. Since the pandemic, low-income Philadelphians of color have reported a heightened inability to make rent payments and keep stable housing. Joe Aff. ¶ 11-12. Low-income Philadelphians of color also increasingly report a fear of not only losing housing during a pandemic, but of the lasting economic harm of eviction, such as damage to credit scores. Joe Aff. ¶¶ 15, 17.

The combined weight of loss of income, the consequences of eviction, and COVID-19 contraction fall on the same population. Since the pandemic began, social services agencies such as TURN have seen an increased number of Philadelphians who fear eviction and homelessness amidst a global pandemic. Joe Aff. ¶ 11. These fears are not theoretical – Philadelphia zip codes with the highest COVID-19 positivity rates typically manifest a 9.1 eviction rate. This compares to a 3.3% eviction rate in zip codes with low COVID-19 positivity rate. Goldstein Aff. ¶ 21. Throughout

---

[9] *See also* Ryan Briggs, *Racial Disparity Grows as the Coronavirus Disproportionately Claims Black lives in Pa., Jersey and Delaware.* WHYY.org May 15, 2020 *available at* https://whyy.org/articles/racial-disparity-grows-as-the-coronavirus-disproportionately-claims-black-lives-in-pa-jersey-and-delaware/.

Philadelphia, most areas with elevated eviction rates fall within zip codes with the highest COVID-19 positivity rates. Goldstein Aff. ¶ 22. Additionally, families who are forced into shelters are at a heightened risk of contracting COVID-19 due to crowding and the challenges of enforcing masking and social distancing guidelines. Blair Aff. ¶ 21. Given all of these converging, public emergencies, the City Council attached these additional legislative findings to each of the EHPA bills:

> 8. The City of Philadelphia is one of the most densely populated cities in the United States of America with an estimated population size of 1.5 million.

> 9. Philadelphia is also one of the poorest cities in America, where 24.5% or 377,116 Philadelphia residents, live in poverty.

> 10. Philadelphia has a high population of renters. The number of renters in Philadelphia has rapidly increased in recent years, growing from 40.7% in 2000 to almost half of the population today.

> 11. Before the pandemic, Philadelphia had the 4th highest eviction rate among large cities, with 1 out of every 14 renters facing eviction each year.

> 12. More than 300,000 of Philadelphia's renters struggled to afford rent before the COVID-19 pandemic. In 2017, 53.4% of Philadelphia renters were cost-burdened, meaning they paid more than 30% of their income on rent, and 31% of Philadelphia renters were severely cost-burdened, meaning they spent more than 50% of their income on rent.

> 13. To address the city's affordable housing crisis, Philadelphia City Council established a Tenant Legal Defense Fund in 2017, an anti-eviction task force in 2017, and right to counsel in 2019 to address evictions.

> 14. The number of Philadelphians struggling to pay rent has undoubtedly increased since the onset of the COVID-19 pandemic, as at least 1.9 million Pennsylvanians and over 120,000 Philadelphians have filed for unemployment since March 2020, exacerbating already-existing financial burdens.

> 15. When the judicial emergency is lifted, there is an estimated backlog of 5,000 eviction cases in Philadelphia Municipal Court.

> 16. The average annual cost for the City of Philadelphia to provide shelter to a family of four is $58,000.

> 17. According to current projections from the Mayor's Office, as a result of the COVID-19 pandemic, the estimated revenue losses, federal reimbursements, and expense increases indicate that the City's Fiscal Year 2021 budget must include

$649 million of reductions to planned spending, reduced reserves and new revenue sources compared to the original Fiscal Year 2021 budget, proposed on March 5th, 2020, to close the budget gap.

18. The Mayor's revised Fiscal Year 2021 budget, submitted to Council on May 1, 2020, included steep cuts to many affordable housing programs and initiatives that serve the City's most vulnerable populations, including reductions in funding for the preservation and construction of affordable housing units, rental assistance programs, low-income home repair programs, the Philly First Home program and the Philadelphia Eviction Prevention Project.

19. In May 2020, the City of Philadelphia used approximately $10 million in federal funds to create PHL Rent Assist, a rental assistance program that aimed to provide rental assistance to 3,000-4,000 families. Approximately 13,000 Philadelphians--three to four times the number of families that could be funded-- applied for this program.

20. The COVID-19 pandemic's negative impact on the lives and incomes of Philadelphians, and City revenues, has exacerbated the pre-existing housing crisis and created a housing emergency in the City of Philadelphia. The measures identified below are necessary to ensure residents are able to remain in their homes, and small businesses are able to stay in business.

Through a collection of temporary measures functioning together in tandem, the EHPA provides time and a framework for renters and landlords to stabilize rather than further exacerbate an already catastrophic health, financial and racial crisis. Bill No. 200295 ("Eviction Relief Bill") provides a two-month buffer, through August 31, 2020, before landlords can proceed with evictions.[10] Bill No. 200302 ("Late Fee Waiver Bill") provides a temporary, three-month waiver of late fees for March 1, 2020 through May 1, 2020 for renters who experienced a COVID-related financial hardship. Bill No. 200294 ("Eviction Diversion Bill") establishes a pre-filing diversion program, based on the highly successful Philadelphia Mortgage Foreclosure Diversion Program,

---

[10] Over 900,000 unemployment compensation applicants have not yet received any funds due to the exceptional strain on the unemployment compensation system as it strives to respond to the increased caseload during the pandemic. Dodds Aff. ¶ 3. In addition, when the EHPA was passed, $150 million in rental assistance had just been allocated by the State of Pennsylvania, but had not yet begun to flow directly to landlords on behalf of renters. The extra $600 per week that is part of the current financial support through unemployment ended on July 25, 2020 and it is not anticipated that Congress will renew it at that rate. Dodds Aff. ¶ 8-9.

through which renters and landlords would be induced to seek mutually acceptable, out-of-court settlements. Bill No. 200305 ("Hardship Repayment Agreement Bill") further provides a framework for renters and their landlords to enter into agreements that will provide the necessary time for renters to catch up on rent due because of COVID-related financial hardship, while also ensuring that landlords are paid their ongoing rent and have a timeline to recoup arrears owed. These repayment agreements will ensure that renters are not harmed and that landlords are soon made whole.

