**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **HAPCO,** | |
| *Plaintiff,* | |
| **v.** | |
| **CITY OF PHILADEPHIA and** | |
| **THE HONORABLE JAMES KENNEY,** | **CIVIL ACTION NO. 20-3300** |
| *Defendants,* | |
| **and** | |
| **TENANT UNION REPRESENTATIVE** | |
| **NETWORK AND PHILADELPHIA** | |
| **UNEMPLOYMENT PROJECT** | |
| *Defendant-Intervenors.* | |

## <u>MEMORANDUM OPINION</u>

Rufe, J.                                                    August 27, 2020

Plaintiff HAPCO, a 501(c)(4) corporation that is an association of Philadelphia

residential investment and rental property owners and managers, seeks to preliminarily enjoin

Defendants City of Philadelphia and the Honorable James Kenney from implementing or

enforcing several temporary emergency bills passed by the Philadelphia City Council in response

to the COVID-19 pandemic. After considering the parties' briefing and after a hearing, for the

following reasons, HAPCO's motion will be denied.

### I.   BACKGROUND

The world is in the midst of an unprecedented public health crisis. The deadliest

pandemic in over a century has swept across the globe and has upended the lives of the

American people in previously unimaginable ways. Over 5.7 million Americans have contracted

the novel coronavirus, COVID-19, and, tragically, more than 177,000 Americans have died.[1] In

---

[1] *Cases of Coronavirus Disease (COVID-19) in the U.S.*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited August 27, 2020).

Philadelphia, more than 33,000 people have tested positive for COVID-19 and the death toll has exceeded 1,700.[2]

Because "COVID-19 spreads mainly among people who are in close contact," and social distancing "is the best way to reduce the spread,"[3] government officials have imposed severe measures to counter the disease. On March 6, 2020, Governor Wolf issued a Proclamation of Disaster Emergency.[4] On March 13, 2020, the Governor closed schools across the Commonwealth.[5] On March 17, 2020, recognizing that "COVID-19 is easily transmitted, especially in group settings, including by people with no symptoms or mild symptoms," Mayor James Kenney and the City of Philadelphia Commissioner of Public Health issued a joint order prohibiting the "operation of non-essential businesses in Philadelphia."[6] On March 23, 2020, Governor Wolf issued an Order For Individuals to Stay at Home which required Philadelphians, among others, to "stay at home except as needed to access, support, or provide life sustaining business, emergency, or government services."[7]

On May 7, 2020, recognizing that "the movement and/or displacement of individuals residing in Pennsylvania from their homes or residences during the current stage of the disaster emergency constitutes a public health danger to the Commonwealth in the form of unnecessary movement that increases the risk of community spread of COVID-19," Governor Wolf imposed

---

[2] *Coronavirus Disease 2019 (COVID-19)*, CITY OF PHILADELPHIA, https://www.phila.gov/programs/coronavirus-disease-2019-covid-19/ (last visited August 27, 2020).

[3] *Social Distancing*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last visited August 27, 2020).

[4] Ex. 1.A, City of Philadelphia's Response in Opposition [Doc. No. 28-2].

[5] Ex. 1.C, City of Philadelphia's Response in Opposition [Doc. No. 28-2].

[6] Ex. 1.E, City of Philadelphia's Response in Opposition [Doc. No. 28-2].

[7] Ex. 1.F, City of Philadelphia's Response in Opposition [Doc. No. 28-2].

a 60-day moratorium on both evictions and foreclosures.[8] As the Governor's order explained, evictions are particularly harmful during the COVID-19 pandemic. Although limited contact with others has been recognized as necessary to counter the pandemic, this is often impossible for people who are evicted. "When a person is unable to find housing to rent on their own, they often 'double-up' by moving in with family or friends."[9] Dr. Michael Z. Levy, an epidemiologist at the University of Pennsylvania, modeled the effect of resuming evictions on the spread of COVID-19 and concluded that, as a result of doubling-up, "[b]y May 1st of 2021 a median additional 1.30% of the population becomes infected in the scenario with evictions."[10]

The public health danger that evictions pose during the COVID-19 pandemic is particularly pronounced in Philadelphia. Even before the COVID-19 emergency began, Philadelphia was "facing an eviction crisis."[11] Philadelphia has a poverty rate of 24.5%,[12] and renters account for approximately 46% of all households in Philadelphia.[13] Over 51% of Philadelphia renters pay more than 30% of their income on rent and 30.5% of renters pay more

---

[8] Ex. 5.H, City of Philadelphia's Response in Opposition [Doc. No. 28-6]. The Governor's order was triggered by the imminent expiration of earlier orders from the Supreme Court of Pennsylvania preventing evictions. *Pennsylvania Supreme Court Closes Courts to the Public Statewide*, THE UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA, (March 18, 2020), http://www.pacourts.us/news-and-statistics/news/?Article=1018 (last accessed August 27, 2020).

[9] Decl. of Liz Hersh, Ex. 2, City of Philadelphia's Response in Opposition [Doc. No. 28-3] at ¶ 13. The City of Philadelphia's Office of Homeless Services has represented that, while it is currently able to adhere to social distancing norms in its facilities, it "would not be prepared to handle a large influx if eviction proceedings were to resume all at once and result in increased homelessness" and, therefore, "[b]ecause of the slowdown in the local economy due to the pandemic, eviction protections are necessary beyond the immediate emergency to provide time for tenants who have been financially impacted to recover and become current on their existing rent obligations." *Id.* at ¶ 29.

[10] Ex. 4, City of Philadelphia's Response in Opposition [Doc. No. 28-5] at ¶ 15. As Philadelphia has an estimated 2019 population of 1,584,064, the additional 1.3% of the population becoming infected represents approximately 20,592 people. *See QuickFacts, Philadelphia city, Pennsylvania,* UNITED STATES CENSUS BUREAU, https://www.census.gov/quickfacts/philadelphiacitypennsylvania (last visited August 27, 2020).

[11] Ex. 2.A, City of Philadelphia's Response in Opposition [Doc. No. 28-3] at 6.

[12] Ex. 5.O, City of Philadelphia's Response in Opposition [Doc. No. 28-6] at 5.

[13] Ex. 2.C, City of Philadelphia's Response in Opposition [Doc. No. 28-3] at 1.

than 50% of their income on rent.[14] In 2017, over 24,000 eviction filings were recorded, and

illegal evictions also occur on a regular basis.[15] As the Mayor's Taskforce on Eviction

Prevention summarized in its 2018 report and recommendation:

> Research shows that eviction is not only a symptom of poverty, but also a root
> cause. It disproportionately affects women of color with children, and results in
> great economic burdens on both landlords and tenants. It breaks up communities,
> hurts prospects for future employment and housing, and increases the need for
> homeless services. In short, eviction negatively affects everyone involved in the
> process.[16]

The pandemic has only exacerbated this crisis. The measures taken to slow the spread of

the virus have disrupted the global economy and left millions of Americans jobless. In

Pennsylvania alone, during the current crisis, over two million people have filed for

unemployment.[17]

Against this backdrop, and upon finding that "[t]he number of Philadelphians struggling

to pay rent has undoubtedly increased since the onset of the COVID-19 pandemic," the

Philadelphia City Council considered and enacted five separate bills temporarily amending

Chapter 9-800 of the Philadelphia Code, collectively known as the Emergency Housing

Protection Act ("EHPA").[18] The legislative findings for the EHPA also explain that "[t]he

COVID-19 pandemic's negative impact on the lives and incomes of Philadelphians, and City

---

[14] Daniel McCue, *The Burden of High Housing Costs*, FEDERAL RESERVE BANK OF PHILADELPHIA (2015),
https://www.philadelphiafed.org/community-development/publications/cascade/86/01_burden-of-high-housing-costs (last visited August 27, 2020).

[15] Ex. 2.A, City of Philadelphia's Response in Opposition [Doc. No. 28-3] at 3, 12.

[16] *Id.* at 3.

[17] *Unemployment Compensation Claim Statistics & COVID-19*, OFFICE OF UNEMPLOYMENT COMPENSATION,
https://www.uc.pa.gov/COVID-19/Pages/UC-Claim-Statistics.aspx (last visited August 27, 2020).

[18] Ex. A, Am. Compl. [Doc. No. 21-1] at 2. In its Motion for Preliminary Injunction, HAPCO only challenged four of the five bills. Although referenced in the Amended Complaint, HAPCO's motion does not discuss Bill No. 200304, which creates a private right of action for tenants who have been illegally locked out by their landlords during the COVID-19 emergency period to recover damages caused by the lockout.

revenues, has exacerbated the pre-existing housing crisis and created a housing emergency in the

City of Philadelphia" and that the Act is "necessary to ensure residents are able to remain in their

homes, and small businesses are able to stay in business."[19] On July 1, 2020, Mayor Kenney

signed the Act.

