UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **HAPCO,** : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | **Case Number** |
| : | **20-3300-CMR** |
| **CITY OF PHILADELPHIA, et al.,** : | |
| Defendants. : | |
| : | |
| : | |

**[PROPOSED] ORDER**

AND NOW, this ____ day of _____, 2020, upon consideration of Defendants City of Philadelphia and the Honorable James Kenney's Motion to Dismiss, and Plaintiff's Response in Opposition thereto, it is hereby ORDERED that the Motion is GRANTED and the Complaint is dismissed with prejudice.

_____
J.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **HAPCO,** | : |
| **Plaintiff,** | : |
| | : |
| v. | : **Case Number** |
| | : **20-3300-CMR** |
| **CITY OF PHILADELPHIA, et al.,** | : |
| **Defendants.** | : |
| | : |
| | : |

### DEFENDANTS' MOTION TO DISMISS

Defendants, the City of Philadelphia and the Honorable James Kenney, file this Motion to Dismiss Plaintiff's Complaint under Rule 12(b)(6). The Court should grant the motion for the reasons more fully explained in the accompanying memorandum.

WHEREFORE, the City respectfully requests that this Court grant the Motion and dismiss the Complaint with prejudice under Rule 12(b)(6).

Respectfully submitted,

CITY OF PHILADELPHIA LAW DEPARTMENT
MARCEL S. PRATT, CITY SOLICITOR

Dated: August 28, 2020

/s/ Eleanor N. Ewing
ELEANOR N. EWING (PA ID No. 28226)
Chief Deputy City Solicitor
BENJAMIN H. FIELD (PA ID No. 204569)
Divisional Deputy City Solicitor
LYDIA FURST (PA ID No. 307450)
Deputy City Solicitor
MICHAEL PFAUTZ (PA ID No. 325323)
Assistant City Solicitor
Affirmative & Special Litigation
CITY OF PHILADELPHIA LAW DEPARTMENT
1515 Arch Street, 15th Floor
Philadelphia, PA 19102
Phone: (215) 683-5014
*Counsel for Defendants*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **HAPCO,** | : |
| **Plaintiff,** | : |
| | : |
| v. | : **Case Number** |
| | : **20-3300-CMR** |
| **CITY OF PHILADELPHIA, et al.,** | : |
| **Defendants.** | : |
| | : |
| | : |

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

I.     **INTRODUCTION**

In the midst of a devastating global pandemic and an ongoing eviction and housing crisis, Philadelphia's City Council passed several modest provisions designed to help tenants remain in their properties in the immediate future.  Plaintiff HAPCO alleges these provisions are unconstitutional, claiming they are not reasonable, rational, or necessary to preventing evictions and protecting public health, that they take private property but lack a public purpose, and that they conflict with state law. But HAPCO's constitutional claims about impaired contracts, due process, and takings are doomed by the fact that the City's actions were modest, temporary, and aimed at protecting tenants throughout the City from eviction and the spread of a deadly disease. HAPCO's state law argument was rejected over half a century ago by the Pennsylvania Supreme Court.  As a result, HAPCO's Amended Complaint should be dismissed with prejudice.

II.    **FACTUAL BACKGROUND**[1]

    A.     **The COVID-19 Pandemic Is Exacerbating Philadelphia's Housing Crisis**

Philadelphia renters have long faced financial struggles.  Am. Compl. (ECF 21) ¶ 9. Philadelphia is one of the poorest cites in the nation, and City Council found that roughly half of the City's population rents housing. *See, e.g.*, Am. Compl., Ex. A at 3 ¶¶ 9-10.  City Council also found that roughly half of renters struggle to pay rent, and Philadelphia has one of the highest levels of evictions among large cities.  *See id.* at 3 ¶¶ 11-12; *see also* Am. Compl ¶¶ 5, 9.

The COVID-19 pandemic has exacerbated this crisis, wreaking "serious and unprecedented economic damage throughout the United States" and "result[ing] in the loss of more than 100,000 American lives." Am. Compl. ¶ 24.  In response to the COVID-19 pandemic, Pennsylvania Governor Tom Wolf and Philadelphia Mayor James Kenney issued a number of executive orders recognizing the deadly impact of the disease and ordering precautions to

---

[1] For purposes of this Motion to Dismiss only, the City takes the facts as pleaded to be true.