The provisions of the EHPA address the public health crises of both eviction and COVID-19, and their lasting impact on low-income and Black residents. The EHPA's provisions seek to stop the compounding of *two* public health crises on the most vulnerable Philadelphians. As Defendant-Intervenors TURN and PUP can attest, this interest is direct, tangible, and significantly protectable.

## III.    ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008). In order to obtain this "extraordinary remedy," it is Plaintiff's burden to show "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured ... if relief is not granted.... (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)). The first two of these are the "most critical" factors, requiring Plaintiff to make a threshold showing "that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Id*. 858 F.3d at 179.  "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor

of granting the requested preliminary relief." *Id.*

Plaintiff has not met its "gateway" burden of proving irreparable harm and likelihood of success on the merits. With regard to the irreparable harm factor, the inadequacy of Plaintiff's proof is particularly stark. The harm alleged by Plaintiff, besides being speculative and exaggerated, is purely monetary in nature, and thus, not irreparable. That should be enough to deny Plaintiff's Motion. But even assuming Plaintiff had demonstrated a likelihood of suffering truly "irreparable" harm, the balance of equities in this moment of unprecedented, simultaneous, public health and economic emergencies, favor the public interest embodied in the EHPA, as expressed by Philadelphia's elected government. The City's judgment in attempting to minimize mass evictions occurring in the middle of a pandemic should be respected by this Court.

A.    **Plaintiff Has Failed to Make the Required "Gateway" Showing that Its Members Will *Likely* Suffer *Nonmonetary* Harm in the Absence of Injunctive Relief**

There is little doubt that the EHPA will impose financial burdens on some property owners. But financial burdens alone do not constitute "irreparable harm" sufficient to invoke the extraordinary remedy of a preliminary injunction. "Irreparable harm 'must be of a peculiar nature, so that compensation in money alone cannot atone for it.'" *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990) (quoting *Morton v. Beyer,* 822 F.2d 364, 372 (3d Cir.1987)). A "purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement." *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.,* 847 F.2d 100, 102–03 (3d Cir. 1988); *see also Grand Cent. Sanitation, Inc. v. City of Bethlehem,* No. 94-5928, 1994 WL 613674, at *2 (E.D. Pa. Nov. 2, 1994) (citing *Opticians Ass'n* and *Frank's GMC Truck Ctr.*). Further, Plaintiff must prove that this nonmonetary injury is "likely," not merely "possible." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008).

Plaintiff's irreparable harm showing here is woefully inadequate. It consists only of (1) a Affidavit from HAPCO's President, Victor Pinkney that describes speculative harms of a purely monetary nature and (2) a cursory legal argument, characterizing the harm suffered by its members as a "continuing constitutional violation," which, according to Plaintiff, supposedly absolves it from having to prove irreparable harm. Pltf. Mem. at 34. That legal argument is incorrect and the Pinkney Affidavit is legally insufficient to support a finding of irreparable harm.

> **1.    The Pinkney Affidavit Fails to Establish a Nonspeculative, Nonmonetary Harm**

Plainly, the harms alleged by Plaintiff are monetary in nature. Mr. Pinkney states that many of his members are themselves suffering economic hardships from the pandemic, and predicts that many HAPCO members will face difficulties in paying their mortgages and property taxes due to delays in their ability to collect rent and recover properties from delinquent tenants. Aff. of Victor Pinkney, ¶¶ 11, 22. Beyond such generalized speculation, the only specificity he provides is that one of his own eviction actions scheduled for July has been delayed by the closure of Housing Court and that he expects another tenant to be able to show a COVID-related hardship for which he will be denied the ability to evict her. *Id.*, ¶¶ 22, 23. With regard to any harms caused by the temporary closure of Housing Court, that closure was, and remains, in place as a result of the statewide action of the Governor and by order of the First Judicial District of Pennsylvania, so it is disingenuous at best to blame the EHPA for such harms.[11] As for his concerns that, once Housing Court opens, his

---

[11] Order of the Governor of the Commonwealth of Pennsylvania Staying Notice Requirements for Specified Actions Related to the Disposition of Property (July 9, 2020) *available at* https://www.governor.pa.gov/newsroom/gov-wolf-announces-protections-from-foreclosures-and-evictions-through-aug-31/; First Judicial District of Pennsylvania Order 48 of 2020 (July 13, 2020) *available at* https://www.courts.phila.gov/pdf/regs/2020/48-of-2020-PJ-ORDER.pdf. Once landlords can file new landlord-tenant cases, Housing Court will not be hearing any newly filed landlord-tenant cases until after November 16, 2020 at the earliest. For landlord-tenant cases that have already been filed, the court will not hold any hearings until September 3, 2020.

tenant's rights under the EHPA will cause further harm, he does not explain the nature or extent of such harm, other than potential delays in collecting the back rent or in recovering possession.

Even if Plaintiff's vague predictions of economic loss were sufficient to establish irreparable harm, the EHPA bills do nothing to alter the contractual rental obligations of tenants beyond waiving the late charges for a limited period for tenants who certify to a COVID-related financial hardship. The EHPA's requirements are minimal: landlords must send a notice that the tenant, might be eligible for a hardship repayment agreement and waiver of late fees, and must participate in a pre-filing diversion program sponsored by the City—but only for tenants who can certify that they have experienced a COVID-related financial hardship. *See* Bill No. 200305, 200302and Bill No. 200294. If the tenant has not experienced a COVID-related financial hardship, or if no conciliation date can be scheduled within 30 days through the diversion program, then the landlord can proceed with pursuing an eviction. Bill No. 200305, Section (2)(d)(i).  If the tenant has entered into a hardship repayment agreement and does not keep the agreement, the landlord can also pursue an eviction. *Id.* at Section (2)(d)(iii). There is simply no scenario where, as Plaintiff claims, *see* Pltf. Memo at 8, landlords will be forced to allow defaulting tenants to remain in their property rent-free for the duration of the COVID-19 emergency.