Bill No. 200294 authorizes Philadelphia's Fair Housing Commission to establish a

"residential eviction diversion program," to run through December 31, 2020.[20] The program,

which is not yet in effect, would require renters who have experienced a COVID-19 financial

hardship to participate in a mediation process with their landlords, designed to help resolve

issues before they lead to formal evictions.[21] A housing counselor would engage with the tenant

to "educate and discuss available resources" before the tenant and landlord are joined by a

designated mediator in a "conciliation conference."[22] Once the program is implemented, the bill

provides that "no landlord shall take steps in furtherance of recovering possession of a residential

property occupied by a tenant who has suffered a COVID-19 financial hardship" without

participating in a conciliation conference.[23] There are a few exceptions recognized under the Act:

if eviction is necessary to "cease or prevent an imminent threat of harm by the person being

evicted, including physical harm or harassment," or if the landlord has provided the affected

---

[19] *Id.* at 2–3.

[20] *Id.* at 5; *see also Council Committee Advances Five Bills in Emergency Housing Protection Act*, PHILADELPHIA CITY COUNCIL (June 5, 2020), http://phlcouncil.com/council-committee-advances-five-bills-in-emergency-housing-protection-act/ (last visited August 27, 2020).

[21] Ex. A, Am. Compl. [Doc. No. 21-1] at 5. A COVID-19 financial hardship is defined in the Act as the loss of income between March 1, 2020 and August 31, 2020, due to one of ten listed COVID19 related conditions, including a COVID-19 diagnosis, the need to quarantine, or the inability to work because of the shutdown. *See id.* at 3–4.

[22] *Id.*

[23] *Id.*

tenant with notice of their rights and attempted to schedule a conciliation conference, but the program is unable to offer a date within thirty days.[24]

Bill No. 200295 enacts both a blanket residential eviction moratorium and an eviction moratorium for small businesses (defined as any business that employs fewer than 100 total employees) that provide their landlord with a certification of hardship.[25] Both moratoria expire August 31, 2020 (the end of the COVID-19 emergency period as defined in the Act) and, while they are in effect, the only legal basis for an eviction is an imminent threat of harm.[26]

Bill No. 200302 makes it temporarily unlawful for landlords to charge or accept late fees on rent, interest on back rent, or similar charges as a result of delinquent payment of rent for residential tenants who have experienced a COVID-19 financial hardship.[27] Residential tenants may establish a rebuttable presumption that they have suffered a COVID-19 financial hardship by submitting a certification of hardship to their landlord. This provision is effective from March 1, 2020 (the beginning of the retroactive emergency period as defined in the Act) through May

---

[24] *Id.* at 5–6.

[25] Ex. B, Am. Compl. [Doc. No. 21-2] at 4–5. A certification of hardship is:

> A signed written statement, which may be signed by use of a typed electronic signature and provided electronically or may be provided in hard copy, that is subject to the provisions of Section 1-108 of the Code (Certification), and is submitted by an individual with personal knowledge of the facts set forth therein stating, at minimum, as follows, provided that any initial statements may be further supplemented with additional explanation, facts, or support at any time:
>
>> (i) In the case of a residential tenant, that a residential tenant has lost income due to the pandemic and setting forth facts that provide an explanation of the COVID-19 financial hardship suffered.
>>
>> (ii) In the case of a commercial tenant, that a small business has suffered a small business financial hardship and setting forth facts supporting such financial hardship.

*Id.* at 3.

[26] *See id.* at 5.

[27] Ex. C, Am. Compl. [Doc. No. 21-3] at 5.

31, 2020.[28] Any such fees or similar charges that have been submitted by a tenant since March 1, 2020, must be credited against future rent or any other financial obligations.[29]

Bill No. 200305 allows renters who have suffered a COVID-19 financial hardship and who failed to timely pay rent between March 1, 2020 and August 31, 2020, to pay back rent over a nine-month period, beginning August 31, 2020, without being evicted for nonpayment.[30] To qualify, renters must provide a certification of hardship as well as "[d]ocumentary evidence of the loss of income or increases in expenses the tenant has incurred during the retroactive emergency period or the COVID-19 emergency period as a result of such tenant's COVID-19 financial hardship . . ."[31] These tenants are considered to be in full compliance with their payment obligations and can only be evicted if they fail to pay the amount of rent normally due after the conclusion of the COVID-19 emergency period or if they are four or more months behind on the payments owed under the hardship repayment agreement.[32] The bill also requires landlords to provide advance notice to tenants of their rights before seeking to evict them.[33] If the landlord and tenant have not already entered into a hardship repayment agreement, the landlord must provide the tenant with written notice of the right to a repayment agreement at least 30 days before initiating eviction proceedings.

---

[28] *Id.*

[29] *Id.*

[30] Ex. E, Am. Compl. [Doc. No. 21-5] at 5–7.

[31] *Id.* at 5. "[I]f such documentation cannot be reasonably provided, a further certification explaining why such documentation is not available which may be signed by use of a typed electronic signature and provided electronically or may be provided in hard copy, that is subject to the provisions of Section 1-108 of the Code (Certification)" can be used instead. *Id.* at 5–6.

[32] *Id.* at 7

[33] *See id.* at 6–7.

In sum, the EHPA provides that: 1) through August 31, 2020, landlords cannot evict residential tenants and cannot evict small businesses that can provide a certification of hardship due to COVID-19;[34] 2) landlords must allow tenants who did not timely pay rent between March 1 and August 31, and who can prove that they suffered a COVID-19 financial hardship, to pay past due rent on a set plan through May 31, 2021; 3) through December 31, 2020, before taking steps to evict residential tenants who have suffered a COVID-19 financial hardship, landlords must attend mediation;[35] and 4) through May 31, 2020, landlords are barred from charging late fees and interest to residential tenants who have experienced a COVID-19 financial hardship.

Five days after Mayor Kenney signed the Act, on July 6, 2020, Plaintiff HAPCO initiated this action and filed a motion for temporary restraining order. On July 8, 2020, the Tenant Union Representative Network and the Philadelphia Unemployment Project filed a motion to intervene as defendants, which was granted as unopposed.[36] The Court held a video hearing on July 9, 2020.[37] At the hearing, Plaintiff explained that Governor Wolf was likely to extend the statewide eviction moratorium and that its motion for a temporary restraining order would be mooted by such an action. The next day, after the Governor extended the statewide eviction and foreclosure moratoria until August 31, 2020, the Court dismissed HAPCO's motion for a temporary restraining order as moot.[38]

---

[34] As the Philadelphia Municipal Court has announced that landlord-tenant actions filed on or after July 10, 2020, will not be listed for trial until November 16, 2020, at the earliest, even without the bill, landlords would be unable to evict tenants during this time. *See* Ex. 5.S, City of Philadelphia's Response in Opposition [Doc. No. 28-6].

[35] The Court notes that mediation is already an established part of the eviction procedure that resolves 36% of cases through a judgment by agreement. Ex. 2.A, City of Philadelphia's Response in Opposition [Doc. No. 28-3] at 16.

[36] Doc. Nos. 13, 17.

[37] The public hearings in this matter were held by video because of the Court's restrictions on courtroom availability due to the COVID-19 pandemic. Therefore, the Court provided access to the public and to the media through both video and audio participation. *See* Doc. Nos. 12 & 35.

[38] Doc. No. 19.

On July 16, 2020, Plaintiff filed an Amended Complaint and a Motion for a Preliminary Injunction. After the parties fully briefed the motion, the Court held a hearing on August 19, 2020.[39] Having considered the parties' arguments in their papers and at the hearing, the Court will deny HAPCO's motion.

## II.     LEGAL STANDARD

"[A]n injunction is 'an extraordinary remedy, which should be granted only in limited circumstances.'"[40] "The moving party must establish four factors to get a preliminary injunction: (1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) that the public interest weighs in favor of granting the injunction."[41] "[A] movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief."[42] "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief."[43]

---

[39] At the hearing, the parties agreed that no additional evidence or live testimony would be presented.

[40] *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989)).

[41] *Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020) (cleaned up).

[42] *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (footnote omitted).

[43] *Id.*

## III.   DISCUSSION

### A.  Likelihood of Success on the Merits

#### 1.  *Contracts Clause*[44]

Plaintiff argues that the EHPA violates the Contracts Clause because it "compel[s]

landlords] to enter into contractual arrangements [the City has] devised, give up rights

[landlords] had negotiated in pre-existing leases, and surrender their right to seek redress in a

court of law."[45]

"The Contract Clause provides that no State shall pass any law 'impairing the Obligation

of Contracts.'"[46] "The Clause is not, however, the Draconian provision that its words might seem

to imply."[47] "The Contract Clause 'does not prevent the State from exercising such powers as are

vested in it for the promotion of the common weal, or are necessary for the general good of the

---

[44] Although older Supreme Court cases refer to the "Contract Clause," the Supreme Court's more recent cases refer to the "Contracts Clause." *Sveen v. Melin*, -- U.S. --, 138 S. Ct. 1815 (2018); *see also Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, -- U.S. --, 139 S. Ct. 2449, 2463 (2019).