1

minimize its spread. *See* Am. Compl., Ex. A at 2 ¶¶ 1, 3-5. Within a few weeks, schools and businesses—the vast majority of which were small businesses—were ordered closed and residents were told to remain in their homes except for essential travel.[2] Whether because of the disease itself, heightened caretaking responsibilities, or closure-related layoffs, over 100,000 Philadelphians have since filed for unemployment. *See* Am. Compl., Ex. A at 4 ¶ 14.

Early on in the pandemic, Pennsylvania Courts, Governor Wolf, and Congress all saw it necessary to restrict evictions. The Pennsylvania Supreme Court, which has authority over the courts of the Commonwealth, closed court eviction proceedings until May 11, 2020. Am. Compl. ¶ 27. On May 7, 2020, Governor Wolf signed an executive order staying foreclosure and eviction notice requirements for 60 days, thereby tolling the ability to commence the timelines necessary for the initiation of foreclosure and eviction proceedings until July 10, 2020. *Id*. ¶¶ 26, 28. On July 9, the Governor extended his moratorium through August 31, 2020. *Id.* ¶ 30. On July 13, 2020, the President Judges of the Philadelphia Court of Common Pleas and Philadelphia Municipal Court announced that already filed eviction cases would not be heard before September 3, 2020, and any newly filed cases would not be heard before November 16, 2020.[3]

In addition, the federal CARES Act provided for up to a year of forbearance, without additional late fees or interest, for federally backed mortgages but also imposed a 120-day eviction moratorium for landlords with such mortgages or who participate in federal housing programs. *See* 15 U.S.C. §§ 9056(b), 9057(c)-(d), 9058(a)-(b). That moratorium expired on July

---

[2] *See, e.g.*, Press Release, *Governor Wolf Announces Closure of Pennsylvania Schools* (Mar. 13, 2020), *available at* ECF 28-2 at 16; Mayor James F. Kenney & Thomas H. Farley, Health Comm'r, City of Phila., *Emergency Order Temporarily Prohibiting Operation of Non-Essential Businesses to Prevent the Spread of 2019 Novel Coronavirus (COVID-19)* (Mar. 17, 2020), *available at* ECF 28-2 at 21; Am. Compl., Ex. A at 2 ¶ 6. The Court may consider public records on a 12(b)(6) motion. *See* Part III, *infra* (citing *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196-97 (3d Cir. 1993)).

[3] *See* President Judge Admin. Order No. 48 of 2020, *In re: Reopening of Philadelphia Municipal Court Civil Division to In-Person* Proceedings (July 13, 2020), *available at* ECF 28-6 at 165.

24, although landlords are required to provide an additional 30-days' notice before beginning eviction proceedings. *See id.* §§ 9057(e), 9058(c).

### B. The City Passes Legislation to Ensure Residents Remain in their Homes and Small Businesses Stay in Business During the COVID-19 Crisis

To ensure residents can remain in their homes, and small businesses stay in business, the City considered and enacted several new pieces of legislation (collectively, the "Emergency Housing Bills"). *See, e.g.*, Am. Compl., Ex. A at 3 ¶ 20. These Bills amended the City's Fair Housing Ordinance to establish several time-limited protections for tenants affected by the COVID-19 pandemic and additional remedies for tenants whose landlords threaten or actually evict tenants outside of the required court process. *See* Am. Compl., Exs. A-E. The challenged provisions all expire in less than a year, and all eviction limitations provide an exception for evictions that are necessary to prevent an imminent threat of harm by the person being evicted. *E.g.,* Phila. Code § 9-809(3), (4), (5)(b), (6)(a).[4] In addition, some of the tenant protections were limited to residential tenants who lost income due to COVID-19 and the associated closures. *See id.* § 9-809(5)(b) (diversion), (6)(a) (late fees), (7)(a)-(b) (hardship repayment). City Council also considered, but did not pass, a form of rent control in Bill 200301 (ECF 26-8 at 208).

Bill 200295 (the "eviction moratorium") prohibits evictions or the taking of steps in furtherance of recovering possession of a property occupied by small business tenants that suffer small business financial hardships, or by residential tenants (regardless of hardship) for two months, through August 31, 2020. *See* Phila. Code § 9-809(3)-(4). The Bill does so by limiting the legal bases for eviction in Philadelphia during this time period. *See id.*

Bill 200302 (the "late fee waiver") makes it unlawful for a landlord to charge or accept the payment of late fees, interest, or similar charges from residential tenants who have

---

[4] The Amended Complaint attaches as exhibits versions of the Bills voted on by City Council. The Bills have now been consolidated and codified into the Philadelphia Code (a copy of which is included as Exhibit 1 to this Memorandum), which the City now cites for ease of reference.