Moreover, Plaintiff's speculation about landlords facing possible foreclosures as a result of delays in collecting rental payments ignores the foreclosure prevention measures that also have been adopted during the emergency. At the state level, Governor Wolf issued an executive order staying the filing of all new mortgage foreclosures through August 31, 2020. *See* Governor's Executive Order (July 9, 2020). At the federal level, the Department of Housing and Urban Development, the Federal Housing Finance Agency, the Department of Veterans Affairs, and the Department of Agriculture's Rural Housing Service imposed a moratorium on proceeding with mortgage foreclosure activity for their federally-backed mortgages through August 31, 2020. *See* Fannie Mae Landlord

Letter 2020-02 (Jun. 24, 2020)[12], Freddie Mac Bulletin 2020-16 (May 14, 2020),[13] and H.U.D.

Mortgagee Letter 2020-19 (June 17, 2020).[14] According to the U.S. House Committee on Financial

Services, these federally-backed mortgages comprise approximately 70% of all residential

mortgages.[15] Additionally, the Coronavirus Aid, Relief, and Economic Security Act (CARES Act)

allows mortgagees with a federally-backed mortgage to request forbearance on mortgage payments,

during which time the lender cannot charge additional fees, penalties, or interest. *See* Secs. 4022 and

4023. For a building with fewer than five units, this forbearance can last up to 360 days. *See* Sec.

4022(b)(2).

      Furthermore, Plaintiff has neglected to mention the myriad programs established by the

Defendant City of Philadelphia and other bodies, which are providing financial assistance to

landlords, including but not limited to:

- the Landlord Working Capital Loan Program[16] through which the City provides low interest loans of up to $10,000 with no payments required for the first six months;[17]

- the COVID-19 Working Capital Access Program[18] through which landlords with fewer than 100 employees can take out an interest free loan of up to $100,000;

- the COVID-19 Emergency Rental Assistance Program[19] through which the City approved up to $2,500 in rental assistance per household for about 4,000 households that was paid directly to the landlords of those households totaling about $10 million;[20]

---

[12] https://singlefamily.fanniemae.com/media/22261/display.

[13] https://guide.freddiemac.com/ci/okcsFattach/get/1003812_7.

[14] https://www.hud.gov/sites/dfiles/OCHCO/documents/2020-19hsngml.pdf.

[15] https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=406472.

[16] http://www.impactservices.org/loan-fund/landlord-working-capital/#1543357448177-eeb96dfc-3e19.

[17] Plaintiff publicly praised this program just days before filing the instant suit. *See* Michaelle Bond, *Philly's small landlords can apply for loans to offset missed rent during the pandemic*, Phila. Inquirer, July 1, 2020, https://www.inquirer.com/real-estate/housing/landlord-loan-coronavirus-philadelphia-rent-20200701.html.

[18] https://dced.pa.gov/programs/covid-19-working-capital-access-program-cwca/

[19] https://www.phila.gov/2020-05-30-city-provides-update-on-covid-19-for-saturday-may-30-2020/

[20] https://www.inquirer.com/real-estate/housing/rent-mortgage-relief-coronavirus-pennsylvania-20200629.html.

- the CARES Rent Relief Program which has allocated $28.45 million in rental assistance that will be paid directly to landlords in Philadelphia;[21]

- the Payroll Protection Program[22] through which landlords can take out forgivable loans to pay their employees;

- the SBA Economic Injury Disaster Loan Program[23] which provides businesses with fewer than 500 employees low interest loans of up to $2 million;

- Pandemic Unemployment Assistance[24] through which landlords who have lost income but do not qualify for regular unemployment benefits can receive $600 per week in unemployment compensation;

- the Employee Retention Credit[25] through which landlords can receive a tax credit of up to $10,000 per employee for employee wages and benefits paid during the shutdown;

- deferral of payment of payroll taxes until December 31, 2020 under the CARES Act;[26]

- and the numerous private institutions offering mortgage relief such as Wells Fargo,[27] Bank of America, PNC Bank, WSFS Bank, Citizens Bank, and others.[28]


### 2. Plaintiff Cannot Avoid Its Burden of Proving Irreparable Harm by Alleging "Continuing Constitutional Violations"

HAPCO waits until page 34 of its Memorandum to mention the issue of irreparable harm,

dedicating a paragraph to the proposition that it need not prove irreparable harm at all once it

establishes that "constitutional violations are ongoing." *See* also First Amended Verified Complaint,

---

[21] https://www.phila.gov/2020-06-29-phase-2-of-rental-assistance-for-tenants-affected-by-covid-19/.
[22] https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-program.
[23] https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/economic-injury-disaster-loan.
[24] https://www.uc.pa.gov/unemployment-benefits/file/Pages/Filing-for-PUA.aspx.
[25] https://www.irs.gov/coronavirus/employee-retention-credit.
[26] https://www.irs.gov/newsroom/deferral-of-employment-tax-deposits-and-payments-through-december-31-2020.
[27] https://www.wellsfargo.com/mortgage/manage-account/payment-help/forbearance-plan/
[28] https://www.attorneygeneral.gov/COVID19/.