[45] Pl.'s Omnibus Reply Mem. in Further Supp. of Mot. for Prelim. Inj. [Doc. No. 34] at 3. Although neither party raised the issue, there is a circuit split as to whether a private right of action exists for a Contracts Clause violation. In 1885, the Supreme Court held that the Contracts Clause "so far as it can be said to confer upon or secure to any person any individual rights, does so only indirectly and incidentally." *Carter v. Greenhow*, 114 U.S. 317, 322 (1885). The Sixth and Fourth Circuits have held that a Contracts Clause violation cannot give rise to a cause of action under § 1983. *See Kaminski v. Coulter*, 865 F.3d 339, 347 (6th Cir. 2017); *Crosby v. City of Gastonia*, 635 F.3d 634, 641 (4th Cir. 2011). In contrast, the Ninth Circuit has held that the "Supreme Court has explicitly given *Carter* a narrow reading" and held "that *Carter* can only be read to have 'held as a matter of pleading that the particular cause of action set up in the plaintiff's pleading was in contract and was not to redress deprivation of the right secured to him by that clause of the Constitution [the contract clause], to which he had chosen not to resort.'" *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003) (quoting *Dennis v. Higgins*, 498 U.S. 439, 443 n.9 (1991)). At this juncture, and pending further legal argument from the parties, the Court determines that as a "broad construction of § 1983 is compelled by the statutory language," and the Supreme Court has held that § 1983 is available for suits brought for violations of the Commerce Clause—also an Article I provision—HAPCO has a private right of action to bring a Contracts Clause violation claim under § 1983. *Dennis*, 498 U.S. at 443; *see also Watters v. Bd. of Sch. Directors of City of Scranton*, 400 F. Supp. 3d 117, 128 (M.D. Pa. 2019).

[46] *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Gov't of Virgin Islands*, 842 F.3d 201, 210 (3d Cir. 2016) (quoting U.S. Const. art. I, § 10). The Contracts Clause "applies equally to municipal ordinances." *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 822 (7th Cir. 2019) (citing *St. Paul Gaslight Co. v. City of St. Paul*, 181 U.S. 142, 148 (1901)).

[47] *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978).

public,' even though contracts previously entered into may be affected."[48] "Thus, the Contract Clause 'does not trump the police power of a state to protect the general welfare of its citizens.'"[49]

The "leading case in the modern era of Contract Clause interpretation,"[50] *Home Building & Loan Assn. v. Blaisdell*,[51] is strikingly similar to the instant case. During the Great Depression, states "attempted to address the ever-growing number of foreclosures and the effect they had on the grim residential real estate situation."[52] In 1933, Minnesota passed the Mortgage Moratorium Law, which "was a temporary measure" that extended by 30 days the redemption period for mortgages which were to expire within 30 days of the Act and also allowed for further judicial extension of the time for redemption.[53] The Blaisdells, owners of a lot in Minneapolis that had been foreclosed upon and sold to Home Building & Loan Association, applied to the state court for an order extending the period of redemption. "The court found that the time to redeem would expire on May 2, 1933, under the laws of the state as they were in effect when the mortgage was made and when it was foreclosed."[54] However, in accordance with the Act, the court extended the period of redemption until May 1, 1935.[55] The Minnesota Supreme Court affirmed.

The Association then appealed to the United States Supreme Court asserting that the Minnesota law violated the Contracts Clause because the legislature interfered with its

---

[48] *United Steel Paper*, 842 F.3d at 210 (quoting *Spannaus*, 438 U.S. at 241).

[49] *Id.* (quoting *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 367 (2d Cir. 2006)).

[50] *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 15 (1977).

[51] 290 U.S. 398 (1934).

[52] Fred Wright, *The Effect of New Deal Real Estate Residential Finance and Foreclosure Policies Made in Response to the Real Estate Conditions of the Great Depression*, 57 ALA. L. REV. 231, 240 (2005).

[53] *U.S. Tr.*, 431 U.S. at 15; *see also Blaisdell*, 290 U.S. at 416.

[54] *Blaisdell*, 290 U.S. at 419.

[55] *See id.* at 420.

contractual right to take possession of the foreclosed home on May 2, 1933. The Supreme Court rejected this argument, holding that "[a]lthough the legislation conflicted directly with lenders' contractual foreclosure rights," and "despite the Contract Clause, the States retain residual authority to enact laws 'to safeguard the vital interests of [their] people.'"[56] The Court found five factors significant:

> First, the state legislature had declared in the Act itself that an emergency need for the protection of homeowners existed. Second, the state law was enacted to protect a basic societal interest, not a favored group. Third, the relief was appropriately tailored to the emergency that it was designed to meet. Fourth, the imposed conditions were reasonable. And, finally, the legislation was limited to the duration of the emergency.[57]

Later Supreme Court cases developed a two-part test.[58] "The threshold issue is whether the state law has 'operated as a substantial impairment of a contractual relationship.'"[59] If it has, then the court asks "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'"[60]

### a.  Substantial Impairment

To determine if the state law operates as a substantial impairment, courts consider the "extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights."[61] "An important factor in determining the substantiality of any contractual impairment is whether the parties were

---

[56] *Spannaus*, 438 U.S. at 242 (quoting *Blaisdell*, 290 U.S. at 434).

[57] *Id.* (citations omitted).

[58] *Sveen*, 138 S. Ct. at 1821. The *Blaisdell* limitations "have since been subsumed in the overall determination of reasonableness." *U.S. Tr.*, 431 U.S. at 22 n.19.

[59] *Id.* at 1821–22 (quoting *Spannaus*, 438 U.S. at 244).

[60] *Id.* (quoting *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–12 (1983)).

[61] *Id.* (citations omitted).

operating in a regulated industry."[62] "When a party enters an industry that is regulated in a particular manner, it is entering subject to further legislation in the area, and changes in the regulation that may affect its contractual relationships are foreseeable."[63]

HAPCO argues that its members entered into lease agreement for the purpose of ensuring prompt payment of rent and, in the case of default, to ensure the ability to repossess the property. Accordingly, Plaintiff asserts that the EHPA constitutes a substantial impairment because of the temporary provisions that prohibit landlords from charging or accepting late fees from some tenants, that limit the bases for evictions until August 31, 2020, that require landlords to enter into hardship repayment agreements with some of their tenants, and that require landlords to participate in an eviction diversion program before seeking to reclaim possession of property from certain tenants who fail to pay rent.[64]

Of course, when landlords entered into leases before the EHPA was passed, they did not expect that these specific regulations would be enacted in response to a global pandemic. However, residential leases have been heavily regulated for many years.[65] Pennsylvania's Landlord-Tenant Act of 1951 imposes requirements regarding the amount of security deposits,[66]

---

[62] *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 369 (3d Cir. 2012) (citing *Energy Reserves*, 459 U.S. at 411).

[63] *Id.* (citation omitted).

[64] Mem. of Law in Supp. of Pl. HAPCO's Mot. for a Prelim. Inj. [Doc. No. 22-2] at 18–19. Plaintiff also argues that the Act "reliev[es] tenants of their obligation to pay rent through at least August 31, 2020." *Id.* at 19. However, none of the provisions in the Act forgives rent that is owed. Moreover, as Governor Wolf extended Pennsylvania's eviction moratorium until August 31, 2020, the City's limitation on evictions until August 31, 2020 do not cause any additional impairment of contracts.

[65] *See e.g.*, *Elmsford Apartment Associates, LLC v. Cuomo*, No. 20-4062, 2020 WL 3498456, at *13 (S.D.N.Y. June 29, 2020). The Court notes that this is not the first time that Philadelphia has passed temporary rent and eviction relief in response to an emergency. *See Warren v. City of Phila.*, 115 A.2d 218, 219 (Pa. 1955). Likewise, as mediation is already part of the formal eviction proceedings, the EHPA merely changes when in the process it occurs. *See* Ex. 2.A, City of Philadelphia's Response in Opposition [Doc. No. 28-3] at 16.

[66] 68 Pa. Stat. § 250.511a.

13

the deadline for returning security deposits,[67] and interest on security deposits.[68] The law also regulates how much notice landlords must give before terminating various tenancies,[69] and sets forth the exact procedures for effecting an eviction.[70]

In addition, both state and federal laws govern various aspects of the landlord-tenant relationship. Landlords must disclose all known information on lead-based paint in their dwellings;[71] Civil rights laws prohibit landlords from engaging in discriminatory rental practices;[72] and Pennsylvania's Rent Withholding Act "authorizes rent withholding where a local health department certifies a dwelling as unfit for human habitation."[73]

On the municipal level, the Philadelphia Fair Housing Ordinance prohibits numerous unfair rental practices by landlords against tenants.[74] Landlords cannot terminate a lease in retaliation for an incident of domestic violence or sexual assault in which a tenant was the victim, for the filing of a complaint alleging a violation, for a violation having been found against the premises, or for a tenant for joining a lawful organization or exercising a legal right. Regardless of the lease term, at the request of a tenant who is the victim of domestic violence or sexual assault, a landlord is required to terminate a lease without penalty provided certain conditions are met. Landlords are also required to notify tenants of rent increases within specified time periods. Landlords leasing a residential property for a term of less than one year

---

[67] 68 Pa. Stat. § 250.512.

[68] 68 Pa. Stat. § 250.511b.

[69] 68 Pa. Stat. § 250.501(b).

[70] 68 Pa. Stat. § 250.501 *et seq.*

[71] *See* 42 U.S.C. § 4852d; 40 C.F.R. § 745.107; *see also* Phila., Pa. Code § 6-800.

[72] *See, e.g.*, 42 U.S.C. § 3604.