3

experienced a COVID-19 financial hardship and who were or are late in paying rent during the period between March 1, 2020 and May 31, 2021. *See id.* § 9-809(6).

Bill 200305 (the "hardship repayment agreement requirement") gives impacted residential tenants the right to repay back-rent over time. Under a hardship repayment agreement, a landlord must allow a tenant who suffered a COVID-19 financial hardship and did not timely pay their rent before August 31, 2020 the opportunity to pay, in addition to their usual monthly rent, an additional percentage of the back rent due, with all back due rent to be paid in full within nine months, by May 31, 2021. *See id.* § 9-809(7)(a), (b)). A tenant who complies with their hardship repayment agreement *and who pays ongoing monthly rent on time after August 31, 2020* is considered current on their rent, *see id.* § 9-809(7)(a), (d). Landlords may still evict tenants who fail to pay ongoing monthly rent on time after August 31, 2020 or who fail to pay back rent as agreed if the tenant is in arrears in an amount equal to four or more monthly payments, *see id.* § 9-809(7)(d)(.3)(.a)-(.b). In order to qualify for a hardship repayment agreement, a residential tenant must submit a Certification of Hardship, as well as "documentary evidence" of the loss of income or a certified explanation for why documentation is not available. *See id.* § 9-809(7)(a)(.1)-(.2).

Bill 200305 also requires landlords to provide advance notice to tenants of their rights before seeking to evict them. If the landlord and tenant have not already entered into a hardship repayment agreement, the landlord must provide a specified notice by hand delivery or certified mail at least 30 days prior to taking steps to evict the tenant. *See id.* § 9-809(7)(d)(.1). The notice must inform the tenant of the potential protections available, including hardship repayment agreements. *See id.* If the notice is not provided, the landlord may not take steps to evict the tenant for nonpayment of rent until May 31, 2021. *See id.* § 9-809(7)(d)-(e).

Bill 200294 (the "diversion program") allows Philadelphia's Fair Housing Commission to establish a residential-eviction diversion program. *See* Phila. Code § 9-809(5)(a). The

4

program would provide for a conciliation conference with a designated mediator and a housing counselor to assist the tenant in connecting with available resources, such as rental assistance. *See id.* § 9-809(5)(a)(.1)-(.3). Through December 31, 2020, and in addition to the other protections, landlords are required to participate before taking steps to evict a residential tenant who has suffered a COVID-19 financial hardship unless a conference cannot be scheduled within thirty days of the landlord's request (i.e., during the notice period). *See id.*

## III. LEGAL STANDARD

A complaint fails to state a claim under Rule 12(b)(6) if it does not "contain sufficient factual allegations so as to state a facially plausible claim for relief." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). The Court must "accept all factual allegations in the complaint as true, [and] construe the complaint in the light favorable to the plaintiff," but "is not required to accept legal conclusions alleged in the complaint." *Id.* at 229. The question is whether the facts alleged, even if true, fail to support the claim. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993); *see also St. Croix Waterway Ass'n v. Meyer*, 178 F.3d 515, 519 (8th Cir. 1999) ("[B]ecause the Association's complaint asserted a facial constitutional challenge, the issues presented to the district court were questions of law and the specific facts were not relevant.").

In addition, when deciding a Rule 12(b)(6) motion, the Court is not limited to allegations in the complaint and documents referenced in the complaint. The Court may also consider matters of public record such as legislative history, judicial documents, "and published reports of administrative bodies." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196-97 (3d Cir. 1993); *see also S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999).