¶¶ 71, 94 and 128. Plaintiff's argument consists of a quote from *GJJM Enterprises, LLC v. City of Atlantic City*, 293 F. Supp. 3d 509 (D. N.J. 2017) (citing *Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010)), that, "[w]here probable success on the merits of a constitutional claim is shown, and such violation will continue unless enjoined, the continuing constitutional violation can constitute irreparable harm." *GJJM Enterprises* was a First Amendment case where the irreparable harm asserted was the "chilling effect on free expression." *GJJM Enterprises* at 520 (citing *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965)). The Third Circuit has made plain that, even in First Amendment cases, this rule is limited. *See Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction."). But given that this is not a First Amendment case, irreparable harm remains a critical "gateway" test to a request for preliminary injunction, *Reilly v. City of Harrisburg*, 858 F.3d at 176, a test that Plaintiff fails to meet.

### B. Plaintiff Is Unlikely to Succeed on the Merits

#### 1. Plaintiff's Contract Clause Challenge Fails Since the Impairment of Lease Contracts Caused by the EHPA Is Neither Substantial Nor Unreasonable

It is well settled that "not all laws affecting pre-existing contracts violate the [Contract] Clause." *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018).[29] That cautionary statement by the Supreme Court is particularly relevant where a legislative enactment facing a Contracts Clause challenge is one affecting delays or conditions on available default remedies, rather than one altering substantive terms of a contract. *See El Paso v. Simmons,* 379 U.S. 497, 503-504 (1965) (observing that "statutes

---

[29] Pennsylvania courts interpret the Contracts Clause in the Pennsylvania Constitution, also raised by Plaintiff, consistent with the decisions of the United States Supreme Court under the federal Contracts Clause. *Commonwealth v. Ritz*, 153 A.3d 336, 346 (Pa. Super. 2016)

existing when the contracts were made were not to be considered the exclusive remedies available in the event of the purchaser's default since there was no promise, express or implied, on the part of the State not to enlarge the remedy or grant another in case of breach"). Further, legislative responses to "broad and desperate emergency" conditions, like those present during the Great Depression and today's Global Pandemic, which are "enacted to deal with a broad, generalized economic or social problem," should be given great deference by the courts. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 249-250 (1978) (citing as an example the two-year foreclosure moratorium that survived Contract Clause challenge in *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934)); *see also Edgar A Levy Leasing Co. v. Siegel*, 258 U.S. 242 (1922) (upholding two-year suspension of evictions and limitation on rent hikes contained in New York legislation designed to address emergency shortage of rental housing).

Contract Clause claims are subject to a two-step analysis; first, the party challenging the legislative act must show a "substantial" impairment to contractual rights and then, only if this first test is met, "the inquiry turns to the means and ends of the legislation. In particular, the Court has asked whether the state law is drawn in an "appropriate" and "reasonable" way to advance 'a significant and legitimate public purpose.'" *Sveen*, 138 S. Ct. at 1822 (*citing Spannaus*, 438 U.S. at 244, and *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411–412 (1983). Here, Plaintiff argues that the contractual impairments imposed on landlords by the EHPA are both "substantial" and "unreasonable." Neither is true.

In trying to make the case for a "substantial" impairment, Plaintiff engages in gross exaggeration about the reach of the EHPA, *see, e.g.,* Pltf. Mem. at 19 (characterizing the EHPA as "upending" landlord rights by supposedly "allow[ing] tenants to remain on the properties rent-free for the duration of the COVID-19 emergency period"), and does not even attempt to distinguish this case from the Supreme Court's eviction and foreclosure moratorium cases, *Blaisdell* and *Edgar A.*

16

*Levy*. Notably, all of the EHPA's protections for tenants, including the waiver of late fees, are temporary, and will remain in effect for shorter than the two-year periods involved in *Blaisdell* and *Edgar A. Levy*. Except for the invalidation of late-charge penalties during the emergency period, the EHPA does not alter the contractual bargain between a tenant and a landlord and does not prevent landlords from recovering possession during the emergency. The only change, once courts reopen shortly, will be that landlords whose tenants have certified that they experienced a COVID-related financial hardship will have to engage in a pre-filing court diversion program modeled after the already successful foreclosure diversion program in the Court of Common Pleas; will have to allow tenants to repay delinquent rent over time; will have to temporarily waive late fees; and will have to send a notice explaining this. To be compelled to work with tenants to avoid an otherwise unnecessary eviction is not a substantial burden on landlords. And the cases already establish that having to send an additional notice before taking a tenant to court is not a substantial burden either. *Sveen*, 138 S.Ct. at 1824 (new statutory requirements regarding notice or filings do not run afoul of the Contracts Clause).

Even if the Court were to find that the EHPA imposes a substantial burden on landlords, Plaintiff cannot satisfy the second stage of its required burden, that is, to demonstrate that the City is pursuing an unreasonable course that is out of proportion to any public interests at stake. At the outset, Plaintiff fails to note that the close inquiry into reasonableness is reserved for statutes that alter contracts to which the state actor is a party. *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Gov't of Virgin Islands*, 842 F.3d 201, 212 (3d Cir. 2016)(quoting U.S. Trust, 431 U.S. at 26, 97 S.Ct. 1505 (1977)). When the state is not a party to the contract that is arguably affected, the legislature is afforded deference in its assessment of reasonable measures to pursue its public interest goals. *Id.*; *see also Elmsford v. Cuomo*, 2020 WL 3498456, at *12.