[73] *Teodori v. Werner*, 415 A.2d 31, 35 n.7 (Pa. 1980).

[74] Phila., Pa. Code § 9-804.

can only terminate the lease if they have good cause and provide notice 30 days before filing for an eviction. For these, and other violations, the Philadelphia Fair Housing Commission has the power to hold a hearing and issue penalties.

Against this heavily-regulated backdrop,[75] "it is doubtful that any impairment of a contractual relationship has occurred" as a result of the EHPA.[76] But even if parts of the EHPA impair existing contracts, the impairment is only a "[m]inimal alteration of contractual obligations."[77] As in *Blaisdell*, where, in response to an emergency, the legislature was permitted to minimally interfere with the expectations of the purchasers of properties at foreclosure sales by extending the time that borrowers could redeem the property, here, the eviction moratorium, the rent repayment plan, and the eviction diversion program "merely postpone[] the date on which landlords may commence" eviction proceedings and collect full rent from their tenants.[78] Because "a reasonable modification of statutes governing contract remedies is much less likely to upset expectations than a law adjusting the express terms of an agreement,"[79] the Court cannot conclude that HAPCO has a likelihood of success on the merits on its claim that a delay of a few

---

[75] *See ASAH v. New Jersey Dep't of Educ.*, 330 F. Supp. 3d 975, 1017 (D.N.J. 2018); *see also Energy Reserves*, 459 U.S. at 413.

[76] *Troy Ltd. v. Renna*, 727 F.2d 287, 297 (3d Cir. 1984).

[77] *Spannaus*, 438 U.S. at 245.

[78] *Elmsford*, 2020 WL 3498456, at *15.

[79] *U.S. Tr.*, 431 U.S. at 19 n.17.

months constitutes a substantial impairment.[80] As the tenants are still bound to their contracts,

the contractual bargain is not undermined and landlord rights are safeguarded.[81]

      b.  <u>Significant and Legitimate Purpose</u>

Even if the EHPA constituted a substantial impairment, the Act is a reasonable way to

advance a significant and legitimate public purpose. "A legitimate public purpose is one aimed at

remedying a broad and general social or economic problem; it need not be addressed to an

emergency or temporary situation."[82] The legislative findings of the EHPA expressly report that

the COVID-19 pandemic has created a housing emergency in the City of Philadelphia and that

the Act is necessary to address the emergency.[83] The City has also identified the need to protect

public health by ensuring that city residents can remain at home during the pandemic as a

significant and legitimate purpose of the Act.[84]

Nonetheless, because the Act only seeks to protect renters, Plaintiff quotes the Supreme

Court's decision in *Allied Structural Steel Co. v. Spannaus* for the proposition that "this law can

---

[80] The only part of the EHPA that permanently forecloses landlords from obtaining their bargained for contractual remedies is the provision that waives late fees and interest for residential tenants who have experienced a COVID-19 financial hardship and submit a certification of hardship to their landlord. However, assuming that this provision is an impairment, *see Blaisdell*, 290 U.S. at 425 ("The statute does not impair the integrity of the mortgage indebtedness . . . [t]he obligation for interest remains."), considering that the main import of the contracts from the landlords' perspective is to receive rent, it is doubtful that the loss of late fees constitutes a *substantial* impairment. Regardless, because the EHPA is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose, even if this provision is a substantial impairment, it would not violate the Contracts Clause.

[81] *See Elmsford*, 2020 WL 3498456, at *15.

[82] *United Steel Paper*, 842 F.3d at 211 (citing *Energy Reserves*, 459 U.S. at 411–12).

[83] *See Troy*, 727 F.2d at 298 (holding that protecting vulnerable citizens from evictions is a significant and legitimate reason for substantially impairing contracts); *see also Blaisdell*, 290 U.S. at 445.

[84] *See Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 25 (1905). Although this purpose is not mentioned in the legislative findings, the Third Circuit has explained that it is proper for district courts to consider "post-enactment evidence offered in support of City Council's decision" because "[i]f a legislative body can produce in court whatever justification is required of it under the applicable constitutional doctrine, we perceive little to be gained by incurring the expense, effort, and delay involved in requiring it to reenact the legislative measure after parading its evidence through its legislative chamber." *Greater Philadelphia Chamber of Commerce v. City of Philadelphia*, 949 F.3d 116, 128 n.61 (3d Cir. 2020) (quoting *Phillips v. Borough of Keyport*, 107 F.3d 164, 178 (3d Cir. 1997)).

hardly be characterized . . . as one enacted to protect a broad societal interest rather than a narrow class."[85] However, the *Spannaus* Court specifically cited *Blaisdell*, in which Minnesota passed a law protecting homeowners from foreclosure at the expense of mortgagees, as a situation where the state law was enacted to protect a broad societal interest.[86]

Moreover, in *Spannaus*, the challenged state law "was enacted when a division of a large motor company closed its Minnesota plant and attempted to terminate its pension plan, which would have financially harmed its terminated employees in that state."[87] The statute "imposed a 'pension funding charge' on certain, narrowly defined employers who terminated their pension plan or closed a Minnesota office" and the "Court noted that the statute applied only to very few employers, and only in very rare situations."[88] Here, because the Act applies broadly to residential leases and small business leases and it was passed in the midst of an "economic emergency which threatened the loss of homes . . . which furnish those in possession the necessary shelter[,] means of subsistence," and means of complying with stay-at-home orders during the COVID-19 pandemic, the City had a significant and legitimate purpose for the enactment of the EHPA.[89]

---

[85] Mem. of Law in Supp. of Pl. HAPCO's Mot. for a Prelim. Inj. [Doc. No. 22-2] at 19 (quoting 438 U.S. at 249).

[86] *See Spannaus*, 438 U.S. at 248–49.

[87] *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 631 (5th Cir. 2010) (citing *Spannaus*, 438 U.S. at 247–48).

[88] *Id.* (quoting *Spannaus*, 438 U.S. at 238).

[89] *Blaisdell*, 290 U.S. at 444–45 (internal quotations removed). Plaintiff also argues that "[e]ven if the Act was designed to address the City's broader, ongoing poverty and purported renter distress, 'a [contractual] impairment is not a reasonable one if the problem sought to be resolved by an impairment of the contract existed at the time the contractual obligation was incurred.'" Mem. of Law in Supp. of Pl. HAPCO's Mot. for a Prelim. Inj. [Doc. No. 22-2] at 19–20 (quoting *United Steel Paper*, 842 F.3d at 213–14). However, this rule only applies in situations where the state is a party to the contract. *See United Steel Paper*, 842 F.3d at 212–14 (explaining that the legislature knew about the budget crisis when it agreed to provide a salary increase to government employees); *see also U.S. Tr.*, 431 U.S. at 30–32.

c. <u>Appropriate and Reasonable</u>

Furthermore, the Act is an appropriate and reasonable way to advance the City's purpose. Where, as here, the contract is between private parties, courts "generally defer to legislative judgment . . . [w]ith respect to reasonableness and necessity."[90] Plaintiff asserts that, in light of the continuing obligation for landlords to pay their mortgages and property taxes, the City could have considered more "moderate course[s]" such as "reduc[ing] the eviction moratorium, allow[ing] for the gradual payment of late fees and interest, . . . ma[king] direct payments to renters consistent with the federal government's mandate under the Coronavirus Aid, Relief, and Economic Recovery Act . . . [or] provid[ing] landlords with property tax relief for the same period that tenants received rent relief under the Act."[91] Plaintiff also argues that even though the City defined the "COVID-19 emergency period" as "[t]he period beginning on the date of the ordinance adding Section 9-809 to the Code becomes law and ending August 31, 2020," it was unreasonable to extend "certain relief to small business and residential tenants through at least May 31, 2021."[92]

"The Contract Clause, however, 'does not require courts . . . to sit as superlegislatures, choosing among various options proposed by plaintiffs.'"[93] The City has determined that there is

---

[90] *ACRA Turf Club, LLC v. Zanzuchi*, 724 F. App'x 102, 108 (3d Cir. 2018) (citing *Energy Reserves*, 459 U.S. at 412–13); *see also Sidamon-Eristoff*, 669 F.3d at 368–69 (quoting *U.S. Tr.*, 431 U.S. at 23). Plaintiff again mistakenly relies on *United Steel Paper* for the proposition that "[t]he government must use the least intrusive means to achieve its goals; it is not free to impose a 'drastic impairment when an evident and more moderate course would serve its purposes equally well.'" Mem. of Law in Supp. of Pl. HAPCO's Mot. for a Prelim. Inj. [Doc. No. 22-2] at 20 (quoting *United Steel Paper*, 842 F.3d at 212). However, as explained above, because *United Steel Paper* involved a contract between the government and private parties, "[t]he higher standard" articulated in *United Steel Paper* "is not relevant to the disposition of this case, which poses the very different problem of legislation allegedly impairing the obligation of contracts between private parties." *Troy*, 727 F.2d at 296; *see also ACRA*, 724 F. App'x at 108 (explaining that it is only when the "State's self-interest is at stake" that "stricter scrutiny" applies) (citations omitted).

[91] Mem. of Law in Supp. of Pl. HAPCO's Mot. for a Prelim. Inj. [Doc. No. 22-2] at 21.