## IV. ARGUMENT

All Counts of the Amended Complaint fail as a matter of law under Rule 12(b)(6). First, the Emergency Housing Bills operate only temporarily and do not relieve tenants of their

obligation to pay rent, and therefore do not substantially impair existing contracts as a matter of law. And even if they did, they would survive Contracts Clause scrutiny because even when considered only on the basis of Plaintiff's complaint and public documents, they are temporary, reasonable, and necessary measures aimed at preventing evictions and limiting the spread of COVID-19. Second, the Bills easily survive the even more deferential rational basis review applicable to economic and social welfare legislation under the Due Process Clause for the same reasons. Third, HAPCO's facial challenge under the takings clauses fails to controvert the City's public purpose in enacting the Bills—to the contrary, HAPCO's complaint demonstrates the acute need for housing protections in the midst of an ongoing pandemic. And fourth, HAPCO's preemption argument is foreclosed by binding Pennsylvania Supreme Court precedent.[5]

### A. The Emergency Housing Bills Comply with the Contracts Clauses

Counts 1 and 2 of the Amended Complaint seek relief under the federal and Pennsylvania Contracts Clauses. At the outset, "[b]ecause [HAPCO] ha[s] chosen to raise [its] Contract Clause arguments in the context of a facial challenge to the statute[s]," HAPCO must "demonstrate that the challenged law[s] 'could never be applied in a valid manner.'" *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 992 (2d Cir. 1997) (citations omitted); *see* Am. Compl. ¶ 10 (stating facial posture). But HAPCO cannot make this showing because the Bills apply to current *and* future leases, while the Contracts Clause only protects existing agreements, *Mabey Bridge & Shore, Inc. v. Schoch*, 666 F.3d 862, 874 (3d Cir. 2012).

---

[5] During this Court's July 9, 2020 hearing, Defendants explained that Plaintiff's original Complaint lacked sufficient allegations to establish Article III standing, citing *N.J. Physicians, Inc. v. President of U.S.*, 653 F.3d 234, 241 (3d Cir. 2011). Plaintiff subsequently amended their complaint with additional standing averments. While Defendants are not challenging Plaintiff's standing in this Motion, we will continue to analyze Plaintiff's standing at each stage in this litigation, cognizant that standing, which goes to the Court's subject matter jurisdiction, *see id.* at 238, "may be raised by a party, or by a court on its own initiative, *at any stage* in the litigation," *Arbaugh v. Y&H Corp.*, 126 S. Ct. 1235, 1240 (2006) (emphasis added). *See also* Aug. 28, 2020 Op. at 28 n.134 (ECF 37) (finding that HAPCO has standing for the requested relief at "[that] stage" in the litigation).

HAPCO has also not identified an existing lease, but an as-applied challenge would fare no better, because—insofar as the Bills operate only temporarily or on ancillary lease terms—they do not "substantially" impair existing leases. Even if the Bills did, they would still be constitutional because they are reasonable and necessary means of furthering the goals of preventing evictions and limiting the spread of disease during the COVID-19 pandemic.

Courts use a two-step, three-part test to evaluate Contract Clause claims: "[1] whether the law has operated as a substantial impairment of a contractual relationship; [2] whether the government entity, in justification, had a significant and legitimate public purpose behind the regulation; and [3] whether the impairment is reasonable and necessary to serve this important public purpose.'" *ACRA Turf Club, LLC v. Zanzuccki*, 724 F. App'x 102, 108 (3d Cir. 2018) (citation omitted). If the law does not operate as a "substantial impairment," the Contracts Clause is not implicated. *Troy Ltd. v. Renna*, 727 F.2d 287, 297 (3d Cir. 1984).

### 1. The Bills Do Not Substantially Impair Leases

In the context here, there is no substantial impairment. Under the first prong, courts "determine whether there has been a substantial impairment of a contractual relationship by inquiring whether legitimate expectations of the plaintiffs have been substantially thwarted." *Transp. Workers Union of Am., Local 290 v. SEPTA,* 145 F.3d 619, 622 (3d Cir. 1998). In determining what expectations were legitimate and whether any impairment is substantial, the court "consider[s] whether the industry the complaining party has entered has been regulated in the past." *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 103 S. Ct. 697, 706 (1983)). "When a party enters an industry that is regulated in a particular manner, it is entering subject to further legislation in the area, and changes in the regulation that may affect its contractual relationships are foreseeable." *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 369 (3d Cir. 2012) (citing *Energy Reserves*, 103 S. Ct. at 704).

7

The Amended Complaint alleges that the Bills violate the Contract Clause in five ways: by (a) temporarily limiting evictions; (b) waiving late fees and interest on back rent for qualifying tenants; (c) requiring participation in an eviction diversion program before evicting qualifying tenants; (d) requiring landlords to allow qualifying tenants to repay back rent over time; and (e) requiring landlords to provide advance notice of tenants' rights and eviction. Am. Compl. ¶¶ 58-59. But these claims misconstrue the Bills and fail to identity a legitimate expectation that is thwarted in this highly regulated field.