Still, even Plaintiff recognizes the existence of a legitimate and significant public purpose for enacting the EHPA. See Amended Complaint, ¶ 24 (noting that the COVID-19 pandemic has "wrought serious and unpreceded economic damage in the United States […] Much work will need be done by the public and private sectors in the coming days, weeks, months and years to recover from this disaster."). The courts have long held that protecting tenants from the negative effects of housing insecurity constitutes legitimate and significant purposes for imposing some interference into private landlord-tenant contracts. *Edgar A. Levy*, 258 U.S.at 245 (allowing to stand a statute that deprived property owners of "all possessory remedies" for two years, and permitting tenants to pay a "reasonable rent price" during that period "where vital public interests would otherwise suffer"); *DePaul v. Kauffman,* 272 A.2d 500, 507 (Pa. 1971) (upholding constitutionality of Pennsylvania Rent Withholding Act, pursuant to the state's legitimate purpose of maintaining an adequate supply of safe and decent housing, citing *Blaisdell*). There is simply nothing constitutionally unreasonable about the measures construed by City Council in the EHPA to address the current crises.

      **2.**        **The Plaintiff has not demonstrated a reasonable likelihood of success that the EHPA constitutes a taking that violates the U.S. Constitution, nor the Pennsylvania Constitution.**

The Plaintiff, in alleging that 'the Act amounts to a temporary, non-categorical regulatory taking" fails to meet the exacting standard required when a landowner makes a facial challenge to a legislative act. "The posture of the case is critical" because the Court has "recognized an important distinction between a claim that the mere enactment of a statute constitutes a taking and a claim that the particular impact of government action on a specific piece of property requires the payment of just compensation." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 494 (1987). Indeed, in a facial challenge, "the narrow inquiry before the Court . . . [is] whether the mere enactment of the regulations constituted a taking." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l*

*Planning Agency*, 535 U.S. 302, 318 (2002). And, "[w]hen a landowner makes a facial challenge, he argues that any application of the regulation is unconstitutional," as applied not just to his property, but to all properties impacted. *Cty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 163 (3d Cir. 2006)(citing *Eide v. Sarasota County,* 908 F.2d 716, 724 n. 14 (11th Cir. 1990)).

Yet the *Penn Central* analysis, which the Court uses to analyze non-categorical regulatory takings, "must be conducted with respect to specific property, and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances" *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc*., 452 U.S. 264, 295 (1981). Thus broadly applicable regulations are not easily susceptible to facial regulatory takings challenges, especially since "plaintiffs may not frame their . . . claim by 'narrowly defin[ing] certain segments of their property' [to] assert that . . . [the EHPA] denies them economically viable use" of their property. *See Elmsford v. Cuomo*, No. 20-cv-4062 (CM), 2020 WL 3498456, at *10 (S.D.N.Y. Jun. 29, 2020) (citing *Keystone*, 480 U.S. at 496.) For the Plaintiff to succeed, the Court must determine that *any* application of *each* of the Ordinances is unconstitutional with respect to the totality of the properties to which the Act applies, utilizing only the facts pled by Plaintiff with regard to its member's specific properties. *Keystone*, 480 U.S. at 495-98; *see also Elmsford* 2020 WL 3498456, at *10. Such is why laying out a facial attack is an "uphill battle." *Keystone*, 480 U.S. at 495.

Assuming Plaintiff's challenge was feasible, the *Penn Central* test weighs heavily against the finding of a taking.[30] When analyzing non-categorical regulatory Takings Claims, which involve situations that do not deny *all* economically beneficial use of the property, the Court must proceed

---

[30] The Pennsylvania Takings Clause provides the same protections offered by the Federal Takings Clause and so Pennsylvania courts have analyzed such claims under Federal Takings Clause case law. *United Artists' Theater Circuit v. City of Philadelphia*, 535 Pa. 370 (1993); *see Friends of Danny DeVito v. Wolf*, 227 A.3d 872 (Pa. 2020). Therefore analysis of Plaintiff's claim under the Pennsylvania Constitution requires the same analysis, and ends with the same result.

with a fact-specific inquiry that is based on three factors: the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action. *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 225 (1986) (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978); *see Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 370 (3d Cir. 2012). The Court thus determines whether the law is "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005).

With regard to the economic impact prong, the EHPA's temporary restrictions do not constitute a taking: "[a] permanent deprivation of the owner's use of the entire area is a taking . . . whereas a temporary restriction that merely causes a diminution in value is not" *Tahoe-Sierra*, 535 U.S. at 332, 338 (internal quotations omitted) (temporary moratoria on land development not a taking); *see Nat'l Amusements Inc. v. Borough of Palmyra, 716 F.3d 57, 60* (3d Cir. 2013) (five-month closure of market not a taking). Courts have generally relied on diminutions above 85 percent when finding a regulatory taking. *Brace v. United States*, 72 Fed. Cl. 337, 357, 366, n.33 (2006), *aff'd*, 250 F. App'x 359 (Fed. Cir. 2007) (internal citations omitted). Given that a facial Takings challenge must demonstrate an unconstitutional impact with respect to the *totality of the properties* impacted by the EHPA, *see Elmsford*, 2020 WL 3498456, at *10 (citing *Keystone*, 480 U.S. at 496), the absence of any evidence of citywide, financial impacts attributable to the EHPA should be dispositive. And, given that landlords remain free under the legislation to obtain money judgments and recover possession it is hard to even imagine how Plaintiff could frame any such impacts as coming close to the 85% threshold.

Nor is this a situation where rental property owners could demonstrate a reasonable expectation of being from future expansions of a City protections for tenants. *See Connolly*, 475 U.S.

at 227 (internal citations omitted) ("[t]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end."); *B & G Const. Co. v. Dir., Office of Workers' Comp. Programs*, 662 F.3d 233, 262 (3d Cir. 2011) ("companies had no reasonable expectation that the government would not expand its regulation of health benefits in the coal industry, given the history of . . . government intervention"). Local government has long imposed restrictions on landlords' rights to evict their tenants. *See* Philadelphia Property Maintenance Code § 9-3902 et seq. (requiring landlords to obtain rental licenses and Certificates of Rental Suitability before collecting rent and/or evicting tenants), Phila Code. 6-800 (requiring landlords to obtain lead safe certifications before collecting rent), Phila Code 9-800 et seq. (requiring landlords to issue a valid Good Cause notice to proceed with an eviction for leases of less than one year, and allowing tenants the right to contest the Good Cause determination in the Fair Housing Commission prior to an eviction proceeding), and Pa. R. Philadelphia Mun. Ct. R.C.P. 123 (for provisions relating to allowance of payment of judgments in installments over twelve months). All of these regulatory ordinances are permanent fixtures in the residential rental market, so it is hard to see how the largely temporary measures in the EHPA could pass the second prong of the *Penn Central* test.