[92] *Id.* at 20.

[93] *ACRA*, 724 F. App'x at 108 (quoting *United Steel*, 842 F.3d at 213). Throughout its briefings, Plaintiff repeatedly argues that the EHPA violates its constitutional rights because the EHPA does not consider the financial burden

a "housing emergency in the City of Philadelphia" and that the challenged bills "are necessary to ensure residents are able to remain in their homes, and small businesses are able to stay in business."[94] Considering the deference owed to this legislative judgment, the Court cannot conclude that the City's methods of alleviating the emergency were inappropriate or unreasonable.[95] The challenged Act undoubtedly helps residents remain in their homes and, especially considering the COVID-19 pandemic during which it is critical that people have the space to remain socially distant from each other, it is reasonable and appropriate for the City to "protect[] the mental and physical health of citizens who could suffer greatly by evictions."[96] It was also not unreasonable for City Council to determine that, after the havoc that COVID-19 has wreaked on the economy, renters would need protections that extended past the emergency period.

In sum, as in *Blaisdell*, where temporary measures enacted in response to emergency conditions to allow people to remain in their homes under certain conditions was upheld in response to a Contracts Clause challenge, HAPCO's Contracts Clause challenge to the City's

---

experienced by landlords. *See* Mem. of Law in Supp. of Pl. HAPCO's Mot. for a Prelim. Inj. [Doc. No. 22-2] at 6, 21, 33; Pl.'s Omnibus Reply Mem. in Further Supp. of Mot. for Prelim. Inj. [Doc. No. 34] at 3, 11. However, it is not the Court's role to strike down legislation merely because certain parties dislike the results of the legislation. *See ACRA*, 724 F. App'x at 108; *see also Myrie v. Comm'r, N.J. Dep't of Corr.*, 267 F.3d 251, 263 (3d Cir. 2001) (explaining, in the due process context, that courts are not authorized "to exercise oversight with respect to the comparative efficiency, and/or relative wisdom, of the particular measure or measures that a legislature selects from a menu of possible measures reasonably calculated to achieve a permissible legislative objective."); *Heffner v. Murphy*, 745 F.3d 56, 81 (3d Cir. 2014) ("An otherwise rational legislative response to a given concern cannot be invalidated under the Due Process Clause merely because the chosen solution creates other problems while addressing the original concern."). Considering the importance of ensuring that residents are able to remain in their homes during the pandemic, it was not inappropriate or unreasonable for the City to pass legislation protecting renters without also protecting landlords from the risk of foreclosure in the same legislation. *See, e.g., Blaisdell*, 290 U.S. at 444–45. Moreover, the City did not legislate against a blank backdrop; as explained below, many programs protect landlords from foreclosure during the current emergency.

[94] Ex. A, Am. Compl. [Doc. No. 21] at 2–3.

[95] *Blaisdell*, 290 U.S. at 445–47.

[96] *Troy*, 727 F.2d at 298; *see also Blaisdell*, 290 U.S. at 444–45 (explaining that "the economic emergency which threatened the loss of homes and lands which furnish those in possession the necessary shelter and means of subsistence was a potent cause for the enactment of the statute.") (internal citation and quotation omitted).

temporary legislation, enacted in response the COVID-19 pandemic and designed to allow residents to remain in their homes, is unlikely to succeed on the merits.[97]

### 2. Due Process

Plaintiff argues that the EHPA violates Plaintiff's substantive due process rights under the federal and Pennsylvania Constitutions.[98] The Supreme Court, however, has explained that "[t]he day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought."[99] "For protection against abuses by legislatures the people must resort to the polls, not to the courts."[100] Therefore, "[t]he Due Process Clause of the Fourteenth Amendment generally does not prohibit retrospective civil legislation, unless the consequences are particularly 'harsh and oppressive.'"[101] "Generally speaking, state laws need only be rational and non-arbitrary in order to satisfy the right to substantive due process."[102]

---

[97] With regard to Plaintiff's claim under the Contracts Clause of the Pennsylvania Constitution, the Court is "bound to apply this provision in the same manner it would be applied by the Supreme Court of Pennsylvania." *Transp. Workers Union of Am., Local 290 By & Through Fabio v. Se. Pennsylvania Transp. Auth.*, 145 F.3d 619, 624–25 (3d Cir. 1998) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966)). "That court has held that it is generally to be applied in the same manner as its federal counterpart." *Id.* at 625 (citing *First National Bank of Pennsylvania v. Flanagan*, 528 A.2d 134, 135 n.1 (Pa. 1987)). Therefore, the Court concludes that the Supreme Court of Pennsylvania would reach the same conclusions in this case with respect to the Pennsylvania Contracts Clause as the Court reached with respect to the federal Contracts Clause.

[98] The federal and Pennsylvania due process clauses are "'substantially equivalent' in their protective scope." *Hospital & Healthsystem Ass'n of Pa. v. Com.*, 77 A.3d 587, 600 n.15 (Pa. 2013) (quoting *Krenzelak v. Krenzelak*, 469 A.2d 987, 991 (Pa. 1983))..

[99] *Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 488 (1955) (citations omitted).

[100] *Id.* at 464–65 (citation omitted).

[101] *U.S. Tr.*, 431 U.S. at 17 n.13 (quoting *Welch v. Henry*, 305 U.S. 134, 147 (1938)).

[102] *Gibson v. Am. Cyanamid Co.*, 760 F.3d 600, 614 (7th Cir. 2014) (citing *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976)); *see also E. Enterprises v. Apfel*, 524 U.S. 498, 537 (1998) (plurality opinion); *id.* at 550 (Kennedy, J., concurring in part) ("Statutes may be invalidated on due process grounds only under the most egregious of circumstances."); *United States v. Carlton*, 512 U.S. 26, 30 (1994); *Cnty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 169 (3d Cir. 2006); *U. S. Steel Corp. v. Oravetz*, 686 F.2d 197, 201 (3d Cir. 1982).

In support of its Motion for a Preliminary Injunction, Plaintiff argued that the EHPA's provisions that bar landlords from repossessing their property until August 31, 2020, that extend protections past the defined emergency period, and that force landlords into hardship repayment agreements and eviction diversion programs violate its due process rights because "even if there was a legitimate reason for these restrictions, the Act is by no mean 'rationally related' to the City's objective."[103] However, because Due Process Clause claims are assessed using a less exacting standard than Contracts Clause claims, for the reasons stated in the Contracts Clause section, these provisions of the EHPA are not arbitrary or irrational.[104]

In its Reply Brief, HAPCO raises several new and more specific arguments in support of its claim that the EHPA is not rationally related to the City's legitimate interest in protecting the public health and economic welfare. Although "arguments raised for the first time in a Reply Brief" are ordinarily "waived," the Court will briefly explain why Plaintiff is unlikely to succeed on the merits of any of these arguments.[105]

First, even though Plaintiff argues that "[i]t defies logic that eliminating contractually bargained-for (and statutory) rights to interest and late fees bears any rational relation to prohibiting evictions, especially because the eviction moratorium already does that," it is not irrational for the City to assume that the fear of accumulating interest and late fees would cause many tenants who are experiencing a COVID-19 financial hardship to self-evict and not take advantage of the Act's protections.[106]

---

[103] Mem. of Law in Supp. of Pl. HAPCO's Mot. for a Prelim. Inj. [Doc. No. 22-2] at 32–33.

[104] *Sidamon-Eristoff*, 669 F.3d at 369; *see also Legal Asset Funding, LLC v. Travelers Cas. & Sur. Co.*, 155 F. Supp. 2d 90, 100 (D.N.J. 2001) (citing *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984)).

[105] *Hayes v. Silvers, Langsam & Weitzman, P.C.*, 441 F. Supp. 3d 62, 67 n.4 (E.D. Pa. 2020) (citing *Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994); *In re BlackRock Mut. Funds Advisory Fee Litig.*, 327 F. Supp. 3d 690, 736 n.42 (D.N.J. 2018)).

[106] Pl.'s Omnibus Reply Mem. in Further Supp. of Mot. for Prelim. Inj. [Doc. No. 34] at 16.

Second, Plaintiff argues that the restriction in Bill No. 200305—which sets up the hardship repayment program—making it unlawful for landlords to take "any steps in furtherance of recovering possession of a residential premises" is unrelated to the City's interests because the City's purpose for the Act only supports halting the actual eviction, not the process leading up to the eviction.[107] However, as "[o]ver half (54%) of all legal evictions are the result of a default judgment entered against a tenant," it is not irrational to completely pause the eviction process to ensure that tenants take advantage of the Act and do not self-evict upon the initiation of the eviction proceedings.[108]

Third, Plaintiff argues that the Act violates the Due Process Clause because there is no way for landlords "to substantiate a claim of COVID-related financial hardship."[109] However, the certifications of hardship must comply with Section 1-108 of the Philadelphia Code which require certifications to be sworn to under oath and, in any event, it is not arbitrary and irrational for the City to not provide landlords with the means of challenging whether tenants have truly experienced a COVID-19 financial hardship.