The landlord-tenant relationship is and has long been subject to extensive regulation, including in Philadelphia. *C.f. Yee v. City of Escondido*, 503 U.S. 519, 528–29 (1992) (listing existing landlord-tenant regulations that did not constitute compensable takings). Pennsylvania's Landlord and Tenant Act of 1951 imposes certain notice and procedural requirements on evictions as well as limitations on security deposits that can be maintained and interest that may be charged for past due rent. *See* 68 P.S. §§ 250.101 *et seq*. Late-performance penalty provisions in contracts, such as leases, are also disfavored under Pennsylvania law. *Cf. Holt's Cigar Co. v. 222 Liberty Assoc.*, 591 A.2d 743, 749 (Pa. Super. Ct. 1991) (penalties only allowed if reasonable estimate of actual damages). State court rules already permit the Court to allow tenants to make "payment of a judgment in installments, over a period not to exceed twelve (12) months." *See* Pa. R. Philadelphia Mun. Ct. R.C.P. 123(a). And in addition to the Bills at issue, the City regulates landlords specifically in several ways, including penalizing self-help evictions, requiring landlord registration, and requiring "good cause" for evictions of month-to-month tenants. *See* Phila. Code. ch. 9-800. The City's Fair Housing Ordinance, Chapter 9-800, dates back to the 1950s. Similarly, longstanding Pennsylvania case law acknowledges that the City previously has and may in the future limit the legal bases for eviction, particularly in an emergency. *See Warren v. City of Philadelphia*, 115 A.2d 218 (Pa. 1955).

8

While most of the provisions HAPCO faults adjust the timing of a landlord's remedies, none relieve tenants of their basic obligation to pay the current rent due or prevent landlords from ultimately recovering back rent due. The eviction moratorium expires after two months. *See* Phila. Code § 9-809(1)(b), (3)-(4).  Hardship repayment plans maintain tenants' obligation to pay rent for past months and merely allow qualifying tenants whose income has declined the option to do so over a period of months *along with currently due rent*.  *See* Phila. Code § 9-809(7)(b), (d). The notice provision simply adds additional time and information that must be provided to tenants complementing the existing notice periods in the eviction process.  *Compare id.*, *with* 68 P.S. §§ 250.501(b) (requiring ten, fifteen, or thirty-days notice); *see also* Phila. Code § 9-804(12) (requiring thirty-days notice prior to good-cause eviction).  The diversion program does not change any lease provision but rather requires the landlord's participation in a City program during the thirty-day notice period. *See* Phila. Code § 9-809(5)(b)(.2). And as for late fees or interest, they have also explicitly been subject to substantial limits and modification under state law.  *See, e.g.*, 68 P.S. §§ 250.301 (interest on back rent limited to "legal rate" and only "*if* deemed equitable" (emphasis added)); *Holt's Cigar*, 591 A.2d at 749.

In light of the many laws governing the landlord-tenant relationship, a landlord enters the industry "subject to further legislation in the area, and changes in the regulation that may affect its contractual relationships are foreseeable." *Am. Exp. Travel*, 669 F.3d at 369; *see also DePaul v. Kauffman*, 272 A.2d 500, 507 (Pa. 1971) ("In light of the paramount public interest in safe and decent housing, the landlord's pre-existing duty to comply with housing code standards, and the fact that in most instances there will be no permanent rent loss, we do not consider the Act to be an unconstitutional impairment of contract obligations."). As a result and as a matter of law, laws like the Emergency Housing Bills that impose modest limitations on the landlord-tenant relationship but maintain the obligation to pay rent do not constitute "substantial" impairments of all leases.