Finally, as to whether the governmental action here "amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good'" *Lingle*, 544 U.S. at 539 (citing *Penn Central*, 438 U.S. at 124), governmental actions undertaken to address public crises generally do *not* violate the Takings Clause. *See, e.g., Block v. Hirsh*, 256 U.S. 135 (1921) (temporary legislation restricting landowner's ability to profit in response to emergency housing conditions growing out of First World War was not a taking); *United States v. Cent. Eureka Mining Co*., 357 U.S. 155, 168

(1958) (temporary wartime shutdown of gold mines not a taking, since "[w]ar ... demands the strict regulation of nearly all resources."); *Nat'l Amusements Inc.*,716 F.3d at 60 (temporary five-month closure of open-air market due to safety concerns was not a taking). Despite Plaintiff's characterization of the EHPA as a decision to "Rob Peter to pay Paul," Pl.'s Mem. at 33, "it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his . . . assets for the benefit of another." *Connolly*, 475 U.S. at 223. Local governments may, in times of emergency or otherwise, reallocate economic hardships between private parties without violating the Takings Clause. *Keystone*, 480 U.S. 470 (1987). The EHPA was passed to prevent exacerbating the current public health emergency by trying to reduce the number of evictions. That is precisely the kind of action, pursuant to the general welfare, that governments should be expected to take in such extraordinary circumstance.

### 3. The Plaintiff is unlikely to succeed on the merits in its contention that the EHPA is preempted by the Landlord-Tenant Act of 1951.

The EHPA is not preempted by the Landlord-Tenant Act of 1951 under any of the three types of preemption recognized in Pennsylvania. Those preemption types are express, field, and conflict. *Holt's Cigar Co., Inc. v. City of Philadelphia*, 10 A.3d 902, 907 (Pa. 2011). Express and field preemption by the Landlord-Tenant Act are not valid challenges to a local ordinance governing the landlord-tenant relationship. *Berwick Area Landlord Ass'n v. Borough of Berwick*, 48 A.3d 524, 534–35 (Pa. Cmwlth. 2012). Additionally, the Plaintiff has only challenged the EHPA under a conflict preemption theory. *See* Plaintiff's First Amended Verified Complaint at ¶¶ 102, 103, 115. Conflict preemption occurs when "a local ordinance […] contradicts, contravenes, or is inconsistent with a state statute[.]" *Holt's Cigar Co., Inc*. 10 A.3d at 907. "For conflict preemption to be applicable, the conflict between the statute and the ordinance must be irreconcilable." *Id.* (citing *City Council of the City of Bethlehem v. Marcincin,* 515 A.2d 1320, 1326 (Pa. 1986)). Even where the General Assembly

"has assumed to regulate a given course of conduct by prohibitory enactments, a municipal corporation with subordinate power to act in the matter may make such additional regulations in aid and furtherance of the purpose of the general law as may seem appropriate to the necessities of the particular locality and which are not in themselves unreasonable." *Id.*

The Landlord-Tenant Act of 1951 merely "sets up the procedure whereby a landlord may repossess premises if he has a *right* to evict the tenant. The substantive law as to *when* he has a right to evict is not touched upon." *Warren v. City of Philadelphia*, 382 Pa. 380, 385 (Pa. 1955). In *Warren*, the Pennsylvania Supreme Court found that the City of Philadelphia Rent Control Act of 1955 did not conflict with the Landlord-Tenant Act and was a valid exercise of the City's police power. *See generally Warren*, 382 Pa. 380. The ordinance in question in *Warren*, "declares the existence of an emergency relative to housing, and seeks to regulate and control housing accommodations and evictions by establishing maximum rents and prohibiting evictions except on certain grounds." *Warren*, 382 Pa. at n. 1. The EHPA does nothing more extreme than what the PA Supreme Court upheld in *Warren*.

The City has frequently exercised its broad police powers to impose limitations on residential landlords' right to evict. *See, e.g.*, Philadelphia Property Maintenance Code § 9-3902 *et seq.* (for Rental License and Certificate of Rental Suitability Requirements), Phila Code. 6-800 (for requirements relating to lead safe certifications), and Phila Code 9-800 *et seq.* (for requirements related to Good Cause for leases of less than one year). Such local pre-requisites to a landlord's right to recover possession are not pre-empted by the Landlord Tenant Act, as they only impact "the procedure whereby a landlord may repossess premises if he has a *right* to evict the tenant." *Warren*, 382 Pa. at 385.

The Plaintiff discusses a landlord's rights in terms of absolutes, but this has never been the case. For example, to obtain a judgment of possession in Philadelphia, the landlord must provide the

tenant with a Certificate of Rental Suitability showing that the property is free and clear of all violations issued by the Department of Licenses and Inspections, must obtain a valid rental license, and, in certain cases, must file a Certificate with the City's Department of Public Health affirming that the property is lead safe. *See* Philadelphia Property Maintenance Code § 9-3902 et seq. (for Rental License and Certificate of Rental Suitability Requirements); Phila Code. 6-800 (for requirements relating to lead safe certifications). For leases of less than one year, the landlord must issue a "Good Cause" notice laying out the basis for ending the lease at least 30 days prior to filing an eviction in Philadelphia Municipal Court. *See* Phila Code 9-800 et seq. Of course, none of these prerequisites are required by the Landlord-Tenant Act of 1951. *See generally* P.L. 69, 68 P.S. § 250.101 et seq. The challenged bills that make up the EHPA all regulate the landlord-tenant relationship and are part of a long history of such ordinances. The only novel thing about them is that these bills are a response to a catastrophic pandemic that is still being brought under control. In each case, the individual bills that make up the EHPA do not conflict with the Landlord Tenant Act.