Finally, Plaintiff argues that the Act is not "rationally related to preventing the spread of COVID-19" because "the Act provides relief to tenants who were struggling to meet their rent obligations as far back as March 1, 2020 – before the coronavirus ravaged the United States and before any declaration of emergency in Philadelphia or Pennsylvania."[110] On March 6, 2020, Governor Wolf issued a Proclamation of Disaster Emergency; the City's determination that beginning relief on March 1, as opposed to March 6, for residents who have suffered a COVID-

---

[107] *Id.* at 17 (quoting Ex. E, Am. Compl. [Doc. No. 21-5] at 7).

[108] Ex. 2.A, City of Philadelphia's Response in Opposition [Doc. No. 28-3] at 16; *see also* Lord Aff. [Doc. No. 29-1].

[109] Pl.'s Omnibus Reply Mem. in Further Supp. of Mot. for Prelim. Inj. [Doc. No. 34] at 18.

[110] *Id.*

19 financial hardship is not irrational.[111] Therefore, Plaintiff's due process claims are unlikely to succeed on the merits.

### 3. Takings Clause

Plaintiff argues that the EHPA violates the Takings Clauses of the federal and Pennsylvania Constitutions. However, whether Plaintiff's claim has a likelihood of success on the merits is irrelevant at this stage; the Supreme Court in *Knick v. Township of Scott, Pennsylvania* recently explained that although "[a] property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it" "[g]overnments need not fear that our holding will lead federal courts to invalidate their regulations as unconstitutional. As long as just compensation remedies are available—as they have been for nearly 150 years—injunctive relief will be foreclosed."[112] Therefore, Plaintiff's motion for injunctive relief based on a violation of the Takings Clause will be denied.[113]

### 4. Preemption

Plaintiff asserts that the EHPA is preempted by the Pennsylvania Landlord-Tenant Act. The Pennsylvania Supreme Court has explained that "[t]here are three generally recognized types

---

[111] *See Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963) ("The doctrine that prevailed in Lochner, Coppage, Adkins, Burns, and like cases—that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely—has long since been discarded. We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws.").

[112] -- U.S. --, 139 S. Ct. 2162, 2167, 2179 (2019); *see also Willowbrook Apartment Associates, LLC v. Mayor and City Council of Baltimore*, No. 20-1818, 2020 WL 3639991, at *3 (D. Md. July 6, 2020) (explaining that the "proper remedy for a Takings violation is not injunctive relief, but rather monetary damages"). Likewise, because "the declaratory relief sought by Plaintiff[] . . . would be the functional equivalent of injunctive relief . . . [t]he Supreme Court's decision in *Knick* forecloses such relief." *Cnty. of Butler v. Wolf*, No. 20-677, 2020 WL 2769105, at *4 (W.D. Pa. May 28, 2020).

[113] The "Pennsylvania Supreme Court has consistently relied upon the decisions of the United States Supreme Court in deciding cases implicating the Takings Clause in the Pennsylvania Constitution. *See Smith v. Cortes*, 879 A.2d 382, 385 (Pa. Commw. Ct. 2005) (citing *In the Matter of Condemnation of the Municipality of Penn Hills*, 870 A.2d 400 (Pa. Commw. Ct. 2005)), *aff'd sub nom. Smith v. Cortez*, 901 A.2d 980 (Pa. 2006). Therefore, the Pennsylvania Supreme Court would likely reach the same conclusion.

of preemption: (1) express or explicit preemption, where the statute includes a preemption clause, the language of which specifically bars local authorities from acting on a particular subject matter; (2) conflict preemption, where the local enactment irreconcilably conflicts with or stands as an obstacle to the execution of the full purposes of the statute; and (3) field preemption, where analysis of the entire statute reveals the General Assembly's implicit intent to occupy the field completely and to permit no local enactments."[114] According to Plaintiff "the Act directly conflicts with the Landlord-Tenant Act in two key respects."[115]

First, Plaintiff argues that Article III of the Landlord-Tenant Act—which provides that "[a]ny landlord may recover from a tenant rent in arrears in an action of assumpsit as debts of similar amount are by law recoverable" and that "[i]n any such action, interest at the legal rate on the amount of rent due may be allowed if deemed equitable under the circumstances of the particular case"—preempts the EHPA's temporary prohibition on late fees and interest on late rent.[116] However, the Landlord-Tenant Act only allows interest if it is "deemed equitable under the circumstances of the particular case"; it does not require that interest be paid (and there is no mention of late fees).[117] The City's determination that it would be inequitable to require a tenant

---

[114] *Hoffman Min. Co. v. Zoning Hearing Bd. of Adams Twp., Cambria Cnty.*, 32 A.3d 587, 593–94 (Pa. 2011) (citations omitted).

[115] Pl.'s Omnibus Reply Mem. in Further Supp. of Mot. for Prelim. Inj. [Doc. No. 34] at 21. Express and field preemption do not apply to challenges to local legislation based on the Landlord-Tenant Act. *See Berwick Area Landlord Ass'n v. Borough of Berwick*, 48 A.3d 524, 534 (Pa. Commw. Ct. 2012) ("The Landlord Tenant Act does not state on its face that local legislation is forbidden. And there is no indication that municipalities must not supplement the area.").

[116] 68 Pa. Stat. § 250.301.

[117] *Id.*; *see also Tsung Tsin Ass'n v. Luen Fong Produce, Inc.*, 2019 WL 1531884, at *2 n.3 (Pa. Super. Ct. Apr. 9, 2019) ("We note that while the law of contracts governs unpaid rent, equity governs whether a landlord can collect interest on the amount of unpaid rent.").

who has experienced a COVID-19 financial hardship to pay interest or late fees does not conflict with the Landlord-Tenant Act.[118]

Second, Plaintiff argues that Article V of the Landlord-Tenant Act, which provides the process for summary eviction proceedings, preempts the EHPA's limitations on evictions. This argument is foreclosed by the Pennsylvania Supreme Court's decision in *Warren v. City of Philadelphia*.[119] In 1955, Philadelphia passed a rent control ordinance that sought "to regulate and control housing accommodations and evictions by establishing maximum rents and prohibiting evictions except on certain grounds."[120] Among others, an association of property owners in Philadelphia filed suit seeking an injunction on the purported basis that the ordinance was invalid because it conflicted with the Landlord-Tenant Act. The Pennsylvania Supreme Court rejected this argument and explained that the Landlord-Tenant Act "sets up the procedure whereby a landlord may repossess premises if he has a *right* to evict the tenant. The substantive law as to *when* he has a right to evict is not touched upon."[121] Therefore, because the City of

---

[118] Plaintiff also argues that "tying the late fee and interest waiver to the certification of financial hardship does not automatically make the waiver 'equitable'" because "[t]he Act provides no verification or enforcement mechanism for the certification, except that it must be signed pursuant to Section 1-108 of the Philadelphia Code." Pl.'s Omnibus Reply Mem. in Further Supp. of Mot. for Prelim. Inj. [Doc. No. 34] at 22–23. However, considering that, in this Court, an affidavit given under oath is reliable enough to be introduced against a criminal defendant, the Court cannot conclude that a certification of hardship that complies with Section 1-108 of the Philadelphia Code is unreliable. *See, e.g.*, *United States v. Hicks*, 510 F. App'x 167, 173 (3d Cir. 2013) (citation omitted). In any event, as explained, the EHPA's provision barring landlords from charging tenants who have experienced a COVID-19 financial hardship does not conflict with the Landlord-Tenant Act because the City determined that requiring interest would be inequitable and the Landlord-Tenant Act only allows for interest when it is deemed equitable. The preemption inquiry concerns whether the City's legislation conflict with the Landlord-Tenant Act, not whether the Court agrees with the City's enactment. *Compare Warren*, 115 A.2d at 221–22 (explaining that the rent control ordinance of 1955 was not preempted by the Landlord-Tenant Act without ruling on the merits of whether the ordinance was lawful), *with Warren v. City of Phila.*, 127 A.2d 703, 706 (Pa. 1956) (ruling that a 1956 ordinance extending the imposition of rent controls to 1957 was "invalid, arbitrary and void" because no emergency existed).

[119] 115 A.2d 218.

[120] *Id.* at 219 n.1.

[121] *Id.* at 221; *see also Berwick*, 48 A.3d at 534–35.

Philadelphia has the right "to ordain controls upon rents and evictions," the Court explained that the ordinance was not preempted.[122]

As in *Warren*, the EHPA fits squarely within the City of Philadelphia's power. Pursuant to the EHPA, until August 31, 2020, landlords temporarily lack the right to evict certain tenants unless there is imminent harm; until May 31, 2020, landlords do not have the right to evict tenants who are on a hardship repayment plan and who meet their obligations under the plan; and, until December 31, 2020, if the City sets up an eviction diversion program, landlords would not have the right to evict certain tenants unless they participate in the program. Accordingly, the EHPA does not conflict with the eviction procedures set forth in the Landlord-Tenant Act because it only regulates *when* landlords have the right to evict. For the same reason, Plaintiff's argument that the EHPA "bars landlords from demanding rent during the emergency period and for an additional nine months after the fact" even though the Landlord-Tenant Act allows a landlord to repossess land "upon the failure of the tenant, upon demand, to satisfy any rent reserved and due"[123] is foreclosed—*Warren* expressly held that Landlord-Tenant Act does not provide the "substantive law as to *when* [a landlord] has a right to evict."[124] Therefore, HAPCO has not shown a likelihood of success on the merits of its claim that the eviction-related provisions of the EHPA are preempted.