### 2. Preventing Evictions and Protecting Public Health Are Public Purposes

Even if any impairment could be deemed "substantial," the City has acted in furtherance of a legitimate public purpose. *Energy Reserves*, 103 S. Ct. at 705. "A legitimate public purpose is one aimed at remedying a broad and general social or economic problem; it need not be addressed to an emergency or temporary situation." *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL- CIO-CLC v. Virgin Islands*, 842 F.3d 201, 211 (3d Cir. 2016) (citation omitted). As a matter of law, providing eviction or foreclosure relief to a broad group such as renters or homeowners during times of economic distress is a classic public purpose not for the advantage of particular individuals. *See, e.g.*, *Home Bldg. & Loan Ass'n v. Blaisdell*, 54 S. Ct. 231, 242 (1934); *Marcus Brown Holding Co. v. Feldman*, 41 S. Ct. 465, 466 (1921); *Troy Ltd.*, 727 F.2d at 298. So is protecting public health by preventing the spread of deadly, communicable diseases. *Cf., e.g.*, *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring); *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). In this case, the City acted to protect City residents in general and tenants in particular from COVID-19's public health and economic consequences by "ensur[ing] residents are able to remain in their homes, and small businesses are able to stay in business." *E.g.*, Am. Compl., Ex. A 2, 3-4 ¶¶ 1-5, 20.

### 3. The Bills Are Reasonable and Necessary to Prevent Evictions and Protect Public Health

At the third step of the Contracts Clause analysis, if a law imposes a substantial impairment but serves a public purpose, it is constitutional if the means chosen are reasonable and necessary, for instance by making measures temporary or tailoring their protections to impacted groups. *See Energy Reserves*, 103 S.Ct. at 708; *Troy Limited*, 727 F.2d at 291, 298. When, as here, the government is not a contracting party, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure," as "is customary in

reviewing economic and social regulation." *Energy Reserves,* 103 S.Ct. at 705–06 (citation omitted); *see also Block v. Hirsh,* 41 S. Ct. 458, 460 (1921).

Here, the provisions of the Emergency Housing Bills are reasonable and necessary to keep tenants in their homes and small businesses afloat. Each challenged provision is temporary, each allows evictions where harm is imminent, and most are limited to tenants who have lost income due to the COVID-19 pandemic. *See, e.g.*, Phila. Code § 9-809(6)(a) (prohibiting late fees for residential tenants who experience a COVID-19 financial hardship only). Rather than requiring landlords to "bear all of the financial burden," Am. Compl. ¶ 63, the Bills spread the income shocks experienced directly by tenants who lost jobs or business as a result of COVID-19 or the related shut-down orders over a broader segment of society that includes landlords.

Further, without these measures, some tenants might face eviction for failure to pay rent as a result of lost income due to the pandemic. Others might be afraid of the effect of an eviction on their credit, overwhelmed by paying back rent—with compounding interest and late fees—all at once, or conclude that it is not worth fighting an eviction notice, and decide to voluntarily vacate. City Council could reasonably infer a connection between evictions—in which people cannot stay home, must move around in close contact, and often end up living with other people or in shelters—and COVID-19.[6] As Chief Justice Roberts recently explained, "When [politically accountable] officials "undertake[] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." *S. Bay United*, 140 S. Ct. at 1613.

Thus, the City's temporary measures represent reasonable judgments about what was and is necessary to limit evictions during this tumultuous time. Particularly given the deference to

---

[6] *See, e.g.*, *Order of the Governor of the Commonwealth of Pennsylvania for Staying the Notice Requirements for Certain Actions Related to the Dispossession of Property* (May 7, 2020), *available at* ECF 28-6 at 46 (noting displacement of individuals from their homes "constitutes a public health danger to the Commonwealth in the form of unnecessary movement that increases the risk of community spread of COVID-19"), *cited in* Am. Compl. ¶ 28.

which the City's reasonableness and necessity judgments are entitled, each provision of the Bills satisfies the limited demands of the Contracts Clauses.

        **B.**        **The Bills Satisfy Rational Basis Review Under Substantive Due Process**

In Counts Six and Seven, HAPCO also contends that the provisions of the Emergency Housing Bills violate landlords' substantive due process rights[7] under the federal and Pennsylvania constitutions. Because the Emergency Housing Bills pass muster under the Contracts Clause, and because scrutiny under the Contracts Clause, deferential as it is, is still more exacting than the rational basis scrutiny applicable here, the Bills also necessarily satisfy rational basis review. *See Am. Exp. Travel*, 669 F.3d at 369 (noting Contracts Clause "review of legislative judgment is more exacting than the rational basis standard applied in the due process analysis" (citing *Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 733 (1984)); *see also* Am. Compl. ¶¶ 121, 125, 132 (applying rational basis test).