The Plaintiff speaks of landlord rights in the City of Philadelphia as if they were absolute, existing without any limitation by local regulation. This is far from the truth. For example, to obtain a judgment of possession in Philadelphia, the landlord must provide the tenant with a Certificate of Rental Suitability showing that the property is free and clear of all violations issued by the Department of Licenses and Inspections, must obtain a valid rental license, and, in certain cases, must file a Certificate with the City's Department of Public Health affirming that the property is lead safe. *See* Philadelphia Property Maintenance Code § 9-3902 et seq. (for Rental License and Certificate of Rental Suitability Requirements); Phila Code. 6-800 (for requirements relating to lead safe certifications). For leases of less than one year, the landlord must issue a "Good Cause" notice laying out the basis for ending the lease at least 30 days prior to filing an eviction in Philadelphia Municipal Court. *See* Phila Code 9-800 *et seq.* Of course, none of these prerequisites are required by

the Landlord-Tenant Act of 1951. *See generally* P.L. 69, 68 P.S. § 250.101 et seq. The challenged

bills that make up the EHPA all regulate the landlord-tenant relationship and are part of a long

history of local regulation in this field. All that is novel here is the emergency context of a still raging

pandemic. The City's reasonable, temporary response to that crisis does not conflict with state law.[31]

### 4. Plaintiffs' Due Process Claim Is Without Merit

This Court should reject out of hand Plaintiff's Substantive Due Process Claim, which is little

more than a recycled version of its Takings Claim. Courts have "held for many years. . . . that the

'liberties' protected by substantive due process do not include economic liberties." *Stop the Beach

Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 721 (2010). "States 'have power to

legislate against what are found to be injurious practices in their internal commercial and business

affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of

some valid federal law.'" *Ferguson v. Skrupa*, 372 U.S. 726, 730–31 (1963) (quoting *Lincoln

Federal Labor Union, etc. v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 536 (1949)). Further, the

Supreme Court has specifically warned against using substantive due process as a stand-in for a

separate Constitutional theory. *See Stop the Beach Renourishmen*t, 560 U.S. at 721 (instructing that

"[w]here a particular [Constitutional] Amendment 'provides an explicit textual source of

constitutional protection' against a particular sort of government behavior. . . , that Amendment, not

the more generalized notion of 'substantive due process,' must be the guide for analyzing these

claims'").

---

[31] Plaintiff manufactures supposed support for its pre-emption claim by cherry picking language from a Fifth Circuit opinion, stating that "individual rights secured by the Constitution do not disappear during a public health crisis." *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020); Plaintiff's First Amended Verified Complaint at ¶ 50. The full quote, which the Plaintiff conveniently omits, is much more illuminating- "To be sure, individual rights secured by the Constitution do not disappear during a public health crisis, but the Court plainly stated that rights could be reasonably restricted during those times." *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020) (citing *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 29 (1905)).

Should the Court undertake a substantive due process analysis of the EHPA, the property rights asserted by the Plaintiff merits a rational-basis standard of review. Plaintiff claims without authority that the right to profitable use of property is "fundamental." *See* Amended Memorandum of Law in Support of Motion for Preliminary Injunction at §12, 35. This assertion is incorrect. While a government act that constrains certain fundamental rights will be held to a higher standard of judicial scrutiny, *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), the rights that qualify as "fundamental" are limited and bear on the most intimate aspects of private life – e.g. "the rights to marry. . . to have children. . . to direct the education and upbringing of one's children. . . to marital privacy. . . ." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (internal citations omitted). By contrast, when evaluating economic legislation that does not bear on such deeply personal liberty interests, courts apply "virtually the same standard of review under the due process clause as it does in equal protection cases involving economic classifications." *Rogin v. Bensalem Twp.*, 616 F.2d 680, 689 (3d Cir. 1980) (internal citation omitted). Thus, "[t]he test for determining whether a law comports with substantive due process is whether the law is rationally related to a legitimate state interest." *Id*.

Under state law, the standard for substantive due process review is the same. "[S]trict judicial scrutiny is only required vis-à-vis legislation that affects fundamental rights (such as the right to marry, the right to privacy, and the right to procreate), whereas rational basis review is applicable to laws that impinge upon rights that are not fundamental." *Driscoll v. Corbett*, 69 A.3d 197, 214 (Pa. 2013). Therefore, Defendants need only have had a rational basis for enacting the EHPA. The rational basis for the EHPA is evident. Plaintiff asserts that the City, in providing relief to residents most at risk of homelessness, fails this most forgiving of constitutional tests. The preamble to the EHPA outlines the looming housing crisis discussed above and its devastating ramifications for individuals, families, communities and the City.

Courts approach rational-basis analyses with substantial deference to legislative intent and fact-finding. Courts are not authorized to "to hold laws unconstitutional when they believe the legislature has acted unwisely." *Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963); *see also E. Enterprises v. Apfel*, 524 U.S. 498, 537 (1998) (quoting *Ferguson* and *Williamson v. Lee Optical Co.*, 348 U.S. 483 (1955)); *Myrie v. Comm'r, N.J. Dep't of Corr.*, 267 F.3d 251, 263 (3d Cir. 2001) (holding that "the due process clause does not authorize courts to exercise oversight with respect to the comparative efficiency, and/or relative wisdom, of the particular measure or measures that a legislature selects from a menu of possible measures reasonably calculated to achieve a permissible legislative objective"). Rather:

> [t]he test for determining whether a law comports with substantive due process is whether the law is rationally related to a legitimate state interest. '(T)he law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.'