---

[122] *Id.* at 222.

[123] Pl.'s Omnibus Reply Mem. in Further Supp. of Mot. for Prelim. Inj. [Doc. No. 34] at 21–22 (quoting 68 P.S. § 250.501).

[124] 115 A.2d at 221. The Court also notes that the EHPA only prohibits landlords from seeking late fees, interest, and similar charges; it does not impose limitations on landlords' ability to seek and collect monthly rent. Moreover, pursuant to the EHPA, a tenant who takes advantage of the Act's protections is not considered to be overdue on their rent. *See* Ex. E, Am. Compl. [Doc. No. 21-5] at 5 (explaining that a tenant who enters into a hardship repayment agreement "shall be considered in full compliance with any payment obligations under such tenant's lease.").

**B.  HAPCO's Irreparable Harm**

"In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the *only* way of protecting the plaintiff from harm."[125] "The requisite feared injury or harm must be irreparable — not merely serious or substantial, and it must be of a peculiar nature, so that compensation in money cannot atone for it."[126] "Thus, a litigant seeking injunctive relief must 'articulate and adduce proof of actual or imminent harm which cannot otherwise be compensated by money damages . . . to sustain its substantial burden of showing irreparable harm.'"[127] The preliminary injunction standard requires the plaintiff to make a clear showing that "it is more likely than not to suffer irreparable harm in the absence of preliminary relief."[128]

HAPCO provides two theories of irreparable harm: that the violation of constitutional rights satisfies the requirement of showing irreparable harm and that landlords will also face "irreparable harm if properties are foreclosed upon and landlords are saddled with the resulting effects on their livelihood and creditworthiness."[129] However, even assuming that a violation of

---

[125] *Checker Cab of Philadelphia Inc. v. Uber Techs., Inc.*, 643 F. App'x 229, 232 (3d Cir. 2016) (citation omitted).

[126] *Kamdem-Ouaffo v. Task Mgmt. Inc*, 792 F. App'x 218, 221 (3d Cir. 2019) (quoting *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91–92 (3d Cir. 1992)).

[127] *Id.* (quoting *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102–03 (3d Cir. 1988)).

[128] *Reilly*, 858 F.3d at 179.

[129] Mem. of Law in Supp. of Pl. HAPCO's Mot. for a Prelim. Inj. [Doc. No. 22-2] at 34–35.

the constitutional rights at issue can constitute irreparable harm,[130] as explained above, HAPCO has failed to demonstrate that its members are suffering from a constitutional harm.[131]

Moreover, although it is true that the foreclosure of property can constitute irreparable harm because property is unique,[132] HAPCO has failed to show that its members are more likely than not to suffer such irreparable harm.[133] HAPCO relies exclusively on the Declaration of Victor Pinckney, a HAPCO member, which states that "HAPCO members rely on rental payments to pay mortgages, property taxes and other expenses for their properties."[134] According

---

[130] *See New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 388 (3d Cir. 2012) (explaining that even though the plaintiffs had shown a likelihood of success on the merits of their Contracts Clause claim they still had to show irreparable harm ); *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 n.2 (3d Cir. 1994) (reversing a district court's preliminary injunction because of a lack of irreparable harm without reversing the district court's determination that the plaintiff established a likelihood of success on the merits on his substantive due process claim).

[131] Although the Court did not consider the merits of Plaintiff's Takings Clause claim, it is black letter law that a Takings Clause violation does not constitute irreparable harm for purposes of obtaining injunctive relief because monetary damages is the proper remedy for such a violation. *Knick*, 139 S. Ct. at 2176–77.

[132] *See Shvartser v. Lekser*, 308 F. Supp. 3d 260, 267 (D.D.C. 2018) (citing *Patriot–BSP City Ctr. II v. U.S. Bank Nat. Ass'n*, 715 F. Supp. 2d 91, 95–96 (D.D.C. 2010); *Peterson v. D.C. Lottery & Charitable Games Control Bd.*, No. 94-1643, 1994 WL 413357, at *4 (D.D.C. July 28, 1994)).

[133] *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

[134] Decl. of Victor Pinckney [Doc. No. 22-3] at 3. Although the parties do not mention standing in their briefings, federal courts "have an obligation to assure themselves of litigants' standing under Article III" and this obligation requires courts to raise the issue of standing *sua sponte. Wayne Land & Mineral Grp., LLC v. Delaware River Basin Comm'n*, 959 F.3d 569, 574 (3d Cir. 2020) (cleaned up). As HAPCO is asserting injury on behalf of its members, *i.e.*, organization standing, it must satisfy three requirements: "(1) the organization's members must have standing to sue on their own; (2) the interests the organization seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires individual participation by its members." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 279 (3d Cir. 2014) (citations omitted). HAPCO satisfies the first requirement because, based on the Pinckney Declaration, it has made "specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). HAPCO also satisfies the second prong because the interests it seeks to protect are germane to its purpose of advocating for landlords. Under the third prong, "the association must demonstrate that neither its claims nor its requested relief 'requires the participation of individual members in the lawsuit.'" *Am. Chiropractic Ass'n v. Am. Specialty Health Inc.*, 625 F. App'x 169, 176 (3d Cir. 2015) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). "Where associations seek injunctive or declaratory relief . . . participation of the individual members 'may be unnecessary.'" *Id.* (quoting *Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 284 n.3 (3d Cir. 2002)). "This is particularly true where . . . a broad based change in procedure rather than individualized injunctive relief is sought." *Action All. of Senior Citizens of Greater Philadelphia v. Snider*, No. 93-4827, 1994 WL 384990, at *3 (E.D. Pa. July 18, 1994). Because HAPCO is seeking to enjoin entirely a municipal ordinance, at this stage, it has standing to seek the requested relief.

to HAPCO, "[t]he obvious result of not having the rental payments to meet those expenses is foreclosure and tax delinquency."[135]

However, Pinckney's Declaration is insufficient to show irreparable harm. First, HAPCO has not shown that all of its members will be irreparably harmed. In *Adams v. Freedom Forge Corp.*, the Third Circuit reviewed a District Court's decision granting a preliminary injunction to approximately 136 former employees (and their spouses) of Freedom Forge Corporation who asserted that "Freedom Forge induced them into early retirement with oral assurances that their health insurance benefits would continue essentially unmodified until death, without informing them that it actually retained the power to amend or eliminate the benefits program altogether."[136] The Court of Appeals explained that "in the absence of a foundation from which one could infer that all (or virtually all) members of a group are irreparably harmed, we do not believe that a court can enter a mass preliminary injunction."[137] Therefore, the Third Circuit reversed the District Court because:

> [T]here was insufficient evidence from which the District Court could infer that all the plaintiff-retirees and their spouses (in whose favor the injunction ran) were in such financial straits that they would be forced to choose between medical care and other necessities. In order to obtain a preliminary injunction that would apply to each one of them, the plaintiffs would have had to present affidavits or other evidence from which one could at least infer that each of them was so threatened. Instead, the plaintiffs only presented evidence from which a court could infer that some of them were threatened with harm.[138]

Here, Pinckney's Declaration fails to establish a foundation for which the Court could infer that the nearly 1,900 HAPCO members are all in the same situation. After all, the financial

---

[135] Pl.'s Omnibus Reply Mem. in Further Supp. of Mot. for Prelim. Inj. [Doc. No. 34] at 7.

[136] 204 F.3d 475, 479 (3d Cir. 2000).

[137] *Id.* at 487.

[138] *Id.* at 488.

situation of HAPCO's members assuredly varies and, as explained below, many landlords are protected from foreclosure by different government programs.[139]

Second, even accepting Pinckney's assertion that all of HAPCO's members rely on rental payments to pay the expenses on their properties, the Court cannot credit HAPCO's "obvious result" because the Third Circuit has held that "[t]he law does not take judicial notice of matters of 'common sense,' and common sense is no substitute for evidence. A preliminary injunction may not be based on facts not presented at a hearing, or not presented through affidavits, deposition testimony, or other documents, about the particular situations of the moving parties."[140] Pinckney's Declaration can only establish that HAPCO's members rely on rental payments for their expenses; it cannot establish that the consequence of the EHPA will be foreclosures. Therefore, because "[t]he risk of irreparable harm cannot be speculative . . . the Court cannot assume irreparable harm will arise from an otherwise economic injury compensable by damages."[141]

Third, a close inspection of HAPCO's "obvious result" reveals that it is not so obvious. The EHPA's eviction moratorium concludes August 31, 2020, which is the same date that the Governor's eviction moratorium is set to conclude and, in any event, the Philadelphia Municipal

---

[139] *See id.* Moreover, the Court cannot accept Pinckney's conclusory statement as evidence that all of HAPCO's members are in the same position. *See Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir. 1990) (citing *De Beers Consol. Mines v. United States*, 325 U.S. 212, 222 (1945)); *see also Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985) (explaining that an affidavit that "fails to show any personal knowledge" by the affiant is conclusory).

[140] *Adams*, 204 F.3d at 487.