        **C.**        **HAPCO Has Not Properly Pled a Facial Takings Challenge**

In Counts Three and Four, HAPCO brings a facial challenge to the diversion program, eviction moratorium, notice, and hardship repayment provisions of the Emergency Housing Bills under the Takings Clauses of the Fifth and Fourteenth Amendments and the Pennsylvania Constitution. *See* Am. Cmpl. ¶¶ 10, 85. But HAPCO's takings challenge fails as a matter of law.

A facial challenge under the Takings Clause "attacks the 'underlying validity' of a law or regulation" on the theory that "'[n]o amount of compensation can authorize a taking rooted in a facially invalid law.'" *Knick v. Twp. of Scott (Knick I)*, 862 F.3d 310, 324–25 (3d Cir. 2017) (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005)), *vacated and remanded on other grounds, Knick v. Twp. of Scott (Knick II)*, 139 S. Ct. 2162 (2019). The only issue on a facial challenge under the Takings Clause—as opposed to the Due Process Clause, *see supra*

---

[7] Although "procedural due process," Am. Compl. ¶ 124, is briefly referenced, that claim is not properly pled as there is no identification of what process was due but allegedly not provided.

Part IV.B—is "for lacking a public purpose." *Knick I*, 862 F.3d at 326. By contrast, an as-applied challenge seeks monetary compensation for government interference with property rights that rises above a certain threshold. *See Lingle*, 544 U.S. at 536.

Rather than seeking "just compensation," HAPCO seeks a declaration that the Bills are "unconstitutional on [their] face," Am. Compl. ¶ 10.[8] Because HAPCO brings a facial challenge, the only issue is whether the various provisions in the Emergency Housing Bills have a public purpose. But HAPCO has not pled an invalid purpose, and as discussed above in Sections IV.A.2 and IV.B, the Bills easily satisfy rational basis and the purpose requirement of the Contracts Clause analysis. *See Hawaii Hous. Auth. v. Midkiff*, 104 S. Ct. 2321, 2329 (1984) ("The 'public use' requirement [of the Takings Clause] is thus coterminous with the scope of a sovereign's police powers."). HAPCO's facial challenge fails to state a takings claim.

### D. *Warren* Establishes the Bills Are Not Preempted by the Landlord-Tenant Act

The Pennsylvania Supreme Court has expressly held that the City of Philadelphia has the legal authority to limit the basis for eviction, require landlords to provide additional notice prior to eviction, and impose limits on the rent a landlord can charge. *See Warren v. City of Philadelphia*, 115 A.2d 218 (Pa. 1955). Approximately 65 years ago, in a strikingly similar case, the Pennsylvania Supreme Court rejected the claim HAPCO makes today—that the City's imposition of eviction and rent controls is preempted by the Pennsylvania Landlord and Tenant Act of 1951 (the "Landlord-Tenant Act"), 68 P.S. §§ 250.101 *et seq*. Because the Court in *Warren* held that the Landlord-Tenant Act did not preempt Philadelphia's regulation of landlord-tenant relations and evictions, HAPCO's preemption claim in Count V fails.

---

[8] Nor could HAPCO seek compensation in this lawsuit, as it has not alleged that it itself has any property, i.e., a lease, that has allegedly been taken. Even then, because the Bills do not remove the obligation to pay rent, a landlord could not plausibly maintain that the Bills deprive them of all economically viable use of their property. *See, e.g.*, *Elmsford Apartment Assocs., LLC v. Cuomo*, No. 20-CV-4062 (CM), 2020 WL 3498456, at *9 (S.D.N.Y. June 29, 2020).

According to the Amended Complaint, the Bills are preempted under the doctrine of conflict preemption because each one "contradicts, contravenes, or is inconsistent" with the Landlord-Tenant Act. Am. Compl. ¶¶ 102-103 (quoting *Holt's Cigar*, 10 A.3d at 907). HAPCO alleges that the Bills conflict with the Act because they "strip landlords of" the "absolute right to seek repossession of their property" provided by the Act. *Id.* ¶¶ 105-106. But the Pennsylvania Supreme Court has held that the Landlord-Tenant Act does not regulate the substantive legal bases for eviction, making clear that the examples provided are merely illustrative not regulatory. In 1955, the City of Philadelphia passed an ordinance in response to a housing emergency that provided for rent control, required notice before eviction, and limited the legal bases for eviction. *See Warren*, 115 A.2d at 219 n.1. In particular, the ordinance expressly prohibited eviction on the ground that the lease had ended and required several additional types of notice prior to eviction. *See id*. (providing "evictions shall not be had unless '(1) The tenant has violated a substantial obligation of his tenancy o*ther than the obligation to surrender possession*" (emphasis added)). Landlords challenged the ordinance, in part, on the ground that it was preempted by the Landlord-Tenant Act. *See id.* at 221. The Court held that the Landlord-Tenant Act "sets up the procedure whereby a landlord may repossess premises if he has a *right* to evict the tenant. The substantive law as to *when* he has a right to evict is not touched upon. The Landlord and Tenant Act is not an exercise of police powers by the state, and hence is not in derogation of the police power of the city." *Id.* (emphasis in original).