*Rogin v. Bensalem Twp.*, 616 F.2d 680, 689 (3d Cir. 1980), *quoting Williamson at* 487-88; *see also Heffner v. Murphy*, 745 F.3d 56, 81 (3d Cir. 2014) ("An otherwise rational legislative response to a given concern cannot be invalidated under the Due Process Clause merely because the chosen solution creates other problems while addressing the original concern").

It is beyond dispute that the economic crisis brought on by the COVID-19 pandemic has caused widespread loss of income, especially among lower income and minority segments of the population, and that public health imperatives lie beneath the City's desire to minimize the number of families forced out of their homes during these dangerous times. [32] Whether the City should have

---

[32] Pennsylvania uses a similar, "means-end review," to evaluate substantive due process claims under its Constitution. *Nixon v. Com.*, 839 A.2d 277, 286 (Pa. 2003). This requires simply that a law "not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained." *Id.* at 287, citing *Gambone v. Com.*, 101 A.2d 634 (Pa. 1954). Simply put, "to withstand a substantive due process challenge, a statute must seek to achieve a valid state objective by means that are rationally

done more to protect landlords is not the inquiry before this Court, but rather whether the City's

enactment of the EHPA makes any rational sense, which, of course, it does.[33]

### C. The Potential Harm Caused by Granting an Injunction Far Outweighs Any Harm Threatening Plaintiff and Its Members

Plaintiff does not address the third factor in a preliminary injunction analysis, "that granting

preliminary relief will not result in even greater harm to the nonmoving party." *Arrowpoint Capital*

*Corp. v. Arrowpoint Asset Mgmt*, 793 F.3d 313, 318-19 (2015). Instead, Plaintiff minimizes any

such countervailing harm as only a general deprivation of constitutional rights and economic losses,

failing to even acknowledge the public emergencies City Council was trying to address. The

balance of the equities does not favor the Plaintiff.

Plaintiff states one central interest: being able to evict tenants during the COVID-19

pandemic.  In contrast, TURN and PUP's interests lie in protecting their members from mass

evictions amidst the COVID-19 pandemic; preventing the harmful impact of health hazards caused

by the pandemic on Philadelphians who would be forced into more crowded homes, shelters and

other higher-risk environments if evicted; and protecting their members from the short-term and

long-term physical and mental health effects that result from disruptive displacement. The impact of

housing insecurity during a health crisis on Philadelphia families can be serious, long-lasting, and in

many cases, irreversible. Goldstein Aff. ¶ 30; Blair Aff. ¶ 27; Dodds Aff. ¶ 11; JoeAff. ¶ 18. Even

the Philadelphia Courts have acknowledged the seriousness of the ongoing pandemic and have

rescheduled all the landlord-tenant cases until after September 2, 2020 and stayed the issuance and

---

related to the objective." *Pennsylvania Med. Soc. v. Foster*, 608 A.2d 633, 637 (Pa. Cmwlth. 1992), *citing Gambone*.

[33] Plaintiff's Amended Complaint raises a procedural, as well as substantive, due process claim, but does not mention that claim in its Motion.

service of all writs of possession and alias writs. *See* First Judicial District Order No 48 of 2020 (July 13, 2020).

Renters make up half the population of Philadelphia, and their housing stability, their health and their economic future is inextricably linked with that of the City of Philadelphia. City Council and Mayor Kenney recognized this and, in enacting the EHPA, took the necessary steps to provide the time and framework that will help stabilize renters and their landlords during this pandemic. Plaintiff asks this Court to regard the possibility of its own speculative, purely monetary harms as being more pressing than the certain harms to people's physical and mental health that will arise from pushing large numbers of families out of their homes in the middle of a pandemic. With that public health dimension added to the mental illness and health problems that ordinarily accompany evictions, the public interest clearly favors the City of Philadelphia, Mayor, and Defendant-Intervenors.


## IV.    CONCLUSION

For all the reasons set forth above, the Court should deny Plaintiff's Motion.

Respectfully submitted,

*/s/Rachel Garland*
Rachel Garland
Osarugue Osa-Edoh
Oraneet Shikmah Orevi
George Gould
Community Legal Services
1424 Chestnut Street, 5th Floor
Philadelphia, PA 19102
Rgarland@clsphila.org
Gosaedoh@clsphila.org
Oorevi@clsphila.org
Telephone: 215-981-3778

*/s/ Irv Ackelsberg*
Irv Ackelsberg
Howard Langer
David Nagdeman
Langer, Grogan and Diver, P.C.
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
iackelsberg@langergrogan.com
hlanger@langergrogan.com
dnagdeman@langergrogan.com
Telephone: 215-320-5701

*Counsel for Defendant-Intervenors*
Dated: August 7, 2020

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HAPCO<br><br>     *Plaintiff,*<br>  v.<br><br>City of Philadelphia and<br>The Honorable James Kenney<br><br>     *Defendants,*<br><br>  and<br><br>Tenant Union Representative Network and<br>Philadelphia Unemployment Project<br><br>     *Defendant-<br>     Intervenors.* | Civil Action No. 2:20-cv-3300 |

## <u>CERTIFICATE OF SERVICE</u>

   I, Rachel Garland, certify that on August 7, 2020, that I served Defendant- Intervenors' Memorandum of Law in Response to Plaintiff's Motion for Preliminary Injunction on all counsel of record for Plaintiff and Defendants, via ECF:


Respectfully submitted,

<u>*/s/Rachel Garland*</u>
Rachel Garland
Community Legal Services
1424 Chestnut Street
Philadelphia, PA 19102
rgarland@clsphila.org
Telephone: 215-981-3778

*Counsel for Defendant-Intervenors*

Dated: August 7, 2020