[141] *Asian-Am. Licensed Beverage Ass'n v. Pennsylvania*, No. 05-2135, 2005 WL 3077246, at *6 (M.D. Pa. Nov. 3, 2005) (citing *Adams*, 204 F.3d at 488). The Court notes that Pinckney's Declaration does not either support this speculation as to himself because it establishes that he has tenants who have failed to pay rent during the COVID-19 emergency period but there is no indication that any of his properties have been foreclosed on or are at risk of foreclosure. Decl. of Victor Pinckney [Doc. No. 22-3] at ¶¶ 22–23; *see also* Ex. 5.Z, City of Philadelphia's Response in Opposition [Doc. No. 28-6] at 4.

Court has announced that it will not hear new eviction filings until November 16, 2020.[142]

Likewise, because mediation is already part of the eviction process, and the EHPA's eviction

diversion program would only cause a short delay in obtaining an eviction, this provision will not

cause irreparable harm.[143] Thus, even accepting that HAPCO's members rely on rental payments

to pay their mortgages, HAPCO is left with the speculation that the EHPA's temporary

restrictions on collecting late fees and interest (which are small and inconsistent sums of money),

and its temporary requirement for landlords to participate in a hardship repayment plan with

those tenants who can provide documentation of a COVID-19 financial hardship (which provides

landlords with all back rent), will lead to all of its members facing foreclosures.[144]

Moreover, HAPCO's speculation cannot support an injunction given the evidence of a

myriad of programs currently protecting landlords from foreclosure.[145] Governor Wolf has issued

an executive order staying the filing of all new mortgage foreclosures through August 31,

2020[146] and many properties are also protected by the Federal Housing Administration's

foreclosure moratorium that is also currently in place until August 31, 2020.[147] The Coronavirus

---

[142] *See* Ex. 5.S, City of Philadelphia's Response in Opposition [Doc. No. 28-6]. In fact, in a July 2, 2020 article, Pinckney explained that even if the Municipal Court had opened on July 6, as scheduled, there was a "good chance" that "he wouldn't have reclaimed his units until November or December and wouldn't have been able to collect rent until he could lease units again in January or February." Ex. 5.Z, City of Philadelphia's Response in Opposition [Doc. No. 28-6] at 5.

[143] Ex. 2.A, City of Philadelphia's Response in Opposition [Doc. No. 28-3] at 16.

[144] The Court notes that as, upon application, the Philadelphia Code already allows for the payment of judgment in installments over twelve months, it is unclear that the EHPA's hardship repayment plan make it more likely that landlords will obtain back rent any slower than they would in the absence of the Act. *See* Pa. R. Philadelphia Mun. Ct. R.C.P. 123.

[145] *See Adams*, 204 F.3d at 488.

[146] Order of the Governor of the Commonwealth of Pennsylvania Staying Notice Requirements for Specified Actions Related to the Dispossession of Property (July 9, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/07/20200709-TWW-eviction-order.pdf (last accessed August 27, 2020).

[147] *Auracle Homes, LLC v. Lamont*, No. 20-00829, 2020 WL 4558682, at *2 (D. Conn. Aug. 7, 2020) (citing Press Release, Dep't of Hous. & Urban Dev., FHA Extends Foreclosure and Eviction Moratorium for Single Family Homeowners for Add'l Two Months (June 17, 2020), https://www.hud.gov/press/press_releases_media_advisories/HUD_No_20_081).

Aid, Relief and Economic Security Act ("CARES Act") also provides relief. Homeowners with a "federally backed mortgage," which are 70% of the mortgages in the current market,[148] "may seek a 180-day forbearance on their loan, with an additional 180-day extension at the homeowner's request" for buildings with less than five units,[149] and the "borrower of a residential mortgage loan that is secured by a lien against a property comprising 5 or more dwelling units," can request forbearance for up to 90 days.[150] Many borrowers of non-federal backed mortgages are also receiving relief as private institutions are also offering protections including grace periods for mortgages and foreclosure moratoriums.[151]

Numerous other programs protect landlords. In May, the COVID-19 Emergency Rental Assistance Program provided rental payments to Philadelphia landlords for 4,000 households.[152] The CARES Rent Relief Program, which is set to pay $28.45 million in rental assistance directly to Philadelphia landlords, went into effect in June.[153] The Landlord Working Capital Loan Program allows Philadelphia landlords who own 15 or fewer residential rental units to obtain low

---

[148] *Frequently Asked Questions about the Federal Response to the Coronavirus (COVID-19) Pandemic,* U.S. HOUSE COMMITTEE ON FINANCIAL SERVICES (April 1, 2020), https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=406472 (visited August 27, 2020).

[149] *Auracle*, 2020 WL 4558682, at *2 (citing 15 U.S.C. § 9056(b)).

[150] 15 U.S.C. § 9057.

[151] *Coronavirus Updates*, OFFICE OF ATTORNEY GENERAL COMMONWEALTH OF PENNSYLVANIA, https://www.attorneygeneral.gov/COVID19/ (last visited Aug. 27, 2020); *see also Frequently Asked Questions about the Federal Response to the Coronavirus (COVID-19) Pandemic,* U.S. HOUSE COMMITTEE ON FINANCIAL SERVICES (April 1, 2020), https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=406472 ("[S]ome lenders are voluntarily aligning the relief they are providing with the relief provided for federally backed mortgages, so it is still possible that homeowners without federally backed mortgages will have access to similar relief.") (last visited August 27, 2020).

[152] *City Provides Update on COVID-19 for Saturday, May 30, 2020*, CITY OF PHILADELPHIA (May 30, 2020), https://www.phila.gov/2020-05-30-city-provides-update-on-covid-19-for-saturday-may-30-2020/ (last visited August 27, 2020).

[153] *Phase 2 of Rental Assistance for Tenants Affected by COVID-19*, CITY OF PHILADELPHIA (June 29, 2020), https://www.phila.gov/2020-06-29-phase-2-of-rental-assistance-for-tenants-affected-by-covid-19/ (last visited August 27, 2020).

interest loans of up to $10,000 with no payment due for the first six months.[154] The COVID-19 Working Capital Access Program provided landlords with interest free loans of up to $100,000.[155] The Small Business Administration's Economic Injury Disaster Loan Program provides businesses with fewer than 500 employees low interest loans of up to $2 million[156] and prior to August 8, 2020, landlords could take out forgivable loans to pay their employees through the Payroll Protection Program.[157] Under the CARES Act, landlords are also able to defer paying payroll taxes until December 31, 2020.[158] Moreover, Philadelphia's Foreclosure Diversion Program is also available to HAPCO members who, despite these numerous other programs, face foreclosure.[159]

      In sum, Pinckney's Declaration is insufficient to make any inferences about all 1,900 HAPCO members, the Court cannot accept HAPCO's speculation that the obvious result of a landlord's inability to immediately collect all payments owed under the lease will lead to foreclosure, and the evidence in the record demonstrates the fallacy of HAPCO's speculation. Therefore, because HAPCO has failed to show that its members are more likely than not to

---

[154] *Landlord Working Capital Loan Program*, IMPACT, http://www.impactservices.org/loan-fund/landlord-working-capital/#1543357448177-eeb96dfc-3e19 (last visited Aug. 27, 2020); *see also* Decl. of Gregory Heller, Ex. 3, City of Philadelphia's Response in Opposition [Doc. No. 28-4] at ¶ ¶ 10–12.

[155] *COVID-19 Working Capital Access Program*, PENNSYLVANIA DEPARTMENT OF COMMUNITY AND ECONOMIC DEVELOPMENT, https://dced.pa.gov/programs/covid-19-working-capital-access-program-cwca/ (last visited Aug. 27, 2020).

[156] *Economic Injury Disaster Loans*, U.S. SMALL BUSINESS ADMINISTRATION, https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/economic-injury-disaster-loans (last visited Aug. 27, 2020).

[157] *Paycheck Protection Program*, U.S. SMALL BUSINESS ADMINISTRATION, https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-program (last visited Aug. 27, 2020).

[158] *Deferral of employment tax deposits and payments through December 31, 2020*, IRS, https://www.irs.gov/newsroom/deferral-of-employment-tax-deposits-and-payments-through-december-31-2020 (last visited Aug. 27, 2020).

[159] Ex. 6, City of Philadelphia's Response in Opposition [Doc. No. 28-7]. For example, a landlord whose tenant is making use of a hardship repayment plan and, therefore, will receive all back rent by May would have the opportunity to mediate with their lender and negotiate a payment plan that tracks the tenant's hardship repayment plan.

suffer from foreclosures as a result of the EHPA, it has failed to meet its burden of showing that it faces irreparable harm.[160]

## IV.    CONCLUSION

Based on the current record, and considering all of the relevant circumstances, HAPCO has not shown that the extraordinary remedy of a preliminary injunction is warranted. An order will be entered.

---

[160] Because Plaintiff has failed to satisfy the two "gateway factors," the Court need not "consider[] the remaining two factors." *Reilly*, 858 F.3d at 179; *Verma v. Doll*, No. 20-14, 2020 WL 1814149, at *3 (M.D. Pa. Apr. 9, 2020) ("Only if these 'gateway factors' are satisfied may the court consider the third and fourth factors.").