Contrary to HAPCO's claims, there are no conflicts here. The Bills do not change the applicable procedure under the Act, but temporarily limit what circumstances may legally constitute default in Philadelphia during the relevant period. *See, e.g.,* Phila. Code § 9-809(3) (evictions limited to imminent harm).[9] Under *Warren*, the City is free to limit the circumstances

---

[9] The diversion program authorized by Bill 200294 is even more benign. While the Bill makes it

14

"*when* [a landlord] has a right to evict." 115 A.2d at 221.  Just as the City in 1955 could impose limitations on rent, require additional notice prior to eviction, and prohibit eviction at the end of a lease term, the City can now, subject to the constitutional constraints discussed above, temporarily limit evictions to cases of imminent harm.  Without a legal basis for eviction, a landlord has no cause to issue a notice to quit or file an eviction complaint in the first place.

HAPCO also claims the Bills prohibit collecting rent, late fees, and interest during the COVID-19 emergency period. Am. Compl. ¶ 112. But no provision imposes any limit on landlords' ability to seek and collect monthly rent if due, as HAPCO elsewhere acknowledges. *See id.* ¶ 86 ("the Act purports to allow owners to recover rent at some later date"). And the late fee and interest waiver provision is consistent with the Act.  The Act provides that "interest . . . *may* be allowed if deemed equitable, " 68 P.S. § 250.301 (emphasis added), but the Act does not require that interest be awarded or mention late fees at all.[10]  Moreover, the waiver provision is limited to those tenants who have lost income due to COVID-19, consistent with the Act's implicit provision that interest is not available where it would be not be "equitable."

Because the Bills do not conflict with the Landlord-Tenant Act as interpreted by *Warren*, the Act does not preempt them.

## V.     CONCLUSION

For all of the foregoing reasons, the Complaint should be dismissed with prejudice.

---

unlawful, absent imminent harm, to begin eviction proceedings within thirty days without participating in a conciliation conference if scheduled, the Bill itself does not change the eviction procedure.  Instead, it builds on the thirty-day notice provision of Bill 200305, which does limit the legal basis for eviction.  As discussed above, that is permissible under *Warren*.

[10] Similarly, HAPCO's passing reference to confession-of-judgment provisions in leases being voided by the Bills also does not raise a preemption issue.  *See* Am. Compl. ¶¶ 110-111. The Landlord-Tenant Act does not provide for confession of judgment; it merely clarifies that the Act does not abolish that procedure if elsewhere authorized.  *See* 68 P.S. § 250.511.

Respectfully submitted,

CITY OF PHILADELPHIA LAW DEPARTMENT
MARCEL S. PRATT, CITY SOLICITOR

Dated: August 28, 2020 /s/ Eleanor N. Ewing
ELEANOR N. EWING (PA ID No. 28226)
Chief Deputy City Solicitor
BENJAMIN H. FIELD (PA ID No. 204569)
Divisional Deputy City Solicitor
LYDIA FURST (PA ID No. 307450)
Deputy City Solicitor
MICHAEL PFAUTZ (PA ID No. 325323)
Assistant City Solicitor
Affirmative & Special Litigation
CITY OF PHILADELPHIA LAW DEPARTMENT
1515 Arch Street, 15th Floor
Philadelphia, PA 19102
Phone: (215) 683-5014
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I, Michael Pfautz, hereby certify that on August 28, 2020, I caused a true and correct copy of the foregoing Defendants' Motion to Dismiss and accompanying Memorandum of Law and Exhibit to be served via CM/ECF filing upon counsel for all parties.

/s/ Michael Pfautz
Michael Pfautz, Assistant City Solicitor

Dated: August 28, 2020